**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS and KEVIN LYNCH,<br><br>                                        Plaintiffs,<br><br>        -against-<br><br>MAESTRA MUSIC, INC.;<br>ARTS IGNITE INC. d/b/a Musicians United for Social Equity (MUSE); and WICKED LLC,<br><br>                                        Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1.      Broadway is known for breaking rules, suspending reality, and—in the case of the blockbuster musical *Wicked*—defying gravity.

2.      But one thing Broadway can't defy is the law, including the many laws banning status-based discrimination. Sadly, even in the year 2026, major players in the New York theater community remain committed to that illegal project.

3.      Two prominent employment directories—Maestra and MUSE—connect aspiring Broadway musicians with real Broadway jobs. But both directories ban musicians who are male (Maestra) or white (MUSE).

4.      That practice is not remotely legal, under a slew of federal, state, and city laws. And when *Wicked* created a paid position open only to members of Maestra and MUSE, it excluded and harmed musicians who could not fairly compete based on race and sex. These directories continue to exclude musicians based on immutable characteristics that they cannot control.

5.    On Broadway, discrimination against white males might be seen as a necessary evil—or even for good. But under the law, discrimination is "invidious in all contexts." *SFFA v. Harvard*, 600 U.S. 181, 214 (2023). As Justice Jackson just reiterated for a unanimous Supreme Court, antidiscrimination laws "establis[h] the same protections for every 'individual'—without regard to that individual's membership in a minority or majority group." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 310 (2025).

6.    Wicked violated the law in the past, and Maestra and MUSE continue to violate it every day. This Court should award all appropriate relief.

## PARTIES

7.    Defendant Maestra Music, Inc., is a Manhattan-based nonprofit. Maestra runs an employment directory for female and nonbinary musicians in the New York theater industry. Maestra is one of the entities responsible for the Music Director Experience, a paid opportunity with the musical *Wicked*.

8.    Defendant Arts Ignite Inc. is a Manhattan-based nonprofit. MUSE is an initiative of Arts Ignite and a sister organization to Maestra. MUSE runs an employment directory for musicians of color. MUSE is one of the entities responsible for the Music Director Experience.

9.    Defendant Wicked LLC is the company that stages the blockbuster Broadway musical *Wicked*. In 2023, Wicked collaborated with Maestra and MUSE to create and run the Music Director Experience.

10.     Plaintiff American Alliance for Equal Rights is a nationwide membership organization dedicated to ending illegal discrimination across the United States. This challenge to practices that discriminate based on race and other immutable characteristics is squarely within the Alliance's mission. *See, e.g.*, *AAER v. Fearless Fund*, 103 F.4th 765, 769-70 (11th Cir. 2024); *AAER v. ABA*, 2026 WL 161596, at *1 (N.D. Ill. Jan. 21).

11.     Plaintiff Kevin Lynch is a composer and musician in the New York tristate area. Lynch is a white male. In 2023, Lynch was barred from Maestra's and MUSE's directories and from Wicked's Music Director Experience based on his race and sex. Lynch is a member of the Alliance.

**JURISDICTION AND VENUE**

12.     This Court has federal-question jurisdiction under 28 U.S.C. §1331 because this case "arise[s] under" federal statutes like 42 U.S.C. §1981. This Court has supplemental jurisdiction over the state and local claims under 28 U.S.C. §1367 because they "derive from a common nucleus of operative fact": the same discrimination against Lynch that violates federal law. *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725 (1966).

13.     Venue is proper under 28 U.S.C. §1391 because Defendants reside here and the challenged discrimination occurred here.

**FACTUAL ALLEGATIONS**

14.     In late June 2023, Maestra announced an opening on its public Facebook page. As the post explained, Maestra was "teaming up" with MUSE to sponsor the "Music Director Experience with the Broadway blockbuster WICKED."

15.     This opportunity was a "three-week intensive" for "aspiring music direc-

tors looking to make a big leap." In exchange for a "weekly stipend," the selected par-

ticipant would attend rehearsals and performances of *Wicked*, study the musical score,

and get "practical playing and conducting experience by working with the Music Direc-

tor one-on-one."



16.     A graphic that accompanied the post stressed that the Music Director

Experience was "for MUSE and Maestra **directory members**."



17. The post linked to a Google form that applicants had to use to submit their applications. *See* MUSE/Maestra MD Experience Application, perma.cc/YFC3-XGTE. Applications were due on July 10, 2023.

18. This same post and same graphic appeared with insignificant variations on several other websites and social-media pages belonging to or associated with Maestra, MUSE, and Wicked. *See, e.g.*, MUSE, Mentorship Programs, perma.cc/BW5P-VS2P; Stephen Oremus, Instagram (June 28, 2023), perma.cc/UX3Z-SQ6H; AlvinHoughPiano, Instagram (June 29, 2023), perma.cc/64XJ-9RXY; Alvin Hough, Jr., Facebook (June 30, 2023), perma.cc/85YD-KKTP; Georgia Stitt, Facebook (June 29, 2023), perma.cc/E3SR-MS4Y. These ads circulated at the prompting of Maestra, MUSE, and Wicked, which used the pages to increase applications for the position.

19. Several Broadway trade publications also advertised the Wicked Music Director Experience. These advertisements repeated that the experience was an exclusive opportunity for Maestra and MUSE directory members and encouraged applicants to use the Google form. *See, e.g.*, Andy Lefkowitz, *'Wicked' Teams Up with Nonprofits MUSE and MAESTRA for 'Music Director Experience'*, Broadway News (June 28, 2023), perma.cc/KBQ3-DMM7; Logan Culwell-Block, *New Program Will Allow Early-Career Musicians to Shadow Music Team at Broadway's* Wicked, Playbill (June 28, 2023), perma.cc/6PC6-6ECL; Playbill, Facebook (June 28, 2023), perma.cc/N4ZU-VM9N; Chloe Rabinowitz, *WICKED to Launch Three-Week Intensive for Aspiring Music Directors With MUSE and MAESTRA*, Broadway World (June 28, 2023), perma.cc/28D5-

PDTN; Broadway World, Twitter (June 28, 2023), perma.cc/NC6R-PSX7. These trade publications published these ads at the urging of Maestra, MUSE, and Wicked, which intentionally provided them information about the position to get the word out.

20.    Lynch, an aspiring Broadway music director, had previous experience as a music director for regional and community theater productions. So when he saw the announcement for a music-directing opportunity that would take him to Broadway, he applied. Lynch, who has a music degree and experience working as an accompanist at Juilliard, was well-qualified.

21.    But when Lynch pulled up the Google form, he discovered that the application could not be completed unless the applicant first joined the MUSE or Maestra directory. The form stated: "[W]e are extremely pleased to be offering this pipeline program *exclusively* to NYC (Tri-State) area MUSE and MAESTRA Directory members." (Emphasis added.)



## MUSE/Maestra MD Experience Application

Announcing the Music Director (MD) Experience initiative from MUSE and MAESTRA. In partnership with the blockbuster musical, WICKED, we are extremely pleased to be offering this pipeline program open exclusively to NYC (Tri-State) area MUSE and MAESTRA Directory members who are emerging MDs looking to make a big leap in their MD journeys.

22. The form also required applicants to answer the question, "Are you a member of the MUSE and/or Maestra Directories?" and to "Drop your MUSE and/or MAESTRA Directory profile link(s) below." It was impossible to submit the application without responding to these prompts.

23. The form directed applicants to pages where they could register for the MUSE and Maestra directories, if they were not already members. Because he sincerely wanted to apply for the Music Director Experience, Lynch attempted to sign up for both directories on June 28, 2023.

24. For Maestra's directory, the registration page instructed musicians to register only if they were "female or non-binary musician[s] working in the theater."

25.     Though Lynch is male and does not identify as nonbinary, he completed a profile with accurate information, including a photograph of himself. The website created a link to his page in the Maestra directory. But that page was not publicly listed or searchable within the Maestra directory, unless and until Maestra reviewed and approved Lynch's application.

26.     That same day, Lynch tried to create a profile for the MUSE directory. According to the registration page, the MUSE directory is for "Person[s] of Color who identif[y] as … musician[s]."

> **To join the MUSE Directory:**
> Are you a Person of Color who identifies as a musician? This includes composers, music directors, arrangers, orchestrators, copyists, conductors, pit musicians, music assistants, rehearsal pianists, contractors, songwriters, voice teachers, musical theater educators, recording engineers, keyboard programmers, sound designers, lyricists, and bookwriters. And yes, students studying to do these things professionally are also welcome.
>
> If this is you, please register below to join the MUSE Directory. **You must then use your new login to create a personal profile page.** You'll receive a confirmation email once you've been approved.

27.     Though Lynch is a musician, he does not identify as a person of color. Even so, Lynch registered for a MUSE profile. Unlike the Maestra directory, the MUSE directory did not immediately generate a link to a profile page for Lynch, private or otherwise.

28.     Lynch used the link to his new profile on the Maestra directory to submit a complete and timely application for the Music Director Experience on June 28.

29.     On July 5, a week after creating his Maestra profile and submitting his Music Director Experience application, Lynch asked Maestra when his profile would be made public within the directory. Lynch received an email from Maestra in response,

stating that his "profile application ha[d] been denied." The email indicated that there were two "[c]ommon" reasons for denial: (1) "[y]our pending profile remained incomplete for too long"; or (2) "[y]our application did not indicate that your profile belongs in the Maestra community." Because Lynch had completed his profile, he was rejected for being male.

30. After he received this email from Maestra, Lynch's Maestra directory page (which had never been publicly searchable) was completely removed.

31. Lynch simultaneously emailed MUSE to follow up about the status of his profile in that directory. As Lynch noted in the email, he had registered for a profile on June 28, but his profile did not appear on the website. MUSE never responded. To this day, MUSE has not added Lynch to its directory.

32. In August 2023, Maestra and MUSE publicly announced the winning applicant for the Music Director Experience: a female and nonbinary person of color who was a member of Maestra's directory.

33. The winning applicant was a singer-songwriter without significant experience as a music director, even though prior music directing experience was "necessary to be considered" for the position. Lynch, by contrast, had previously music directed for over 100 performances—and had won a local award for music directing in 2014.

34. The winning applicant went on to be quite successful in Manhattan theater, attributing that subsequent professional success to the Music Director Experience:

9

"Since the MD Experience, I've gotten six jobs. I've music directed seven new works. … It's been great, I'm getting jobs, getting paid, and then hiring people."

35.    Despite the emphasis on visual diversity characteristics like race and sex, the Maestra and MUSE directories are not for on-stage actors. *Wicked*, for example, has a closed pit—meaning the orchestra and conductor are purposefully invisible to the audience. The apprentice shadowing the conductor for the Music Director Experience likewise was not visible to the audience.

36.    Lynch still wants to be listed in the Maestra and MUSE directories. These lists help musicians get work on and off Broadway, and Lynch continues to seek that work.

37.    Lynch maintains an active profile on the RISE Theatre Directory, a distinct professional directory that is also run by Maestra but that does not outright bar white males from access. RISE does limit Lynch's ability to get work vis-à-vis other directory members, however, because it lets prospective employers filter directory members by race and sex.

38.    If a court ordered Maestra and MUSE to stop discriminating, Lynch would immediately reapply to join both directories. He still has all the necessary information from his prior failed attempts.

10

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. §1981
### (Music Director Experience)
### [By Lynch; Against All Defendants]

39.     Plaintiffs repeat and reallege each of the prior allegations.

40.     Section 1981 guarantees "[a]ll persons … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). It prohibits discrimination by "nongovernmental" actors like Maestra, MUSE, and Wicked. §1981(c). And it authorizes equitable and legal relief, including damages. *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459-60 (1975).

41.     Lynch is protected by §1981, as its "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp.*, 427 U.S. 273, 295 (1976). Titled "Equal rights under the law," §1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019), by protecting the "equal right of all persons … to make and enforce contracts without respect to race," *Domino's Pizza v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up); *accord McDonald*, 427 U.S. at 287 (holding that "[§]1981 is applicable to racial discrimination … against white persons"); *Freeport v. Barrella*, 814 F.3d 594, 605 (2d Cir. 2016) (explaining that "§1981 also forbids so-called 'reverse discrimination'"); *Killin v. Buttercup CT*, 2025 WL 2173993, at *6 n.1 (D. Conn. July 31) ("The Supreme Court and the Second Circuit have made it clear … that white litigants are not restricted from pursuing claims under §1981 on the basis of discrimination against their race.").

11

42. Section 1981 "protects 'would-be contractor[s]' … to the same extent that it protects contracting parties." *Fearless Fund*, 103 F.4th at 776. The statute "offers relief when racial discrimination blocks the creation of a contractual relationship." *Domino's*, 546 U.S. at 476. A contract under §1981 includes "an agreement to do, or refrain from doing, a particular thing, upon sufficient consideration." *Fearless Fund*, 103 F.4th at 775 (quoting 17A Am. Jur. 2d Contracts §1).

43. Employment, at will or otherwise, is "a 'contract' within the meaning of 42 U.S.C. §1981." *Whidbee v. Garzarelli Food Specialties*, 223 F.3d 62, 68 (2d Cir. 2000). Section 1981 "thus outlaws discrimination with respect to … employment," *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004), including discriminatory failures to hire. *See Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 442 (7th Cir. 2014); *Barbour v. Merrill*, 48 F.3d 1270, 1276 (D.C. Cir. 1995). Because paid internships and apprenticeships are also contracts, *Mihalakis v. Cabrini Med. Ctr. (CMC)*, 542 N.Y.S.2d 988, 990 (1st Dep't 1989); *Overseers of Town of Guilderland v. Overseers of Town of Knox*, 5 Cow. 363 (N.Y. Sup. Ct. 1826); *Amendola v. A.C. Elec. Co.*, 608 N.Y.S.2d 279, 279-80 (2d Dep't 1994), they are likewise covered by §1981.

44. Lynch sought to contract with Maestra, MUSE, and Wicked. In exchange for his work as an apprentice music director and satisfying other "[d]ay-to-day duties," Lynch would have been "paid" a "modest … weekly stipend" and received other valuable benefits.

12

45. Maestra, MUSE, and Wicked were all parties to the contract. According to the ads for the role, the three entities "team[ed] up" to create the job, select the winner, and pay that person. As the accompanying graphic made clear, the position was an "initiative" of Maestra, MUSE, and Wicked. A contemporary industry publication explained that Wicked "launch[ed]" the position with MUSE and Maestra. In rendering Lynch ineligible and denying him a fair opportunity to apply and compete, all three parties refused to contract with him on equal terms.

46. Maestra, MUSE, and Wicked directly discriminated against Lynch. By limiting eligibility for the position to members of the MUSE directory—who are necessarily people of color—Maestra, MUSE, and Wicked facially discriminated based on race. Because their policy was "discriminatory on its face," the *McDonnell Douglas* burden-shifting framework is inapplicable. *Trans World Airlines v. Thurston*, 469 U.S. 111, 121 (1985); *see Johnson v. New York*, 49 F.3d 75, 78-79 (2d Cir. 1995).

47. If Lynch had been a person of color, he could have competed on an equal basis for the Music Director Experience. Lynch's race was a but-for cause of Maestra, MUSE, and Wicked's refusal to contract with him on equal terms. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020). Absent the discrimination, Lynch also would have been selected: He had extensive previous music directing experience, far more than the applicant who was ultimately offered the position.

48. Defendants' racial discrimination cannot satisfy strict scrutiny. "Any exception" to federal guarantees of equal protection "must survive" that "daunting two-

13

step examination." *Harvard*, 600 U.S. at 206 (cleaned up). That test first asks "whether the racial classification is used to further compelling governmental interests." *Id.* at 206-07. It then asks "whether the government's use of race is narrowly tailored—meaning necessary—to achieve that interest." *Id.*; *see also Gratz v. Bollinger*, 539 U.S. 244, 270 (2003).

49.    The Supreme Court has recognized only two interests that are sufficiently compelling: (1) avoiding imminent and serious risks to human safety in prisons, as in a race riot; and (2) remediating specific, identified instances of unlawful past discrimination. *See Louisiana v. Callais*, 146 S. Ct. 1131, 1152 (2026). Maestra, MUSE, and Wicked do not promote prison safety. And they do not claim to have been remedying specific, identified instances of illegal discrimination.

50.    Even if the discrimination by Maestra, MUSE, and Wicked served a compelling interest, their blanket ban on white male applicants was not narrowly tailored. It would have been possible to remedy any past discrimination without outright excluding all white males.

51.    Wicked, Maestra, and MUSE are liable for punitive damages. They launched the discriminatory Music Director Experience the very week the Supreme Court decided *SFFA v. Harvard*. And these entities used subterfuge to conceal their lawbreaking. Rather than state "no white males need apply," they linked the requirements for the job to membership in two directories that were (and are) closed to white

males. They knew explicit race-based discrimination violated the law, so they tried to make it look like they were not facially discriminating.

## COUNT II
## 42 U.S.C. §1981
## (MUSE Directory)
## [By All Plaintiffs; Against MUSE]

52.     Plaintiffs repeat and reallege each of the prior allegations.

53.     MUSE refuses to add Lynch to its directory solely because of his race.

54.     MUSE admits only people of color. The "**Requirements**" to join the MUSE directory include that the applicant is a "Person of Color who identifies as a Musician working, interested or aspiring to the theater." Because he works in the theater industry, including as a "compose[r]" and "music directo[r]," Lynch satisfies all the non-ethnic criteria to join MUSE's directory.

55.     If MUSE stops excluding him based on race, Lynch will immediately join the MUSE directory.

56.     MUSE's continuing refusal to admit Lynch violates §1981's ban on racial discrimination in contracting.

57.     A job seeker enters a contract when he joins MUSE's directory. According to MUSE's privacy policy, when a directory applicant "submit[s] information to or through the Site," he is "consenting to the collection, processing, and retention of [his] information as described in this Privacy Policy." In exchange for access to the valuable opportunities provided through the MUSE directory, directory members let MUSE use

"[a]ny information [they] submit … for a variety of purposes." This contract also includes a choice-of-law clause (that selects American law, not foreign law).

58.    By refusing to let Lynch join its directory, MUSE is refusing to contract with Lynch. It is, at minimum, refusing to give Lynch the equal benefit of any contract he entered when he applied to join the directory.

59.    Separately, MUSE's failure to refer Lynch for employment and other contractual opportunities violates §1981. "By discriminating against the plaintiff through a refusal to refer him for jobs, [MUSE] intentionally deprived [Lynch] of the ability to enter into contracts with employers, and this manner of discrimination falls squarely within the prohibition of § 1981." *Daniels v. Pipefitters' Ass'n Loc. Union No. 597*, 945 F.2d 906, 915 (7th Cir. 1991).

## COUNT III
## New York State Human Rights Law
## N.Y. Exec. Law §296
## (Music Director Experience)
## [By Lynch; Against All Defendants]

60.    Plaintiffs repeat and reallege each of the prior allegations.

61.    The Music Director Experience was an employment opportunity from which Lynch was unlawfully excluded based on his race and sex.

62.    Under the New York State Human Rights Law, it is "an unlawful discriminatory practice" for an employer "to refuse to hire or employ" an individual or "to bar … [him] from employment" "because of [his] … race, … color, … [or] sex." N.Y. Exec. Law §296(1)(a).

16

63. Maestra, MUSE, and Wicked discriminated against Lynch in employment based on his race and sex. All three entities were joint employers under New York law because they jointly created the paid Music Director Experience position, set its terms, and selected the individual to fill it. *See Greenberg v. Seton Educ. Partners*, 227 N.Y.S.3d 870, 875-76 (N.Y. Sup. Ct. 2025).

64. Maestra, MUSE, and Wicked discriminated against Lynch by refusing to consider him equally for the Music Director Experience based on his race and sex. Only members of the Maestra and MUSE Directories were eligible to apply. Lynch could not qualify for the Maestra directory because he is male, and he could not qualify for the MUSE directory because he is white. He was then rejected, over someone who was not white or male, even though that person did not satisfy the position's stated criteria.

65. The NYSHRL also prohibits "an employment agency" from "discriminat[ing] against any individual because of … [his] race, … color, … [or] sex … in receiving, classifying, disposing or otherwise acting upon applications for its services or in referring an applicant … to an employer or employers." N.Y. Exec. Law §296(1)(b).

66. Maestra and MUSE are employment agencies. "The term 'employment agency' includes any person undertaking to procure employees or opportunities to work." N.Y. Exec. Law §292(2). Maestra and MUSE undertake to procure opportunities for musicians to work in the New York theater industry.

67. MUSE runs the MUSE directory, an employment directory that matches musicians with suitable work in the theater industry. It allows prospective employers to

screen would-be employees by experience (Broadway versus Off-Broadway versus Regional), expertise (Composer versus Music Director versus Librettist), instruments (cello versus flute versus saxophone), and racial identity ("African Descent" versus "Latine" versus "API" versus "Indigenous" versus "MENA"). A musician cannot "become a member" of the directory unless he satisfies the "Requiremen[t]" that he be a "Person of Color."

68.    MUSE illegally discriminated against Lynch based on race. It refused to recommend him for employment—and declined to list him in its employment directory—because he is not a "Person of Color." Lynch suffered a completed legal violation at least in summer 2023, when he tried to create a profile in the MUSE employment directory. MUSE rejected his profile because he is white.

69.    Maestra runs the Maestra directory—another employment directory that matches musicians with suitable work in the New York theater industry. The only salient difference between Maestra and its sister organization MUSE is that Maestra discriminates based on sex too. The Maestra directory lets employers sort through hundreds of musician profiles, filtering them by experience, expertise, and instruments. It also allows them to view only "persons of color." Individuals cannot "Join The Maestra Directory" unless they "are … female or gender-expansive musician[s] who wor[k] in musical theater or opera."

70.    Maestra illegally discriminated against Lynch based on sex. It refused to recommend him for employment—and declined to list him in the Maestra directory—

because he is not "female or gender-expansive." Lynch is male and identifies as male. Lynch suffered a completed legal violation at least in summer 2023, when he tried to create a profile in the Maestra directory. After reviewing his profile and determining that he was male, Maestra removed it.

71. The NYSHRL also makes it illegal "[f]or any employer or employment agency to print or circulate or cause to be printed or circulated any statement, advertisement or publication, or to use any form of application for employment or to make any inquiry in connection with prospective employment, which expresses directly or indirectly, any limitation, specification or discrimination as to … race, … [or], sex … or any intent to make any such limitation, specification or discrimination." N.Y. Exec. Law §296(1)(d).

72. Maestra, MUSE, and Wicked all violated this provision by circulating ads—and causing others to circulate ads—for the Music Director Experience via social media and trade publications. *Supra* ¶¶14-19. These ads stated (among other materially identical formulations) that the opportunity was only "for MUSE and Maestra directory members." Because MUSE excludes white people and Maestra excludes men, these ads expressed an intent to discriminate against white males like Lynch.

73. The NYSHRL authorizes punitive damages for employment discrimination. *See* N.Y. Exec. Law §297(9) ("Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages, including, in cases of employment discrimination related to private

employers … punitive damages."); *see also Diggs v. Oscar De La Renta, LLC*, 94 N.Y.S.3d 574, 576 (2d Dep't 2019). "A prevailing party is entitled to punitive damages under … the NYSHRL where defendants engaged in intentional discrimination with malice or reckless indifference to plaintiff's … rights." *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 100 (E.D.N.Y. 2020) (cleaned up). Lynch is entitled to punitive damages because Defendants contrived to conceal their racial and sex-based discrimination and chose to discriminate based on race the very week the Supreme Court decided *Harvard*. *See supra* ¶51.

74.    The NYSHRL also makes it unlawful to "refuse to hire …  or to bar … from internship an intern … because of the intern's … race, … color, … [or] sex" and to "discriminate against an intern in receiving, classifying, disposing or otherwise acting upon applications for internships" on those grounds. N.Y. Exec. Law §296-c(2)(a)-(b). Even if the Music Director Experience did not qualify as traditional employment, it was at least an internship. It "provide[d] … training … [to] enhance … employability" in Manhattan theater; it "provide[d] experience for the benefit of" the person selected for the position; it "d[id] not displace regular employees" of Maestra, MUSE, and Wicked; and it was "performed under the close supervision of existing staff." §296-c(1)(c). As the Google application form explained: "Day to day duties ... include[d] observing cast rehearsals, observing performances from both the orchestra pit and the sound board, studying one of the keyboard books from the show, and gaining practical playing and conducting experience by working with the Music Director one on one." It was a "3-

20

week intensive shadowing engagement" intended to be a "pipeline program" for "emerging [music directors] looking to make a big leap in their [music director] journeys."

75.     Maestra, MUSE, and Wicked barred Lynch from the Music Director Experience and discriminated against him. They openly deterred him and other white males from applying, announced that such applicants were categorically ineligible, and refused to let him equally compete because he is a white male.

76.     The NYSHRL likewise makes it illegal to "print or circulate or cause to be printed or circulated any statement, advertisement or publication, or to use any form of application for employment as an intern or to make any inquiry in connection with prospective employment, which expresses directly or indirectly, any limitation, specification or discrimination as to … race, … color, … [or] sex." N.Y. Exec. Law §296-c(2)(c). Maestra, MUSE, and Wicked violated this law by advertising the Music Director Experience position as being open only to Maestra and MUSE directory members—*i.e.*, female and nonbinary people of color. *See supra* ¶¶14-19.

## COUNT IV
### N.Y. Civ. Rights Law §40-c
### (Music Director Experience)
### [By Lynch; Against All Defendants]

77.     Plaintiffs repeat and reallege each of the prior allegations.

78.     Under the New York State Civil Rights Law, "[n]o person shall, because of race … , color … [or] sex … be subjected to any discrimination in his or her civil

rights … by any other person or by any firm, corporation or institution." N.Y. Civ. Rights Law §40-c.

79.　As a 501(c)(3) nonprofit that operates multiple professional directories, Maestra is a "firm, corporation, or institution" subject to the NYSCRL.

80.　MUSE operates the professional directory of the 501(c)(3) nonprofit Arts Ignite Inc. MUSE and its parent organization each qualify as a "firm, corporation, or institution" subject to the NYSCRL.

81.　Wicked is a limited liability company. As a "firm, corporation, or institution," it is subject to the NYSCRL.

82.　"A valid cause of action based on a violation of the [New York State Human Rights Law] exposes the defendant to civil penalties under Section 40-c of the New York Civil Rights Law, recoverable by the person aggrieved." *Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 352 (E.D.N.Y. 2008) (cleaned up). So "facts sufficient to sustain a cause of action under [the New York State Human Rights Law] will support a cause of action under section 40–c of the Civil Rights Law." *Id.* at 353. (cleaned up); *see also Gordon v. PL Long Beach*, 903 N.Y.S.2d 461, 74 A.D.3d 880, 885 (2d Dep't 2010) (same).

83.　Maestra, MUSE, and Wicked are liable under the Civil Rights Law, §40-c, for the same reasons they are liable under the State Human Rights Law, Exec. Law §296. *See supra* ¶¶60-76.

84.    "Any person who shall violate [N.Y. Civ. Rights Law §40-c] … shall for each and every violation thereof be liable to a penalty of not less than one hundred dollars nor more than five hundred dollars," to be paid to the person "aggrieved thereby." N.Y. Civ. Rights Law §40-d.

85.    Maestra, MUSE, and Wicked each owe Lynch a $500 penalty for refusing to consider him for employment or an internship. Maestra and MUSE each owe Lynch a separate $500 penalty for rejecting him from their directories. And Maestra, MUSE, and Wicked each owe Lynch separate penalties for every individual discriminatory state-ment or advertisement that they circulated themselves or caused to be circulated by others. *See, e.g., supra* ¶¶14-19.

## COUNT V
### New York State Human Rights Law
### N.Y. Exec. Law §296
### (Maestra and MUSE Directories)
### [By All Plaintiffs; Against Maestra and MUSE]

86.    Plaintiffs repeat and reallege each of the prior allegations.

87.    Under New York state law, "an employment agency" may not "discrimi-nate against any individual because of … [his] race, … color, … [or] sex … in receiving, classifying, disposing or otherwise acting upon applications for its services or in refer-ring an applicant … to an employer or employers." N.Y. Exec. Law §296(1)(b); *see also Gordon*, 74 A.D.3d at 885 (facts sufficient for a New York State Human Rights Law claim also suffice for a New York Civil Rights Law claim).

23

88.    Maestra and MUSE are employment agencies because they run employment directories whose purpose is to connect musicians with employment in the New York theater industry. *See* N.Y. Exec. Law §292(2).

89.    Maestra continues to violate the NYSHRL and N.Y. Civil Rights Law §40-c by excluding male musicians, including Lynch, from its directory. Maestra is also violating these laws by allowing employers to sort musicians, including Lynch, by race in its separate RISE Directory.

90.    MUSE continues to violate NYSHRL and N.Y. Civil Rights Law §40-c by excluding white musicians, including Lynch, from its directory.

91.    Lynch is suffering from Maestra's and MUSE's ongoing legal violations. He continues to seek music-related work in the New York theater industry. His career would benefit from his inclusion in both the Maestra and MUSE directories. These directories still openly exclude white male musicians like Lynch. If a court ordered them to stop discriminating, Lynch would immediately create profiles in both directories. But his prior applications were denied, actually or constructively; and because he is not female, nonbinary, or a racial minority, reapplying would be futile.

**COUNT VI**
**New York City Human Rights Law**
**N.Y.C. Admin. Code §8-107**
**(Music Director Experience)**
**[By Lynch; Against All Defendants]**

92.    Plaintiffs repeat and reallege each of the prior allegations.

24

93. The New York City Human Rights Law makes it unlawful for any employer "[t]o refuse to hire or employ or to bar … from employment" any person based on race, color, or gender. N.Y.C. Admin. Code §8-107(1)(a)(2). "The protections of this chapter relating to employees apply to interns, freelancers and independent contractors." §8-107(23).

94. With the Music Director Experience, Maestra, MUSE, and Wicked all barred Lynch from employment—or, at the least, an internship—because he is a white male. *Supra* ¶¶61-64, ¶¶74-75.

95. The NYCHRL also makes it unlawful for any employment agency "to discriminate against any person" because of his race, color, or gender—including "in referring an applicant … for its services to an employer or employers." N.Y.C. Admin. Code §8-107(1)(b).

96. MUSE and Maestra violated this command by excluding Lynch from their directories because of his race and sex. *Supra* ¶¶65-70.

97. New York City makes it unlawful "[f]or any employer … or employment agency … to declare, print or circulate or cause to be declared, printed or circulated any statement, advertisement or publication, or to use any form of application for employment or to make any inquiry in connection with prospective employment, which expresses, directly or indirectly, any limitation, specification or discrimination as to" race, color, or gender "or any intent to make any such limitation, specification or discrimination." N.Y.C. Admin. Code §8-107(1)(d).

98.    Maestra, MUSE, and Wicked violated this ordinance when they colluded to advertise the Music Director Experience. *Supra* ¶¶14-19, 76.

99.    "[P]unitive damages in discrimination cases are available under … the local Administrative Code." *Farias v. Instructional Sys.*, 259 F.3d 91, 101 (2d Cir. 2001). "[T]he standard for determining punitive damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 43 (2d Cir. 2025) (quoting *Chauca v. Abraham*, 89 N.E.3d 475 (N.Y. 2017)). This standard is "lower than the federal standard." *Id.* For the reasons already explained, Maestra, MUSE, and Wicked owe Lynch punitive damages. *Supra* ¶51.

## COUNT VII
### New York City Human Rights Law
### N.Y.C. Admin. Code §8-107
### (Maestra and MUSE Directories)
### [By All Plaintiffs; Against Maestra and MUSE]

100.    Plaintiffs repeat and reallege each of the prior allegations.

101.    The NYCHRL makes it illegal for an "employment agency" to discriminate based on race, color, or sex "in referring an applicant or applicants for its services to an employer or employers," N.Y.C. Admin. Code §8-107(1)(b). It also makes it illegal to "circulate … any statement … which expresses … any limitation, specification or discrimination as to" race, color, or sex. *Id.* §8-107(1)(d).

102.   Maestra is breaking this law by running the Maestra Directory, which excludes men. It is also breaking this law by running a separate employment directory, the RISE Directory, which sorts potential employees by race.

103.   MUSE is breaking this law by running an employment directory that excludes white people. It is also breaking this law by classifying potential employees by race within its directory.

104.   Lynch has previously tried, without success, to join the Maestra and MUSE directories. Because of Maestra's and MUSE's blatant and intentional discrimination, it would currently be futile for him to re-apply. If a court ordered Maestra and MUSE to comply with the NYCHRL, Lynch would immediately join both directories.

## PRAYER FOR RELIEF

105.   Plaintiffs respectfully ask this Court to enter judgment in favor of Plaintiffs and against Defendants and to enter the following relief:

A. A declaratory judgment that the Maestra and MUSE directories violate 42 U.S.C. §1981, the New York State Human Rights Law, the New York State Civil Rights Law, and the New York City Human Rights Law;

B. A permanent injunction barring Maestra and MUSE from viewing or considering applicants' race or sex when deciding whether to add them to the directories;

C. A permanent injunction barring Maestra and MUSE from classifying individuals by race or sex in their directories;

D. Compensatory damages for Lynch;

E. Punitive damages for Lynch;

F. Nominal damages;

G. Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws; and

H. All other relief that Plaintiffs are entitled to.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Lynch demands a trial by jury of all issues so triable.

Dated: June 3, 2026

Respectfully submitted,

/s/ Daniel M. Vitagliano
Thomas R. McCarthy*
Cameron T. Norris*
Daniel M. Vitagliano[†]
   (SDNY Bar No. 5856703)
Tyler A. Dobbs*[†]
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
tom@consovoymccarthy.com
cam@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
tdobbs@consovoymccarthy.com

* Pro hac vice applications forthcoming
[†] Supervised by principals of the firm admitted to practice in Virginia

28