**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS and KEVIN LYNCH,<br><br>        *Plaintiffs*,<br><br>        v.<br><br>MAESTRA MUSIC, INC.; ARTS IGNITE INC. d/b/a MUSICIANS UNITED FOR SOCIAL EQUITY (MUSE); and WICKED LLC,<br><br>        *Defendants*. | Case No. 1:26-cv-04645-DLC<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WICKED LLC'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

MITCHELL SILBERBERG & KNUPP LLP

Jacob D. Albertson
Harrison A. Newman
437 Madison Ave., 25th Floor
New York, NY 10022
(212) 509-3900
j1a@msk.com
han@msk.com

Adam Levin (*pro hac vice*)
2049 Century Park East, 18th Floor
Los Angeles, CA 90067
(310) 312-3116
axl@msk.com

*Counsel for Defendant Wicked LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ...................................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................................... 3

I.      The Parties ............................................................................................................... 3

II.     The Music Director Experience ............................................................................... 3

III.    This Lawsuit ............................................................................................................. 5

LEGAL STANDARD ................................................................................................................. 6

ARGUMENT ........................................................................................................................... 7

I.      Lynch Fails to Plead a Section 1981 Claim Against Wicked (Count I). ............................ 7
        A.      The MD Experience Did Not Arise Under a Contract. ........................................... 8
        B.      Race Was Not a But-For Cause of Any Refusal by Wicked to Contract with
                Lynch. ....................................................................................................... 13

II.     Lynch Fails to Plead NYSHRL and NYCHRL Claims Against Wicked (Counts III
        and VI). ............................................................................................................... 15
        A.      The MD Experience Did Not Constitute Employment Under the NYSHRL or
                NYCHRL. .................................................................................................. 16
                1.      The MD Experience Participant Was Not Hired by Wicked. .................... 16
                2.      No Employment Relationship Existed Between the MD Experience
                        Participant and Wicked. ................................................................... 18
        B.      The MD Experience Did Not Constitute an Internship Under the NYSHRL or
                NYCHRL. .................................................................................................. 21
        C.      Neither Race Nor Gender Motivated Any Action Taken by Wicked. .................... 22
        D.      Wicked Did Not Circulate or Cause to Be Circulated Any Discriminatory
                Advertisement in Violation of the NYSHRL or NYCHRL. ............................... 24

III.    Lynch Fails to Plead a Section 40-c Claim Against Wicked (Count IV). ......................... 25

CONCLUSION ....................................................................................................................... 26

CASES

*Adam v. Obama for Am.*,
   210 F. Supp. 3d 979 (N.D. Ill. 2016) ................................................................12

*Allegheny Coll. v. Nat'l Chautauqua Cnty. Bank of Jamestown*,
   159 N.E. 173 (N.Y. 1927) .................................................................................9

*Amendola v. A.C. Electric Co.*,
   201 A.D.2d 689 (2d Dep't 1994) .....................................................................12

*Andrews v. Blick Art Materials, LLC*,
   268 F. Supp. 3d 381 (E.D.N.Y. 2017) ............................................................26

*Areu v. Fox News Network, LLC*,
   2021 WL 4124226 (S.D.N.Y. Sept. 9, 2021) ..............................................16, 18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................6, 15, 25

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...........................................................................................6

*Cityview Partners, LLC v. Mercedes*,
   2023 WL 1929716 (E.D.N.Y. Feb. 10, 2023) ..................................................10

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
   589 U.S. 327 (2020) .........................................................................................13

*Community for Creative Non-Violence v. Reid*,
   490 U.S. 730 (1989) .............................................................................18, 19, 20

*Davis v. Mich. Dep't of Treas.*,
   489 U.S. 803 (1989) .........................................................................................24

*Doe v. Columbia Univ.*,
   831 F.3d 46 (2d Cir. 2016) ................................................................................6

*Domino's Pizza, Inc. v. McDonald*,
   546 U.S. 470 (2006) ...........................................................................................8

*Eisenberg v. Advance Relocation & Storage, Inc.*,
   237 F.3d 111 (2d Cir. 2000) ............................................................................20

*Gaffney v. Dep't of Info. Tech. & Telecomms.*,
   536 F. Supp. 2d 445 (S.D.N.Y. 2008) ............................................................20

*Glaser v. Upright Citizens Brigade, LLC*,
377 F. Supp. 3d 387 (S.D.N.Y. 2019)......................................................................17

*Glatt v. Fox Searchlight Pictures, Inc.*,
811 F.3d 528 (2d Cir. 2016).....................................................................................21

*Goldstein v. Pataki*,
516 F.3d 50 (2d Cir. 2008).......................................................................................14

*Gooden v. Joseph P. Addabbo Fam. Health Ctr., Inc.*,
2023 WL 2709735 (E.D.N.Y. Mar. 30, 2023)........................................................24

*Hirsch v. Arthur Andersen & Co.*,
72 F.3d 1085 (2d Cir. 1995)...............................................................................14, 19

*Hollander v. Sears, Roebuck & Co.*,
450 F. Supp. 496 (D. Conn. 1978)................................................................10, 11, 12

*Hughes v. Twenty-First Century Fox, Inc.*,
304 F. Supp. 3d 429 (S.D.N.Y. 2018)..........................................................17, 18, 19

*Hyman v. Cornell Univ.*,
834 F. Supp. 2d 77 (N.D.N.Y. 2011)......................................................................26

*Lauture v. Int'l Bus. Machines Corp.*,
216 F.3d 258 (2d Cir. 2000).......................................................................................9

*Lee v. Riverbay Corp.*,
751 F. Supp. 3d 259 (S.D.N.Y. 2024).................................................................22, 23

*Marvelli v. Chaps Cmty. Health Ctr.*,
193 F. Supp. 2d 636, 659 (E.D.N.Y. 2002) ............................................................12

*McDonald v. Santa Fe Trail Transp. Co.*,
427 U.S. 273 (1976)...................................................................................................8

*Mihalakis v. Cabrini Medical Center (CMC)*,
151 A.D.2d 345 (1st Dep't 1989) ............................................................................12

*Moy v. Napoli Shkolnik, PLLC*,
2024 WL 3498131 (S.D.N.Y. July 22, 2024) .........................................................26

*Overseers of Town of Guilderland v. Overseers of Town of Knox*,
5 Cow. 363 (N.Y. Sup. Ct. 1826) ............................................................................12

*Pastor v. P'ship for Children's Rights*,
2012 WL 4503415 (E.D.N.Y. Sept. 27, 2012) .......................................................17

*Percy v. Loc. 412 of CSEA, Inc.*,
  2022 WL 704904 (S.D.N.Y. Mar. 9, 2022) ........................................17

*Reynolds v. Barrett*,
  685 F.3d 193, 201-02 (2d Cir. 2012) ..............................................13

*Roelcke v. Zip Aviation, LLC*,
  571 F. Supp. 3d 214 (S.D.N.Y. 2021)..........................................16, 18

*Singh v. City of New York*,
  524 F.3d 361 (2d Cir. 2008)......................................................21, 22

*Soto v. Disney Severance Pay Plan*,
  26 F.4th 114 (2d Cir. 2022) ...........................................................7

*Stack v. Karr-Barth Assocs., Inc.*,
  2021 WL 1063389 (S.D.N.Y. Mar. 18, 2021) .................................20

*United States v. City of New York*,
  359 F.3d 83 (2d Cir. 2004).....................................16, 17, 18, 20

*Velarde v. GW GJ, Inc.*,
  914 F.3d 779 (2d Cir. 2019).........................................................22

*Village of Freeport v. Barrella*,
  814 F.3d 594 (2d Cir. 2016).........................................................13

*York v. Ass'n of Bar of City of N.Y.*,
  286 F.3d 122 (2d Cir. 2002).........................................................17

### STATUTES & RULES

42 U.S.C.
  § 1981............................................................................... *passim*
  § 1981(a) ....................................................................................8
  § 1981(b)....................................................................................8

Fed. R. Civ. P.
  Rule 12(b)(6)...........................................................................1, 6

N.Y. Civ. Rights Law
  § 40-c .................................................................................25, 26

N.Y. Exec. Law
  § 292.........................................................................................26
  § 296.........................................................................................15
  § 296(1)....................................................................................24
  § 296(1)(d) ..............................................................................24
  § 296-c ................................................................................15, 24

§ 296-c(1)..................................................................................................................21
§ 296-c(2)(a) ...........................................................................................................21
§ 296-c(2)(b) ...........................................................................................................21
§ 296-c(2)(c) ...........................................................................................................24

N.Y.C. Admin. Code
§ 8-102 ....................................................................................................................21
§ 8-107 ....................................................................................................................15
§ 8-107(1)(d)...........................................................................................................24
§ 8-107(23)........................................................................................................21, 24

### TREATISES

3 Williston on Contracts § 7:19 (4th ed. updated May 2026)...........................................9

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Wicked LLC ("Wicked") respectfully submits this Memorandum of Law in support of its Motion to Dismiss the Complaint (Dkt. No. 3, "Compl.") filed by Plaintiffs American Alliance for Equal Rights and Kevin Lynch.

**INTRODUCTION**

In 2023, the Broadway musical *Wicked* provided a venue for an educational shadowing opportunity allowing an aspiring music director to observe the inner workings of a Broadway production. Plaintiff Kevin Lynch was not selected for that opportunity. Lynch now alleges that his application to Defendants Maestra Music, Inc. ("Maestra") and Arts Ignite Inc., d/b/a Musicians United for Social Equity ("MUSE") was rejected for discriminatory purposes— namely, that he is white and male—and he seeks to hold Wicked (the company that stages the *Wicked* musical) liable for discrimination. Lynch fails to state a claim against Wicked as a matter of law.[1]

The shadowing opportunity in question—the Music Director ("MD") Experience—was a "three-week intensive" offering opportunities for the recipient to "[o]bserv[e]" rehearsals and performances, "[s]tudy[]" part of the musical score, and "[g]ain[] practical playing and conducting experience" behind-the-scenes. Compl. ¶ 15. The participant also received a "modest paid weekly stipend." *Id.*

The MD Experience was designed, advertised, and administered by Defendants Maestra and MUSE. Maestra and MUSE are non-profit organizations that manage music directories for musicians. Plaintiff alleges that Maestra's directory is limited to musicians who identify as

---

[1] Lynch's allegations of discrimination are also untrue. However, solely for purposes of this Motion, Wicked treats the factual allegations in the Complaint, except for conclusory allegations and those contradicted by documents incorporated therein, as if they are true.

female or nonbinary and that MUSE's directory is limited to persons of color.  As alleged, Wicked's sole connection to Maestra, MUSE, or the MD Experience is that it hosted the shadowing experience one time for a three-week period.  Critically, the Complaint is devoid of any factual allegations suggesting that Wicked established, administered, enforced, or required any race- or sex-based eligibility criteria for the MD Experience; that Wicked reviewed or rejected Lynch's application; or that Wicked selected the participant.

Every claim against Wicked arises from a decision that Wicked was not involved in and did not make.  Instead, Wicked merely hosted a three-week educational opportunity one time, several years ago.  Lynch nevertheless seeks to impose liability on Wicked for MUSE's and Maestra's purported eligibility restrictions, restrictions over which Wicked has no control.  He brings claims under the federal statute forbidding racial discrimination in contracting and state and city laws forbidding race and gender discrimination in employment.  But even on the facts Lynch alleges, his claims against Wicked all fail.  Lynch's federal contract-based claim fails because: (1) Wicked did not receive any consideration in exchange for hosting the MD Experience, and therefore no contract existed; and (2) Wicked did not impose any racial criteria in relation to the MD Experience, and thus was not a "but for" cause of the alleged discrimination.  Lynch's state and city law employment discrimination claims fail because: (1) the MD Experience participant did not perform any "work" for Wicked; and (2) Wicked took no actions based on Lynch's race or gender.  Having failed to plausibly allege an employment or internship relationship or discriminatory intent, Lynch cannot invoke these employment discrimination statutes.  Those same deficiencies foreclose Lynch's state and city law advertising-based claims, as does the absence of any allegation that Wicked advertised the MD Experience.

These defects are fatal to each of the Complaint's causes of action against Wicked (Counts I, III, IV, and VI), and the Court should dismiss the Complaint against Wicked.

**FACTUAL BACKGROUND**

## I. The Parties

Plaintiff American Alliance for Equal Rights ("AAER") is a nationwide membership organization that states it is dedicated to ending illegal discrimination across the United States. Compl. ¶ 10.  Its members include Plaintiff Kevin Lynch, a white male composer and musician in the New York tristate area with a music degree.  *Id.* ¶¶ 11, 20.  Although he aspires to be a Broadway music director, Lynch's only previous experience as a music director is on "regional and community theater productions."  *Id.* ¶ 20.

Defendant Maestra is a Manhattan-based nonprofit that runs an employment directory for female and nonbinary musicians in the New York theater industry.  *Id.* ¶ 7.

Defendant MUSE is also a Manhattan-based nonprofit and is a sister organization to Maestra.  *Id.* ¶ 8.  MUSE runs an employment directory for musicians of color.  *Id.* ¶ 8.

Defendant Wicked is the company that stages the Broadway musical *Wicked*.  *Id.* ¶ 9. The Complaint does not allege that Wicked operates or controls any employment directory or that Wicked creates, administers, or enforces any hiring criterion, whether based on race, sex, or any other characteristic, relevant to the directories or the MD Experience.  *See id.* ¶¶ 7–9, 24, 26.

## II. The Music Director Experience

The MD Experience was a one-time three-week shadowing opportunity.  *Id.* ¶ 15. Maestra announced the opportunity in June 2023 on its public Facebook page, explaining that it was "teaming up" with MUSE to sponsor the "Music Director Experience with the Broadway blockbuster WICKED" and linking to the application.  *Id.* ¶¶ 14, 17.  The opportunity was structured as a "three-week intensive" for "aspiring music directors looking to make a big leap in

3

their [music director] journeys." *Id.* ¶ 15. The participant would "get the opportunity to shadow engagement in-person in New York City," including "[o]bserving cast rehearsals," "[o]bserving performances from both the orchestra pit and the sound board," "[s]tudying one of the keyboard books from the show," and "[g]aining practical playing and conducting experience by working with the Music Director one-on-one." *Id.* The participant would also receive "a modest paid weekly stipend" for the duration of the three weeks. *Id.*

A graphic accompanying Maestra's Facebook post indicated that the MD Experience was "for MUSE and Maestra directory members." *Id.* ¶ 16. The same post and graphic from Maestra's Facebook page appeared with minor variations on other websites and social-media pages purportedly operated by MUSE and three individuals. *Id.* ¶ 18. Various Broadway trade publications also advertised the MD Experience, allegedly "at the urging of Maestra, MUSE, and Wicked," which allegedly "provided [the publications] information about the position to get the word out." *Id.* ¶ 19.

The online application specified that the experience was being offered "exclusively to NYC (Tri-State) area MUSE and MAESTRA Directory members" and could not be completed unless the applicant had first joined either the MUSE or Maestra directory. *Id.* ¶¶ 16, 21 (emphasis omitted); *see also id.* ¶ 22 (requiring applicant to verify membership). Maestra's directory states that individuals should register only if they are "female or non-binary musician[s] working in the theater." *Id.* ¶ 24. MUSE's directory states that individuals should register only if they are "Person[s] of Color who identif[y] as … musician[s]." *Id.* ¶ 26.

On June 28, 2023, Lynch applied to the MD Experience. *Id.* ¶¶ 20, 23, 28. In doing so, he attempted to sign up for both the MUSE and Maestra directories. *Id.* ¶¶ 23–28. Lynch received a link to his privately visible profile in the Maestra directory but did not receive

anything similar for any MUSE profile. *Id.* ¶¶ 25, 27. He used the link to his Maestra directory profile to complete and submit his application to the MD Experience. *Id.* ¶ 28.

On July 5, 2023, Lynch asked Maestra when his profile would be made public in its directory. Maestra responded that his profile application had been denied for two reasons: (1) his pending profile remained incomplete for too long, and (2) his application did not indicate that his profile belonged in the Maestra community. *Id.* ¶ 29. Lynch alleges that he completed his profile, so, according to him, Maestra rejected him for being male. *Id.* His private Maestra directory profile was then removed. *Id.* ¶ 30. Also on July 5, 2023, Lynch asked MUSE about the status of his directory profile. *Id.* ¶ 31. MUSE never responded, and his profile never appeared in the directory. *Id.*

In August 2023, Maestra and MUSE announced the winning applicant for the MD Experience, whom the Complaint identifies as "a female and nonbinary person of color" who was a member of Maestra's directory. *Id.* ¶ 32. The sole specific factual allegation arguably relating to the selection process is that Maestra and MUSE made the announcement of the winning applicant. With respect to Wicked, Plaintiff asserts only an undifferentiated and conclusory allegation that all three Defendants "'team[ed] up' to create the job, select the winner," and provide the stipend to the participant, *id.* ¶ 45.

## III. This Lawsuit

The Complaint asserts seven claims for relief under the following statutes: 42 U.S.C. § 1981, the New York State Human Rights Law ("NYSHRL"), the New York State Civil Rights Law ("NYSCRL"), and the New York City Human Rights Law ("NYCHRL"). Four counts—Counts I (contract discrimination based on race), III (employment/internship discrimination based on race and sex), IV (derivative civil rights discrimination claim based on race and sex), and VI (employment/internship discrimination based on race and sex)—arise solely from the

2023 MD Experience and are brought by Lynch against all three Defendants. Compl. ¶¶ 39–51 (Count I), 60–76 (Count III), 77–85 (Count IV), 92–99 (Count VI). The remaining three counts—Counts II, V, and VII—arise from the ongoing operation of the Maestra and MUSE directories; each is asserted by both Plaintiffs only against Maestra and/or MUSE. *Id.* ¶¶ 52–59 (Count II), 86–91 (Count V), 100–104 (Count VII).

Lynch seeks declaratory and injunctive relief only as to the Maestra and MUSE directories. *Id.* ¶ 105(A)–(C). The only relief the Complaint seeks relating to the MD Experience (and thus, against Wicked) is monetary: nominal, compensatory, and punitive damages, as well as costs and attorneys' fees. *Id.* ¶ 105 (D)–(G).

## LEGAL STANDARD[2]

"The role of the court at this [Rule 12(b)(6)] stage of the proceedings is not in any way to evaluate the truth as to what really happened, but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed." *Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir. 2016). To survive a motion to dismiss, a complaint must allege sufficient facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[B]lanket assertion[s]," "labels and conclusions, and a formulaic recitation of the elements of a cause of action" fail to satisfy this threshold. *Twombly*, 550 U.S. at 555 n.3. This standard thus "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. "Although [courts] accept all factual allegations in the complaint as true and draw all reasonable inferences in the

---

[2] In case citations, unless otherwise noted, all citations, quotation marks, and alterations and emphases in original are omitted.

plaintiff's favor, [courts] must dismiss a claim if a plaintiff pleads himself out of court by alleging facts which show that he has no claim." *Soto v. Disney Severance Pay Plan*, 26 F.4th 114, 120 (2d Cir. 2022).

**ARGUMENT**

The Complaint's allegations defeat every claim Lynch brings against Wicked. To the extent the Complaint alleges discriminatory conduct or intent with any factual specificity, it correctly attributes that conduct and intent only to MUSE and Maestra. Lynch seeks to hold Wicked liable not for any decision Wicked made, but for decisions that Maestra and MUSE allegedly made in designing and administering their directories and selecting the participant. And any benefits arising from the three-week shadowing experience accrued to the participant, not Wicked; therefore, the MD Experience was not employment or an internship under the governing law. This Court should accordingly dismiss the Complaint against Wicked.

## I. Lynch Fails to Plead a Section 1981 Claim Against Wicked (Count I).

Lynch's Section 1981 claim (against all Defendants) rests on the erroneous theory that the MD Experience was an employment relationship arising from a contract with all three Defendants based on the following allegations: (1) the participant would perform "[d]ay-to-day duties" in exchange for being "paid" a "modest … weekly stipend"; (2) Maestra, MUSE, and Wicked were all parties to that contract; and (3) the opportunity was an "initiative" that the three organizations "launch[ed]" together. Compl. ¶¶ 44–45. He also alleges that race was a "but-for cause" of Defendants' refusal to contract with him because the MD Experience was limited to members of the MUSE directory, who are "necessarily people of color." *Id.* ¶ 46.

As against Wicked, Count I fails for two independent reasons. First, the Complaint does not plead a contract between Wicked and the MD Experience participant because Wicked never received any consideration. Second, the Complaint's allegations establish that race was not a

7

but-for cause of anything Wicked did because MUSE—not Wicked—imposed the only racial criterion for eligibility. Either deficiency alone requires dismissal of the Section 1981 claim against Wicked.

### A. The MD Experience Did Not Arise Under a Contract.

*First*, Lynch's Section 1981 claim should be dismissed because there is no requisite contract undergirding his claim. Section 1981 guarantees "[a]ll persons within the jurisdiction of the United States … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. § 1981(a); *see also McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286–87 (1976) (holding that statute also applies to racial discrimination in private employment against white persons). Section 1981 defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Any Section 1981 claim must therefore "initially identify an impaired 'contractual relationship,' under which the plaintiff has rights"—one that either exists or that the plaintiff sought to form. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (quoting 42 U.S.C. § 1981(b)).

Here, the Complaint does not plead a prospective contractual relationship between Lynch and Wicked because it does not and cannot allege that Wicked would have received any consideration in return for Lynch completing the MD Experience. Lynch alleges that he sought to contract with Maestra, MUSE, and Wicked by exchanging his performance of "[d]ay-to-day duties" as (what he terms) "an apprentice music director" for a "modest … weekly stipend" and undefined "other valuable benefits." Compl. ¶ 44. But under traditional contract principles and the governing law, that desired relationship does not give rise to a contract because it does not result from any bargained-for exchange and thus lacks consideration.

For purposes of Section 1981, the term "contract" carries "its ordinary meaning." *Lauture v. Int'l Bus. Machines Corp.*, 216 F.3d 258, 261 (2d Cir. 2000). Interpreting that meaning, the Second Circuit has looked to the Restatement (Second) of Contracts, which defines a "contract" as "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." *Id.* (quoting Restatement (Second) of Contracts § 1 (A.L.I. 1979)). With exceptions not relevant here, contract formation requires more than just an "agreement … of mutual assent"; it requires consideration, which is a "bargain … to exchange promises or to exchange a promise for a performance or to exchange performances." Restatement (Second) of Contracts §§ 3, 17 (A.L.I. 1981); *see also id.* § 71(1) ("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.").

A contractual obligation arises from "words of condition in a promise" only if those words "indicate a request for consideration," but not if they "state a mere condition in a gratuitous promise." 3 Williston on Contracts § 7:19 (4th ed. updated May 2026). The touchstone is whether "the happening of the condition will benefit the promisor"; if it will, "it is a fair inference that the happening was requested as a consideration." *Id.* But where "the happening of the condition not only will not benefit the promisor but is obviously for the purpose of enabling the promisee to receive a benefit (a gift)," the condition is not consideration, even if the promisee brought it about in reliance on the promise. *Id.*; *accord Allegheny Coll. v. Nat'l Chautauqua Cnty. Bank of Jamestown*, 159 N.E. 173, 176 (N.Y. 1927) (Cardozo, C.J.). Nevertheless, "[i]n close cases," courts sometimes look to "whether the promisee has incurred a detriment on the faith of the promise or has conferred a benefit on the promisor in bringing about the condition." 3 Williston on Contracts § 7:19. In all cases, "the promise and the consideration

must purport to be the motive for the other, in whole or at least in part." *Cityview Partners, LLC v. Mercedes*, 2023 WL 1929716, at *2 (E.D.N.Y. Feb. 10, 2023) (quoting *Allegheny Coll.*, 159 N.E. at 174).

Wicked gained no benefit from offering the MD Experience participant an "opportunity to shadow" at the *Wicked* production. Compl. ¶ 15. To the contrary, the conditions Wicked imposed on that opportunity benefited only the participant by fostering the participant's professional development: the so-called "[d]ay-to-day duties" consisted of "[o]bserving cast rehearsals," "[o]bserving performances from both the orchestra pit and the sound board," "[s]tudying one of the keyboard books from the show," and "[g]aining practical playing and conducting experience by working with the Music Director one-on-one." *Id.* That Wicked offered a "modest paid weekly stipend" and "other" undefined "valuable benefits," *id.* ¶¶ 15, 44, does not compel a different conclusion because Wicked received no bargained-for benefit in exchange. Instead, the program's launch announcement, which the Complaint relies on, made clear that those benefits were offered to provide the participant with "invaluable training and access." *Id.* ¶ 15. The Complaint does not and cannot allege that Wicked's participation in the MD Experience was motivated even in part to obtain the participant's labor or services "as an apprentice music director." *Id.* ¶ 44. Nor does the Complaint allege that the participant incurred any detriment in reliance on Wicked's promise to host the shadowing opportunity. Accordingly, under traditional contract principles, the MD Experience did not give rise to any contractual relationship.

The case law also supports Wicked's position. Courts have long recognized that even paid internships, much less a one-sided "opportunity to shadow engagement," *id.* ¶ 15, do not support a cognizable Section 1981 claim. In *Hollander v. Sears, Roebuck & Co.*, 450 F. Supp.

496 (D. Conn. 1978), for example, the court entered judgment for Sears on a white male plaintiff's Section 1981 claim arising from Sears's refusal to consider him for a paid, eleven-week summer internship program offered only to minority students. *Id.* at 498–99. Although the court noted that the internship "may have many indicia of an employment contract," it held that the internship was "in substance, realistically different," because the interns "were not paid … to fill regular positions" but were instead "paid to come in and observe the performance of such jobs, to try them out for short periods, and to be taught the relationships among various positions." *Id.* at 504. The payment, the court explained, was not intended "to have [the intern] work as an employee … rather, it was payment to secure his attention to the manner in which [the company's] regular employees worked." *Id.* at 504–05. "In substance," the court concluded, "it was not a contract for services between an employer and employee." *Id.* at 505.

On the face of the Complaint, the MD Experience bears even fewer indicia of a contract for services than the Sears internship did. While the Sears program was designed "to stimulate applicant flow from minority groups to Sears' regular management training programs and management positions," *id.* at 498, the MD Experience had nothing to do with Wicked's hiring practices and neither the Complaint nor the advertisement referenced therein claims otherwise. The MD Experience aimed instead to "provide[] … training and access to aspiring music directors looking to make a big leap in their [music director] journeys." Compl. ¶ 15. And while Sears interns performed services like those performed by employees—they were required to "try … out" various Sears employment roles, *Hollander*, 450 F. Supp. at 504—the MD Experience participant did not. Instead, they merely "[o]bserv[ed]," "[s]tud[ied]," and "[g]ain[ed]" limited playing and conducting experience in one-on-one sessions with the Music Director. Compl.

¶ 15. Even more so than in *Hollander*, the MD Experience does not support a claim under Section 1981.

More recent decisions dismissing Section 1981 claims based on internships likewise confirm that the MD Experience does not support such a claim. *See, e.g.*, *Adam v. Obama for Am.*, 210 F. Supp. 3d 979, 986 (N.D. Ill. 2016) (finding, on a motion to dismiss: "Since OFA cannot be said to have 'exchanged' the opportunity to work as an intern for [the plaintiff's] work performance, 'the internship itself' is not consideration and cannot form the basis of a contract."); *Marvelli v. Chaps Cmty. Health Ctr.*, 193 F. Supp. 2d 636, 659 (E.D.N.Y. 2002) (two-month interns who received "no salary and no benefits" or promise of employment failed to state a claim under Section 1981).

The Complaint cites three cases for the proposition that paid internships and apprenticeships are contracts under Section 1981, but none supports Lynch's claim. Compl. ¶ 43. Two involve written employment contracts under which the employees performed work benefitting their employers, and the third is a 200-year-old case about transferring an indentured apprentice. *Mihalakis v. Cabrini Medical Center (CMC)*, 151 A.D.2d 345 (1st Dep't 1989) involved a written agreement governing full-time hospital internship employment undertaken after medical school and required for medical licensure. *Id.* at 345. *Amendola v. A.C. Electric Co.*, 201 A.D.2d 689 (2d Dep't 1994) involved a written agreement specifying "wages" for apprentice electricians employed by an electrical company. *Id.* at 689. And *Overseers of Town of Guilderland v. Overseers of Town of Knox*, 5 Cow. 363 (N.Y. Sup. Ct. 1826) held only that "[a]n agreement, for consideration, that an apprentice shall serve another, is binding as between the parties"—in the context of one master transferring an indentured apprentice to another. *Id.* at 363.

Accordingly, Count I should be dismissed as against Wicked because the MD Experience did not arise under any contract for purposes of Section 1981.

**B.      Race Was Not a But-For Cause of Any Refusal by Wicked to Contract with Lynch.**

*Second*, and independently, Lynch's Section 1981 claim should be dismissed because Wicked's alleged actions were not a but-for cause of any racial discrimination.  Section 1981 requires a plaintiff to plead "that [his] injury would not have occurred 'but for' the defendant's unlawful conduct."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 329 (2020).  That alleged unlawful conduct is "racial discrimination in public or private employment."  *Village of Freeport v. Barrella*, 814 F.3d 594, 604 (2d Cir. 2016).  But Lynch does not plead that but for *Wicked's*—as opposed to MUSE's—conduct, he would have been able to contract for the MD Experience.[3]

The Complaint's disparate intent allegations are that Wicked, along with Maestra and MUSE, "facially discriminated based on race" because it "limit[ed] eligibility for the position to members of the MUSE directory—who are necessarily people of color."  Compl. ¶ 46.  But the Complaint unambiguously alleges that MUSE, not Wicked, set the racial eligibility criterion. Applicants were eligible for the MD Experience only if they belonged to either the MUSE or Maestra directories, Compl. ¶ 21, and the only racially exclusionary criterion alleged is MUSE's requirement that its members be "Person[s] of Color," *id.* ¶ 26; *see also id.* ¶ 67 ("A musician cannot 'become a member' of the [MUSE] directory unless he satisfies the 'Requiremen[t]' that he be a 'Person of Color.'").  Critically, MUSE—not Wicked—"runs the MUSE directory." *Id.* ¶ 67.  Indeed, Lynch's actions reflect his own understanding that Wicked played no role in

---

[3] There is no claim for "disparate impact" discrimination under Section 1981.  *See Reynolds v. Barrett*, 685 F.3d 193, 201–02 (2d Cir. 2012) (a plaintiff pursuing a "disparate impact theory of liability" under Section 1981 "must show that the [racial] discrimination was intentional").

defining or monitoring eligibility to join the MUSE directory: When Lynch sought to follow up about the status of his pending application to join the MUSE directory, he contacted only MUSE, not Wicked. *Id.* ¶ 31. Additionally, "Maestra and MUSE"—without Wicked—"publicly announced the winning applicant for the Music Director Experience." *Id.* ¶ 32.

The Complaint does not allege that Wicked took any racially discriminatory action. It does not allege, for example, that Wicked created, set, or controlled MUSE's "person of color" membership criterion; that Wicked played any role in operating the MUSE directory or deciding who was admitted to it; that Wicked reviewed MD Experience applications, reviewed Lynch's application, or selected the winning applicant; or that Wicked ever even knew Lynch's race (much less that Wicked ever took any action because of Lynch's race). At most, the Complaint alleges that Wicked provided the venue for the shadowing opportunity. But merely hosting an educational experience with selection criteria others designed and applied is insufficient to render Wicked a but-for cause of the racial barrier that allegedly excluded Lynch.

The only allegations tying Wicked to the alleged discrimination are generalized assertions contradicted by the Complaint's more specific allegations, impermissible group pleadings, or mere legal conclusions. *See, e.g.*, Compl. ¶¶ 45–46 (alleging that "Maestra, MUSE, and Wicked" "limit[ed] eligibility for the position to members of the MUSE Directory" and that the "three entities" "'team[ed] up' to create the job, select the winner, and pay that person"); *see also, e.g.*, *id.* ¶ 9 (alleging that Wicked "collaborated with Maestra and MUSE to create and run" the MD Experience). "Read carefully, however, the specific allegations in the complaint foreclose" the possibility of discrimination by Wicked. *Goldstein v. Pataki*, 516 F.3d 50, 58 (2d Cir. 2008); *see Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) ("General, conclusory allegations need not be credited ... when they are belied by more specific allegations

of the complaint.").[4]  As set forth in detail above, Lynch specifically and correctly alleges that MUSE alone set the racial criterion for the MUSE directory, which is the sole racial barrier alleged in the Complaint.  *Id.* ¶¶ 26, 67.  Remove Wicked from the picture entirely, and that racial barrier still stood; conversely, Wicked's alleged conduct toward Lynch would have been no different had Lynch been a different race.

Accordingly, Count I should be dismissed as against Wicked because Wicked's actions were not a but-for cause of any discrimination Lynch alleges.

## II. Lynch Fails to Plead NYSHRL and NYCHRL Claims Against Wicked (Counts III and VI).

Count III asserts race- and sex-based employment discrimination based on the erroneous theory that Maestra, MUSE, and Wicked were "joint employers" because they "jointly created" the MD Experience position, "set its terms," and "selected the individual to fill it."  Compl. ¶¶ 60, 63, 67 (asserting claim under NYSHRL, New York Exec. Law § 296).  Lynch also alleges that Maestra, MUSE, and Wicked violated the NYSHRL's separate prohibition on discriminatory advertisements by "circulating ads—and causing others to circulate ads—for the Music Director Experience."  *Id.* ¶ 72.  In the alternative, Lynch alleges the MD Experience was an "internship" covered by New York Executive Law § 296-c because it "provide[d] … training," "provide[d] experience for the benefit of" the participant, "d[id] not displace regular employees," and was "performed under the close supervision of existing staff."  *Id.* ¶ 74 (alterations in original).

Count VI asserts similar claims under NYCHRL, New York City Administrative Code § 8-107, incorporating by reference the same allegations that Lynch asserts to support Count III.

---

[4] Similarly, labeling non-discriminatory conduct with the legal conclusion of "discrimination" does not make it so.  *See Iqbal*, 556 U.S. at 678.

*Id.* ¶¶ 92–99; *see also id.* ¶ 94 (alleging that Maestra, MUSE, and Wicked "barred Lynch from employment—or, at the least, an internship—because he is a white male" (incorporating by reference *id.* ¶¶ 61–64, 74–75)); *id.* ¶ 98 (alleging that Maestra, MUSE, and Wicked "colluded to advertise the Music Director Experience" in violation of the NYCHRL's advertising prohibition (incorporating by reference *id.* ¶¶ 14–19, 76)).

Counts III and VI fail as a matter of law. As alleged, the MD Experience did not create an employment or internship relationship between Wicked and the MD Experience participant. Neither race nor gender was a motivating factor in any action taken by Wicked. Nor did Wicked circulate any advertisement expressing any limitation as to race or sex. Accordingly, Lynch's NYSHRL and NYCHRL claims as against Wicked should be dismissed.

### A. The MD Experience Did Not Constitute Employment Under the NYSHRL or NYCHRL.

Neither the NYSHRL nor the NYCHRL defines "employee," so courts look to Title VII case law as "instructive" because "courts use a nearly identical standard to determine the employment relationship across the three statutes." *Roelcke v. Zip Aviation, LLC*, 571 F. Supp. 3d 214, 226 n.3 (S.D.N.Y. 2021). A plaintiff must plausibly allege that (1) he "was hired by the putative employer," which in turn requires establishing that he "received remuneration in some form for h[is] work" and (2) "an employment relationship exist[ed]" between the plaintiff and the putative employer. *United States v. City of New York*, 359 F.3d 83, 91–92 (2d Cir. 2004). Lynch satisfies neither element as to the MD Experience participant.

### 1. The MD Experience Participant Was Not Hired by Wicked.

*First*, Lynch cannot satisfy the threshold requirement that the MD Experience participant was hired by Wicked.

As "a prerequisite to a finding of employment," a plaintiff must establish that he "was hired by the putative employer," which requires that he "received remuneration in some form for h[is] work." *Areu v. Fox News Network, LLC*, 2021 WL 4124226, at *9 (S.D.N.Y. Sept. 9, 2021) (quoting *City of New York*, 359 F.3d at 91–92). Although remuneration need not be a salary, it must convey a "substantial benefit" to the putative employee, *City of New York*, 359 F.3d at 92, which means that it must "meet a minimum level of significance or substantiality," *York v. Ass'n of Bar of City of N.Y.*, 286 F.3d 122, 126 (2d Cir. 2002). Thus, benefits sufficiently substantial to qualify as remuneration include "salary, vacation, sick pay, … health insurance, disability insurance, life insurance, death benefits, and retirement pension." *York*, 286 F.3d at 126.

Here, by contrast, the "modest … weekly stipend" and undefined "other valuable benefits," Compl. ¶ 44, offered to the participant are not sufficiently substantial to qualify as remuneration. The Southern District and other New York federal courts have repeatedly held that minor benefits like the weekly stipend—including travel reimbursement, networking opportunities, and comparable perks—are not sufficiently substantial to create an employment relationship. *See Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 442–44 (S.D.N.Y. 2018) (transportation reimbursement, hair and makeup, and boosting of career prospects too insignificant or insubstantial to qualify as remuneration); *Glaser v. Upright Citizens Brigade, LLC*, 377 F. Supp. 3d 387, 395–96 (S.D.N.Y. 2019) (free drinks and tickets to comedy shows and the opportunity to showcase work to casting directors too insubstantial to qualify as remuneration); *Pastor v. P'ship for Children's Rights*, 2012 WL 4503415, at *2 (E.D.N.Y. Sept. 27, 2012) (reimbursement for legal education courses too insubstantial to qualify as remuneration), *aff'd*, 538 F. App'x 119 (2d Cir. 2013); *see also Percy v. Loc. 412 of CSEA,*

17

*Inc.*, 2022 WL 704904, at *6 (S.D.N.Y. Mar. 9, 2022) ("Reimbursement is generally not substantial enough to be considered remuneration.").  The undefined "other valuable benefits" the participant allegedly received, Compl. ¶ 44, are "akin to the vague benefits," such as "networking opportunities," "that courts have excluded from the financial benefit analysis" in the employment discrimination context.  *Hughes*, 304 F. Supp. 3d at 444.  "If such allegations were deemed a financial benefit for purposes of determining employee status, virtually every [participant in a shadowing program] could satisfy the remuneration requirement."  *Id.*  That is not the law.

Even if the MD Experience participant had received remuneration, Lynch's claims still fail at the threshold because the existence of an employment relationship presupposes that the putative employee be hired to perform some "work" for the benefit of the alleged employer.  *See City of New York*, 359 F.3d at 92 (to establish the requisite employee status under Title VII, plaintiff "must establish that she received remuneration in some form *for her work*" (emphasis added)).[5]  For the reasons discussed above, *see supra* Section I.A, the Complaint fails to allege that the MD Experience participant performed any work or that Wicked received any benefit.

Accordingly, Lynch has failed to plausibly allege that Wicked "hired" the MD Experience participant, and his claims under the NYCHRL and NYSHRL must be dismissed.  *Areu*, 2021 WL 4124226, at *9.

### 2. No Employment Relationship Existed Between the MD Experience Participant and Wicked.

*Second*, even assuming *arguendo* that the MD Experience participant received remuneration in exchange for work at Wicked, no employment relationship existed.  At this step,

---

[5] *See also Roelcke*, 571 F. Supp. 3d at 226 ("Under the NYSHRL and NYCHRL," a plaintiff "must establish that she received remuneration in some form *for her work*." (emphasis added)).

courts "look to the thirteen factors articulated by the Supreme Court in *Community for Creative Non-Violence v. Reid,* 490 U.S. 730 (1989) to determine whether an employment relationship exists." *City of New York*, 359 F.3d at 92. "Those factors include: (1) the hiring party's right to control the manner and means by which the product is accomplished; (2) the skill required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; and (13) the tax treatment of the hired party." *Hughes*, 304 F. Supp. 3d at 442. "In the context of anti-discrimination cases, courts place the 'greatest emphasis on the extent to which the hiring party controls the manner and means by which the worker completes his or her assigned tasks.'" *Id.* at 442–43 (quoting *City of New York*, 359 F.3d at 92).

Application of the *Reid* factors here compels the conclusion that the MD Experience participant was not an employee of Wicked. First and foremost, the Complaint does not allege that the participant was assigned any tasks at all, much less that Wicked controlled them. Compl. ¶¶ 15, 74 (alleging that the participant would "attend" and "[o]bserv[e]" rehearsals and performances and get an opportunity to play and conduct with the Wicked Music Director for his or her own benefit). The Complaint's scattered conclusory references to the participant's "work" and supposed status as an "apprentice music director," *id.* ¶ 44, "need not be credited" because they are contradicted by specific allegations describing only observation and self-directed practice. *Hirsch*, 72 F.3d at 1092. Having failed to allege any cognizable work or even control

by Wicked over the edifying activities, this factor bearing the "greatest emphasis" is fatal to Lynch's claims. *Hughes*, 304 F. Supp. 3d at 443.

The majority of the other *Reid* factors reinforce the same conclusion. The MD Experience's fixed length of three weeks, Compl. ¶ 15, cuts against an employee relationship because it evinces a discrete engagement rather than an ongoing, indefinite, or, in the context of a Broadway stage production, run-of-show engagement characteristic of employment. *Cf. Stack v. Karr-Barth Assocs., Inc.*, 2021 WL 1063389, at *5 (S.D.N.Y. Mar. 18, 2021) ("[M]ulti-year tenures suggest an employer-employee relationship."). As does the flat "weekly stipend" method of payment, Compl. ¶¶ 15, 44, rather than a wage keyed to hours worked, *cf. Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 119 (2d Cir. 2000) ("Compensation primarily or exclusively on the basis of time worked (rather than on the basis of projects completed) suggests that a worker is an employee."). Because prior music directing experience was "necessary to be considered" for the shadowing engagement, Compl. ¶¶ 20, 33, the opportunity required "*specialized* skills of the sort typically acquired through experience and/or education" that undercut a finding of employment, *Eisenberg*, 237 F.3d at 118. The only "instrumentalities" mentioned in the Complaint are a score and a keyboard book supplied for the participant's own "[s]tudy[]," *id.* ¶¶ 15, 74, not for use in any work done for Wicked. Nor was the shadowing engagement part of Wicked's regular business of staging performances, *id.* ¶ 9; the Complaint concedes that the MD Experience lasted only three weeks, *id.* ¶ 15. The Complaint does not allege that Wicked provided the participant with an assistant or any additional benefits like eligibility for workers' compensation or vacation. *Cf. City of New York*, 359 F.3d at 92 (finding employment relationship where plaintiffs "received other benefits including transportation and child care expenses and eligibility for workers' compensation because of their work"); *Gaffney v.*

*Dep't of Info. Tech. & Telecomms.*, 536 F. Supp. 2d 445, 461 (S.D.N.Y. 2008) (finding

employment relationship where defendant "approved vacation requests" from plaintiffs). The

shadowing engagement occurred at Wicked's theater only because the rehearsals and

performances the participant sought to observe took place there. Finally, the Complaint does not

allege that the MD Experience afforded Wicked any right to assign work or control the

participant's hours, nor does it allege anything about the participant's tax treatment.

**B.** **The MD Experience Did Not Constitute an Internship Under the NYSHRL or NYCHRL.**

Both the NYSHRL and NYCHRL forbid discrimination on the basis of race and sex

against an "intern." N.Y. Exec. Law § 296-c(2)(a)–(b); N.Y.C. Admin. Code § 8-107(23). And

both statutes define an "intern" as a person "who performs work for an employer" under

specified conditions. N.Y. Exec. Law § 296-c(1); N.Y.C. Admin. Code § 8-102.

The New York State Legislature and New York City Council have not explicitly defined

what constitutes "work" under the NYSHRL and NYCHRL, respectively, just as "Congress has

never explicitly defined what constitutes work under the [Fair Labor Standards Act ('FLSA')]."

*Singh v. City of New York*, 524 F.3d 361, 367 (2d Cir. 2008) (Sotomayor, J.). In the absence of

New York case law interpreting the term under either provision, federal case law interpreting the

term under the FLSA is instructive. New York courts routinely construe identical statutory terms

the same way across state and federal statutes. *See, e.g.*, *Glatt v. Fox Searchlight Pictures, Inc.*,

811 F.3d 528, 534 (2d Cir. 2016) ("Because the [New York Labor Law ('NYLL') and FLSA]

define 'employee' in nearly identical terms, we construe the NYLL definition as the same in

substance as the definition in the FLSA.").

To determine whether a covered individual's activity is compensable "work" under the

FLSA, courts ask whether the activity consists of "physical or mental exertion … controlled or

required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Singh*, 524 F.3d at 367 (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944)).  The Supreme Court later clarified that exertion is not strictly required, and that "the issue is whether the time is spent predominantly for the employer's benefit or for the employee's." *Id.*

Here, as set forth in detail above, even as alleged, the MD Experience was structured and advertised as a "three-week intensive" solely to benefit the selected participant.  Compl. ¶ 15. The program's express aim was to "provide[] invaluable training and access to aspiring music directors," *id.*, not to secure labor for Wicked.  The participant's "[d]ay-to-day duties" reflect the same.  *Id.* (alleging "[d]ay-to day duties" consisted of "[o]bserving" cast rehearsals and performances, "[s]tudying" the show's keyboard book, and getting an opportunity to play and conduct in "one-on-one" sessions with the show's music director).

As the Supreme Court held in finding that "trainees" in a railroad's program for prospective brakemen were not employees, the FLSA "was not intended to penalize railroads for providing, free of charge, the same kind of instruction at a place and in a manner which would most greatly benefit the trainees." *Velarde v. GW GJ, Inc.*, 914 F.3d 779, 784 (2d Cir. 2019) (quoting *Walling v. Portland Terminal Co.*, 330 U.S. 148, 153 (1947)).  The same principle is true, under the NYSHRL and NYCHRL, for the owner and operator of a Broadway musical.

**C.      Neither Race Nor Gender Motivated Any Action Taken by Wicked.**

The Complaint also fails to allege that Lynch's race or gender motivated Wicked not to select Lynch for the MD Experience.  "To state a claim for discrimination under the NYCHRL, and for causes of action that accrue after October 11, 2019, under the NYSHRL," a plaintiff must allege that he was "treated less well because of a discriminatory intent, *i.e.*, that the unequal treatment was based, at least in part, on a protected characteristic." *Lee v. Riverbay Corp.*, 751

F. Supp. 3d 259, 275 (S.D.N.Y. 2024). Under that standard, the discriminatory motive must be "one of the motivating factors" for the challenged conduct. *Id.*

Here, however, the Complaint does not allege that either race or gender motivated any of Wicked's actions. As set forth above with respect to race, *see supra* Section I.B, the Complaint's conclusory allegation that Wicked, Maestra and MUSE "barred Lynch from employment—or, at the least, an internship—because he is a white male," Compl. ¶ 94, is refuted by the Complaint's specific allegations. The same is true with respect to gender. The Complaint does not allege that Wicked took any action based in any part on race or gender (or even knew Lynch's race or gender). To the contrary, the Complaint makes clear that MUSE and Maestra, not Wicked, set the only racial and gender-based eligibility criteria, respectively. *See id.* ¶ 26 (alleging that MUSE sets the race-based eligibility requirement for its directory and manages the directory); *id.* ¶¶ 24, 69 (alleging that Maestra sets the gender-based eligibility requirement for its directory and manages the directory); *see also id.* ¶¶ 29, 70, 79 (alleging that Maestra removed Lynch's profile from its directory after determining he was male and refused to recommend him for employment or list him in its directory); *id.* ¶¶ 29, 70 (alleging that Lynch contacted Maestra alone to advocate for his eligibility on its directory and that he "was rejected for being male" based on those discussions). And it was MUSE and Maestra that publicly announced the selected participant. *Id.* ¶ 32. Wicked hosted the opportunity; it did not decide who was eligible for it or who would fill it.

In short, the Complaint does not contain a single non-conclusory allegation that Wicked bore any discriminatory intent or took any discriminatory action. That failure is fatal under the "motivating factor" standard, which requires a discriminatory intent behind the *defendant's own* conduct, not the conduct of its co-defendants. The Complaint's "bald assertions of

discrimination" by Wicked without specific factual allegations "from which a court could infer that [it] possessed a discriminatory motive, are implausible and insufficient to survive a motion to dismiss."  *Gooden v. Joseph P. Addabbo Fam. Health Ctr., Inc.*, 2023 WL 2709735, at \*4 (E.D.N.Y. Mar. 30, 2023) (dismissing gender discrimination claims brought by male plaintiff under NYSHRL and NYCHRL).

> **D.**  **Wicked Did Not Circulate or Cause to Be Circulated Any Discriminatory Advertisement in Violation of the NYSHRL or NYCHRL.**

Wicked did not circulate or cause to be circulated any discriminatory advertisement in violation of either the NYSHRL or NYCHRL.  The NYSHRL and NYCHRL ban discriminatory advertising and inquiries by employers and employment agencies, who may not print, circulate, or cause to be printed or circulated any statement, advertisement, or publication, or use any employment application or inquiry, "in connection with prospective employment," that directly or indirectly expresses a race- or sex-based limitation, specification, or discrimination, or intent to discriminate.  N.Y. Exec. Law § 296(1)(d) (employment); *id.* § 296-c(2)(c) (internships); N.Y.C. Admin. Code § 8-107(1)(d) (internships).  The advertising ban applies only to advertisements for employment or internship opportunities because each provision appears within a subdivision of the relevant statute that governs only employment discrimination, N.Y. Exec. Law § 296(1), or intern discrimination, *id.* § 296-c; N.Y.C. Admin. Code § 8-107(23), and each applies only to an "employer" or "employment agency," *see Davis v. Mich. Dep't of Treas.*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

The Complaint alleges that Wicked, Maestra, and MUSE violated these provisions "by advertising the Music Director Experience position as being open only to Maestra and MUSE

directory members—*i.e.*, female and nonbinary people of color," Compl. ¶ 76, as well as "collud[ing]" to do the same, *id.* ¶ 98, and "circulating" and "causing others to circulate" these ads "via social media and trade publications," *id.* ¶ 72. Lynch's claims fail for two independent reasons.

*First*, for the reasons explained above, the MD Experience referenced in the advertisements was not "in connection with prospective employment" or an internship under both the NYSHRL and NYCHRL. *See supra* Sections II.A–B.

*Second*, the Complaint does not allege that Wicked circulated or caused to be circulated any ads. Although the Complaint alleges without specificity that "websites and social-media pages belonging to or associated with Maestra, MUSE, and Wicked" circulated an advertisement for the MD Experience and links to several advertisements for the experience, Compl. ¶ 18 (linking to advertisements or social media posts at perma.cc/BW5PVS2P; perma.cc/UX3Z-SQ6H; perma.cc/64XJ-9RXY; perma.cc/85YD-KKTP; perma.cc/E3SR-MS4Y), it does not allege any instance of a Wicked website or social-media page circulating such an advertisement. And although the Complaint alleges that Maestra, MUSE, and Wicked "urg[ed]" trade publications to advertise the MD Experience and "intentionally provided them information about the position to get the word out," *id.* ¶ 19, it does not allege any facts identifying anything Wicked purportedly said or provided to any publication. In the absence of anything other than conclusory group pleadings that should be disregarded, *see Iqbal*, 556 U.S. at 681, these claims fail as against Wicked.

## III.     Lynch Fails to Plead a Section 40-c Claim Against Wicked (Count IV).

Count IV asserts a claim under NYSCRL § 40-c on the theory that Maestra, MUSE, and Wicked are liable under § 40-c "for the same reasons" they are liable under the NYSHRL (Count

III).  *Id.* ¶¶ 82–83.  For the same reasons Count III fails (as set forth in detail above), Count IV also fails as a matter of law.

Courts refer to NYSCRL § 40-c and New York Executive Law § 292 with "the collective term NYSHRL."  *Moy v. Napoli Shkolnik, PLLC*, 2024 WL 3498131, at *4 n.4 (S.D.N.Y. July 22, 2024).  In other words, the NYSHRL includes both "the New York Executive Law §§ 292 *et seq.* (which provides the substance of the law) and the New York Civil Rights Law §§ 40 *et seq.* (which provides for penalties)."  *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 398 (E.D.N.Y. 2017).  "Where a plaintiff cannot support a claim under the [NYSHRL], the defendant will not be exposed to liability under § 40–c."  *Hyman v. Cornell Univ.*, 834 F. Supp. 2d 77, 84 (N.D.N.Y. 2011), *aff'd*, 485 F. App'x 465 (2d Cir. 2012).  Because Lynch fails to state a NYSHRL claim against Wicked, his Section 40-c claim against Wicked necessarily fails as well.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint against Wicked with prejudice.

DATED: New York, NY Respectfully submitted,
July 30, 2026

MITCHELL SILBERBERG & KNUPP LLP

*/s/ Jacob D. Albertson*
Jacob D. Albertson
Harrison A. Newman
437 Madison Ave., 25th Floor
New York, NY 10022
(212) 509-3900
j1a@msk.com
han@msk.com

Adam Levin (*pro hac vice*)
2049 Century Park East, 18th Floor
Los Angeles, CA 90067
(310) 312-3116
axl@msk.com

*Counsel for Defendant Wicked LLC*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of S.D.N.Y. Local Civil Rule 7.1(c) because it contains 8,033 words, excluding the portions exempted by S.D.N.Y. Local Civil Rule 7.1(c).

DATED:     New York, NY                     */s/ Jacob D. Albertson*
              July 30, 2026                    Jacob D. Albertson