**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMERICAN ALLIANCE FOR EQUAL RIGHTS and KEVIN LYNCH,

Plaintiffs,

-against-

MAESTRA MUSIC, INC.; ARTS IGNITE INC. d/b/a Musicians United for Social Equity (MUSE); and WICKED LLC,

Defendants.

Case No. 1:26-cv-04645-DLC

**AMENDED COMPLAINT**
**JURY TRIAL DEMANDED**

1. Broadway is known for breaking rules, suspending reality, and—in the case of the blockbuster musical *Wicked*—defying gravity.

2. But one thing Broadway can't defy is the law, including the many laws banning status-based discrimination. Sadly, even in the year 2026, major players in the New York theater community remain committed to that illegal project.

3. Two prominent employment directories—Maestra and MUSE—connect aspiring Broadway musicians with real Broadway jobs. But both directories ban musicians who are male (Maestra) or white (MUSE).

4. That practice is not remotely legal, under a slew of federal, state, and city laws. And when *Wicked* created a paid position open only to members of Maestra and MUSE, it excluded and harmed musicians who could not fairly compete based on race and sex. These directories continue to exclude musicians based on immutable characteristics that they cannot control.

5. On Broadway, discrimination against white males might be seen as a necessary evil—or even for good. But under the law, discrimination is "invidious in all contexts." *SFFA v. Harvard*, 600 U.S. 181, 214 (2023). As Justice Jackson just reiterated for a unanimous Supreme Court, antidiscrimination laws "establis[h] the same protections for every 'individual'—without regard to that individual's membership in a minority or majority group." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 310 (2025).

6. *Wicked* violated the law in the past, and Maestra and MUSE continue to violate it every day. This Court should award all appropriate relief.

**PARTIES**

7. Defendant Maestra Music, Inc., is a Manhattan-based nonprofit. Maestra runs an employment directory for female and nonbinary musicians in the New York theater industry. Maestra is one of the entities responsible for the Music Director Experience, a paid opportunity with the musical *Wicked*.

8. Defendant Arts Ignite Inc. is a Manhattan-based nonprofit. MUSE is an initiative of Arts Ignite and a sister organization to Maestra. MUSE runs an employment directory for musicians of color. MUSE is one of the entities responsible for the Music Director Experience.

9. Defendant Wicked LLC is the company that stages the blockbuster Broadway musical *Wicked*. In 2023, Wicked collaborated with Maestra and MUSE to create and run the Music Director Experience.

10. Plaintiff American Alliance for Equal Rights is a nationwide membership organization dedicated to ending illegal discrimination across the United States. This challenge to practices that discriminate based on race and other immutable characteristics is squarely within the Alliance's mission. *See, e.g.*, *AAER v. Fearless Fund*, 103 F.4th 765, 769-70 (11th Cir. 2024); *AAER v. ABA*, 2026 WL 161596, at *1 (N.D. Ill. Jan. 21).

11. Plaintiff Kevin Lynch is a composer and musician in the New York tristate area. Lynch is a white male. In 2023, Lynch was barred from Maestra's and MUSE's directories and from Wicked's Music Director Experience based on his race and sex. Lynch is a member of the Alliance.

## JURISDICTION AND VENUE

12. This Court has federal-question jurisdiction under 28 U.S.C. §1331 because this case "arise[s] under" federal statutes like 42 U.S.C. §1981. This Court has supplemental jurisdiction over the state and local claims under 28 U.S.C. §1367 because they "derive from a common nucleus of operative fact": the same discrimination against Lynch that violates federal law. *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725 (1966).

13. Venue is proper under 28 U.S.C. §1391 because Defendants reside here and the challenged discrimination occurred here.

## FACTUAL ALLEGATIONS

14. In late June 2023, Maestra announced an opening on its public Facebook page. As the post explained, Maestra was "teaming up" with MUSE to organize and run the "Music Director Experience with the Broadway blockbuster WICKED."

15. This opportunity was a "three-week intensive" for "aspiring music directors looking to make a big leap." In exchange for receiving a "weekly stipend" of $300, the selected participant had to complete several "duties," including attending rehearsals and performances of *Wicked*, studying the musical score, and getting "practical playing and conducting experience by working with the Music Director one-on-one." If the selected participant did not show up or perform these duties, the participant would not get to participate or be paid.

> **Maestra Music**
> 6d ·
>
> MUSE- Musicians United for Social Equity and Maestra are teaming up for the Music Director Experience with the Broadway blockbuster WICKED The Musical! This three-week intensive provides invaluable training and access to aspiring music directors looking to make a big leap in their MD journeys. Participants will get the opportunity to shadow engagement in-person in New York City with a modest paid weekly stipend.
>
> Day-to-day duties will include:
>
> ✅ Observing cast rehearsals.
> ✅ Observing performances from both the orchestra pit and the sound board.
> ✅ Studying one of the keyboard books from the show.
> ✅ Gaining practical playing and conducting experience by working with the Music Director one-on-one.
>
> The application deadline will be Monday, July 10th, 2023 11:59pm EDT. Selected musician(s) will be notified by Thursday, July 20th, 2023. To learn more and to submit your application, head over to this link here: https://docs.google.com/.../1FAIpQLSeeS3l.../viewform

16. Wicked paid the weekly $300 stipend for the Music Director Experience. Together with Wicked, Maestra and MUSE determined the tasks that the intern would be assigned.

17. A graphic that accompanied the post stressed that the Music Director Experience was "for MUSE and Maestra **directory members**." This graphic was approved by and circulated on behalf of Maestra, MUSE, and Wicked, using the official logos of all three groups. In particular, the graphic used Wicked's trademarked logo, which required Wicked's permission.




18. Maestra's post linked to a Google form that applicants had to use to submit their applications. *See MUSE/Maestra MD Experience Application*, perma.cc/YFC3-XGTE. Applications were due on July 10, 2023.

19. This same post and same graphic appeared with insignificant variations on several other websites and social-media pages belonging to or associated with Maestra, MUSE, and Wicked. *See, e.g.*, MUSE, Mentorship Programs, perma.cc/BW5P-VS2P; Stephen Oremus, Instagram (June 28, 2023), perma.cc/UX3Z-SQ6H; Stephen Oremus, Facebook (June 28, 2023), perma.cc/FZ5U-EVVX; AlvinHoughPiano, Instagram (June 29, 2023), perma.cc/64XJ-9RXY; Alvin Hough, Jr., Facebook (June 30, 2023), perma.cc/85YD-KKTP; Georgia Stitt, Facebook (June 29, 2023), perma.cc/E3SR-MS4Y. These ads also circulated at the prompting of Maestra, MUSE, and Wicked, which used the pages to increase applications for the position.

20. Wicked was aware of MUSE's and Maestra's illegal discrimination when it chose to collaborate with them on the Music Director Experience. Wicked's music supervisor, Stephen Oremus, had then (and still has) hiring power at Wicked. He chose to solicit applications for the Music Director Experience and to require membership in Maestra or MUSE. Oremus also served then (and still serves) on the executive committee of MUSE. He was aware of the discriminatory membership practices of MUSE and its sister organization, Maestra. More broadly, MUSE's founding members include at least five Wicked employees, some of whom hold hiring power within Wicked.

21. Wicked also advertised the Music Director Experience on its official social-media pages.







22. The *Playbill* article that Wicked posted included information about how to apply, including the deadline and the link to the application form. *See* Culwell-Block, *New Program Will Allow Early-Career Musicians to Shadow Music Team at Broadway's* Wicked,

Playbill (June 28, 2023), perma.cc/6PC6-6ECL. It also made clear that only "MUSE and Maestra Directory members" were eligible. *Id.* Wicked publicized this article to solicit applications for the Music Director Experience.

23. Several other Broadway trade publications also advertised the Wicked Music Director Experience. These advertisements repeated that the experience was an exclusive opportunity for Maestra and MUSE directory members and encouraged applicants to use the Google form. *See, e.g.*, Lefkowitz, *'Wicked' Teams Up with Nonprofits MUSE and MAESTRA for 'Music Director Experience'*, Broadway News (June 28, 2023), perma.cc/KBQ3-DMM7; Playbill, Facebook (June 28, 2023), perma.cc/N4ZU-VM9N; Rabinowitz, *WICKED to Launch Three-Week Intensive for Aspiring Music Directors With MUSE and MAESTRA*, Broadway World (June 28, 2023), perma.cc/28D5-PDTN; Broadway World, Twitter (June 28, 2023), perma.cc/NC6R-PSX7. These trade publications published these ads at the urging of Maestra, MUSE, and Wicked, who provided the publications information about the position to get the word out.

24. Lynch, an aspiring Broadway music director, had previous experience as a music director for regional and community theater productions. So when he saw the announcement for a music-directing opportunity that would take him to Broadway, he applied for the Music Director Experience with Wicked. Lynch, who has a music degree and experience working as an accompanist at Juilliard, was well-qualified.

25. But when Lynch pulled up the Google form, he discovered that the application could not be completed unless the applicant first joined the MUSE or Maestra

directory. The form stated: "[W]e are extremely pleased to be offering this pipeline program *exclusively* to NYC (Tri-State) area MUSE and MAESTRA Directory members." (Emphasis added.)



MUSE MAESTRA

MUSE/Maestra MD Experience Application

Announcing the Music Director (MD) Experience initiative from MUSE and MAESTRA. In partnership with the blockbuster musical, WICKED, we are extremely pleased to be offering this pipeline program open exclusively to NYC (Tri-State) area MUSE and MAESTRA Directory members who are emerging MDs looking to make a big leap in their MD journeys.

26. The form also required applicants to answer the question, "Are you a member of the MUSE and/or Maestra Directories?" and to "Drop your MUSE and/or MAESTRA Directory profile link(s) below." It was impossible to submit the application without responding to these prompts.



Are you a member of the MUSE and/or Maestra Directories? *

Yes

No

Drop your MUSE and/or MAESTRA Directory profile link(s) below *

Your answer

27. The form directed applicants to pages where they could register for the MUSE and Maestra directories, if they were not already members. Because he sincerely wanted to apply for the Music Director Experience, Lynch attempted to sign up for both directories on June 28, 2023.

28. For Maestra's directory, the registration page instructed musicians to register only if they were "female or non-binary musician[s] working in the theater."



Join The Maestra Directory

**If you just want to join our Mailing List,** click HERE.

**To join the** Maestra Directory**:**
Are you a female or non-binary musician working in the theater? This includes composers, music directors, arrangers, orchestrators, copyists, conductors, pit musicians, music assistants, rehearsal pianists, contractors, songwriters, voice teachers, musical theater educators, recording engineers, keyboard programmers, sound designers, lyricists, and bookwriters. And yes, students studying to do these things professionally are also welcome.

If this is you, please register below to join the Maestra Directory. **You must then use your new login to create a personal profile page.** Note: your page **will not be approved** until you have uploaded a photo, added a bio, and highlighted the searchable fields that apply to you. You'll receive a confirmation email once your profile has been added to the Directory.

29. Though Lynch is male and does not identify as nonbinary, he completed a profile with accurate information, including a photograph of himself. The website created a link to his page in the Maestra directory. But that page was not publicly listed or searchable within the Maestra directory, unless and until Maestra reviewed and approved Lynch's application.

30. That same day, Lynch tried to create a profile for the MUSE directory. According to the registration page, the MUSE directory is for "Person[s] of Color who identif[y] as … musician[s]."

> **To join the MUSE Directory:**
> Are you a Person of Color who identifies as a musician? This includes composers, music directors, arrangers, orchestrators, copyists, conductors, pit musicians, music assistants, rehearsal pianists, contractors, songwriters, voice teachers, musical theater educators, recording engineers, keyboard programmers, sound designers, lyricists, and bookwriters. And yes, students studying to do these things professionally are also welcome.
>
> If this is you, please register below to join the MUSE Directory. **You must then use your new login to create a personal profile page.** You'll receive a confirmation email once you've been approved.

31. Though Lynch is a musician, he does not identify as a person of color. Even so, Lynch registered for a MUSE profile. Lynch's page was not publicly listed or searchable within the MUSE directory, unless and until MUSE reviewed and approved Lynch's application (which never happened).

32. Lynch used his new link on the Maestra directory to submit a complete and timely application for the Music Director Experience on June 28.

33. On July 5, a week after creating his Maestra profile and submitting his Music Director Experience application, Lynch asked Maestra when his profile would be made public within the directory. Lynch received an email from Maestra in response, stating that his "profile application ha[d] been denied." The email said there were two "[c]ommon" reasons for denial: (1) "[y]our pending profile remained incomplete for too long"; or (2) "[y]our application did not indicate that your profile belongs in the Maestra community." Because Lynch had completed his profile, he was rejected for being male.

34. After he received this email from Maestra, Lynch's Maestra directory page (which had never been publicly searchable) was completely removed.

35. Lynch simultaneously emailed MUSE to follow up about the status of his profile in that directory. As Lynch noted in the email, he had registered for a profile on June 28, but his profile did not appear on the website. MUSE never responded. To this day, MUSE has not added Lynch to its directory.

36. In August 2023, Maestra and MUSE publicly announced the winning applicant for the Music Director Experience: a female and nonbinary person of color who was a member of Maestra's directory. The winner was also a member of MUSE's directory.

37. Had Lynch been a woman of color, he would have been selected for the Music Director Experience. After setting the eligibility requirements, duties, and compensation for the internship in consultation with Wicked and with Wicked's approval, Maestra and MUSE organized a selection committee to review applications for the internship. Maestra and MUSE's selection committee chose the winner of the contest under the terms jointly set by Maestra, MUSE, and Wicked. As one of the panelists on the selection committee put it: "Kevin is clearly talented. … Wants to bring his own show to fruition. Desires the opportunity" to train "at the highest level of [Music Theater]." And another panelist, who reviewed all the applications, said that Lynch "looks like a solid [Music Director]." But Lynch could not be selected due to his race and sex.

38. Despite Lynch's evident talent, extensive experience, and noted drive, the committee selected a less impressive candidate—but one who checked off the right

demographic boxes. Lynch was working on a master's degree from Berklee, had a significant track record of relevant music directing experience, and lived—as the competition rules required—in the New York Tri-State area. Lynch had also taught voice lessons at the Juilliard School. The winner, by contrast, had not pursued graduate studies in music.

39. The winning applicant was a singer-songwriter without significant experience as a music director, even though prior music directing experience was stated to be "necessary to be considered" for the position. Lynch, by contrast, had previously music directed for over 100 performances—and had won a local award for music directing in 2014.

40. The winning applicant went on to be quite successful in Manhattan theater because of the Music Director Experience. As the winner put it, "Since the MD Experience, I've gotten six jobs. I've music directed seven new works. … It's been great, I'm getting jobs, getting paid, and then hiring people."

41. Long after the Music Director Experience had ended, the winner still attributed various successes to having been selected for the MD Experience. "I'll have 4 shows running on [December 8, 2024]. … Pretty damn proud and excited at my musical life. Who did that? @museonline_org did that & @maestramusicorg did that w/the MD experience."

42. The successes kept on coming. Based on publicly available statements alone (including show announcements and credits), the winner has held 17 employed

roles in shows ranging from *Henry IV* to *Music City* and has shadowed for shows ranging from *Moulin Rouge* to *The Book of Mormon*.

43. The winner wrote that Maestra and MUSE "have jump-started my professional development in NY musical theatre." "As the inaugural winner of the Maestra/MUSE MD Experience with Wicked, I learned so much from Dan [the music director], the music team, the actors, and the music itself, that I've been able to immediately apply to my work MD'ing new musicals in NYC. Absolutely priceless."

44. The winner was even hired to play as a musician for Wicked itself—again thanking the Music Director Experience for making this opportunity possible. "I made my Broadway debut … subbing on Key 2 in @wicked_musical … I could not have gotten here without … @maestramusicorg and @museonline_org who work tirelessly to open stage doors & orchestra pits to female/nonbinary musicians and those of color and did so for me with the MD Experience with Wicked."

45. Despite the emphasis on visual diversity characteristics like race and sex, the MUSE and Maestra directories (including RISE) are not for on-stage actors. *Wicked*, for example, has a closed pit—meaning the orchestra and conductor are purposefully invisible to the audience. The apprentice shadowing the conductor for the Music Director Experience likewise was not visible to the audience.

46. Lynch still wants to be listed in the Maestra and MUSE directories. These lists help musicians get work on and off Broadway, and Lynch continues to seek that work.

47. Lynch maintains an active profile on the RISE Theatre Directory, a distinct professional directory that is also run by Maestra but that does not outright bar white males from appearing. RISE does limit Lynch's ability to get work vis-à-vis other directory members, however, because it lets prospective employers filter directory members by race and sex.

48. The Maestra directory leads to real employment opportunities.

a. Individuals with hiring power in New York theater use Maestra for their staffing needs. For example, a prominent music director explained that he used Maestra to ensure that 14 of his 28 orchestra members—exactly half—were women. Similarly, a prominent music coordinator—who has hired musicians for over a dozen New York productions, including *The Lost Boys*, *The Outsiders*, *Beetlejuice*, *Cabaret*, and *Back to the Future: The Musical*—said she uses Maestra to "hire a woman" or "person of color" because she can "go on the Maestra directory and punch in a location and instrument" and "how they identify."

b. On the employee side, another person in the industry said: "Seven different people … have told me they've gotten work from the [Maestra] directory." And a music director said: "I just got a job today through this network."

c. Maestra boasts about its influence over hiring. It highlights that a prominent composer "frequently uses the Maestra Directory when looking for

musicians to help support her work and bring her musicals to life," "especially those who are underrepresented in the industry." And Maestra has registered with the federal government as providing "[p]rofessional and career networking services."

49. Maestra's RISE Directory also leads to real employment opportunities. For example, a California theater recently needed a music director for a production and searched the RISE Directory, where it found Lynch's profile. The theater reached out to Lynch and asked him to schedule an interview. More broadly, RISE encourages individuals with hiring power to take the following pledge: "As an organization, we commit that each hiring process will start with utilizing the RISE Theater Directory." More than a dozen people with hiring power in the New York theater industry have signed the pledge. They have publicly committed to use the RISE Theater Directory for hiring. And RISE itself stands for "Representation, Inclusion and Support *for Employment*." (Emphasis added.)

50. The MUSE directory leads to real employment opportunities. "MUSE hosts … opportunities for members to connect and network with each-other. … MUSE provides many opportunities to connect with a mentor whether it's MUSE One-on-One, a 6-month-long mentorship program, or playing alongside a seasoned Broadway vet." Moreover, MUSE directory members have "exclusive access" to the jobs posted on the MUSE job board. According to one of its founders, the MUSE directory

provides a pool of talent that MUSE's leaders make personal references from when their colleagues in the New York theatre industry reach out with staffing needs.

51. Lynch sincerely wants access to these valuable professional opportunities, including employment and internships. If a court ordered Maestra and MUSE to stop discriminating, Lynch would immediately reapply to join both directories. He still has all the necessary information from his prior failed attempts.

52. In addition to Lynch, AAER has another member who is harmed by the RISE directory. He has worked in theater as a director and educator for many years, but is currently underemployed and looking for more work.

53. This AAER member is ready and able to join the RISE directory. He sincerely wants to join the RISE directory because RISE helps match directors—and others who work off-stage in the theater—with suitable work. He believes the RISE directory would help him get more directing work in New York theater.

54. But the RISE directory is currently designed to facilitate employers screening out white job seekers, like AAER's member. In his experience, New York theater employers use race-based filtering to sort out white male applicants like him. If a court ordered RISE to end its discriminatory practices, this AAER member would promptly join the RISE directory and use it to seek work.

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. §1981
### (Music Director Experience)
### [By Lynch; Against All Defendants]

55. Plaintiffs repeat and reallege each of the prior allegations.

56. Section 1981 guarantees "[a]ll persons … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). It prohibits discrimination by "nongovernmental" actors like Maestra, MUSE, and Wicked. §1981(c). And it authorizes equitable and legal relief, including damages. *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459-60 (1975).

57. Lynch is protected by §1981, as its "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp.*, 427 U.S. 273, 295 (1976). Titled "Equal rights under the law," §1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019), by protecting the "equal right of all persons … to make and enforce contracts without respect to race," *Domino's Pizza v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up); *accord McDonald*, 427 U.S. at 287 (holding that "[§]1981 is applicable to racial discrimination … against white persons"); *Freeport v. Barrella*, 814 F.3d 594, 605 (2d Cir. 2016) (explaining that "§1981 also forbids so-called 'reverse discrimination'"); *Killin v. Buttercup CT*, 2025 WL 2173993, at *6 n.1 (D. Conn. July 31) ("The Supreme Court and the Second Circuit have made it clear … that white litigants are not restricted from pursuing claims under §1981 on the basis of discrimination against their race.").

58. Section 1981 "protects 'would-be contractor[s]' … to the same extent that it protects contracting parties." *Fearless Fund*, 103 F.4th at 776. The statute "offers relief when racial discrimination blocks the creation of a contractual relationship." *Domino's*, 546 U.S. at 476. A contract under §1981 includes "an agreement to do, or refrain from doing, a particular thing, upon sufficient consideration." *Fearless Fund*, 103 F.4th at 775 (quoting 17A Am. Jur. 2d Contracts §1).

59. Employment, at will or otherwise, is "a 'contract' within the meaning of 42 U.S.C. §1981." *Whidbee v. Garzarelli Food Specialties*, 223 F.3d 62, 68 (2d Cir. 2000). Section 1981 "thus outlaws discrimination with respect to … employment," *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004), including discriminatory failures to hire. *See Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 442 (7th Cir. 2014); *Barbour v. Merrill*, 48 F.3d 1270, 1276 (D.C. Cir. 1995). Because paid internships and apprenticeships are also contracts, *Mihalakis v. Cabrini Med. Ctr. (CMC)*, 542 N.Y.S.2d 988, 990 (1st Dep't 1989); *Overseers of Town of Guilderland v. Overseers of Town of Knox*, 5 Cow. 363 (N.Y. Sup. Ct. 1826); *Amendola v. A.C. Elec. Co.*, 608 N.Y.S.2d 279, 279-80 (2d Dep't 1994), they are likewise covered by §1981. *See Juarez v. Nw. Mut. Life Ins. Co.*, 69 F. Supp. 3d 364, 366 (S.D.N.Y. 2014) (permitting an intern's §1981 claim to proceed past a motion to dismiss); *Adam v. Obama for Am.*, 210 F. Supp. 3d 979, 988 n.2 (N.D. Ill. 2016) (payment makes an internship a contract).

60. Lynch sought to contract with Maestra, MUSE, and Wicked. In exchange for showing up on site, completing the tasks assigned to him as an apprentice music

director, and satisfying other "[d]ay-to-day duties," Lynch would have been "paid" a "modest … weekly stipend" and received other valuable benefits, such as access to the Wicked network and mentorship from the Wicked music director. The winner's performance in the Music Director Experience likewise benefitted Maestra, MUSE, and Wicked. It gave Wicked goodwill and the opportunity to vet and hire someone, as it did in fact hire the winner to work on Wicked after the MD Experience. And it gave Maestra and MUSE the opportunity to tout their influence placing musicians on Broadway, which they did in public statements like Maestra's 2023 Annual Report.

61. The producers of Wicked paid the winner $300 each week in consideration for the winner's time, attention, and energy. If the winner had not been present and completed the assigned tasks, Wicked would not have paid the stipend. This exchange of money for time onsite—between 6 and 12 hours each week—was a contract.

62. The Music Director Experience was at least a contest. *See AAER v. Fearless Fund*, 103 F.4th 765, 775 (11th Cir. 2024). "It is hornbook law that the rules of a contest constitute a contract offer and that the participant's entry into the contest constitutes an acceptance of that offer." *Sargent v. New York Daily News, L.P.*, 840 N.Y.S.2d 101, 103 (App. Div. 2007) (cleaned up); *Afr. Diaspora Mar. Corp. v. Golden Gate Yacht Club*, 968 N.Y.S.2d 459, 464-65 (App. Div. 2013) (same). The application process required applicants to draft an original essay, provide other application materials, and perform an audition piece for the judges. A "winning entrant obtain[ed] [money] and valuable

mentorship" in exchange for successfully completing the requirements of the application and the experience. *Fearless Fund*, 103 F.4th at 775.

63. Maestra, MUSE, and Wicked were all parties to the contract. Maestra, MUSE, and Wicked jointly set the rules. According to the ads for the role, the three entities "team[ed] up" to create the contest. *Supra* ¶14. As the accompanying graphic made clear, the position was an "initiative" of Maestra, MUSE, and Wicked. *Supra* ¶¶17-18. A contemporary industry publication explained that Wicked "launch[ed]" the position with MUSE and Maestra. *Supra* ¶23. MUSE and Maestra organized the panel that selected the winner using the criteria that MUSE, Maestra, and Wicked had all previously agreed to and advertised. And Wicked paid the winner on behalf of itself, MUSE, and Maestra. In rendering Lynch ineligible and denying him a fair opportunity to apply and compete, all three parties refused to contract with him on equal terms.

64. Maestra, MUSE, and Wicked directly discriminated against Lynch. By limiting eligibility for the position to members of the MUSE directory—who are necessarily people of color—Maestra, MUSE, and Wicked facially discriminated based on race. Because their policy was "discriminatory on its face," the *McDonnell Douglas* burden-shifting framework is inapplicable. *Trans World Airlines v. Thurston*, 469 U.S. 111, 121 (1985); *see Johnson v. New York*, 49 F.3d 75, 78-79 (2d Cir. 1995).

65. If Lynch had been a person of color, he could have competed on an equal basis for the Music Director Experience. Lynch's race was a but-for cause of Maestra, MUSE, and Wicked's refusal to contract with him on equal terms. *See Comcast Corp. v.*

*Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020). Absent the discrimination, Lynch also would have been selected: He had extensive previous music directing experience, far more than the applicant who was ultimately offered the position. *Supra* ¶¶38-39.

66. Defendants' racial discrimination cannot satisfy strict scrutiny. That "daunting" test first asks "whether the racial classification is used to further compelling governmental interests." *Harvard*, 600 U.S. at 206-07. It then asks "whether the government's use of race is narrowly tailored—meaning necessary—to achieve that interest." *Id.*; *see also Gratz v. Bollinger*, 539 U.S. 244, 270 (2003).

67. The Supreme Court has recognized only two interests that are sufficiently compelling: (1) avoiding imminent and serious risks to human safety in prisons, as in a race riot; and (2) remediating specific, identified instances of unlawful past discrimination. *See Louisiana v. Callais*, 146 S. Ct. 1131, 1152 (2026). Maestra, MUSE, and Wicked do not promote prison safety. And they do not claim to have been remedying specific, identified instances of illegal discrimination.

68. Even if the discrimination by Maestra, MUSE, and Wicked served a compelling interest, their blanket ban on white male applicants was not narrowly tailored. They could have, for example, offered the position to applicants of all races and sexes that could prove that they had lost opportunities due to discrimination.

69. Wicked, Maestra, and MUSE are liable for punitive damages. They launched the discriminatory Music Director Experience the very week the Supreme

Court decided *SFFA v. Harvard*. And these entities used subterfuge to conceal their lawbreaking. Rather than state "no white males need apply," they linked the requirements for the experience to membership in two directories that were (and are) closed to white males. They knew explicit race-based discrimination violated the law, so they tried to make it look like they were not facially discriminating.

**COUNT II**
**42 U.S.C. §1981**
**(MUSE Directory)**
**[By All Plaintiffs; Against MUSE]**

70. Plaintiffs repeat and reallege each of the prior allegations.

71. MUSE refuses to add Lynch to its directory solely because of his race.

72. MUSE admits only people of color. The "**Requirements**" to join the MUSE directory include that the applicant is a "Person of Color who identifies as a Musician working, interested or aspiring to the theater." Because he works in the theater industry, including as a "compose[r]" and "music directo[r]," Lynch satisfies all the non-ethnic criteria to join MUSE's directory.

73. If MUSE stops excluding him based on race, Lynch will immediately join the MUSE directory.

74. MUSE's continuing refusal to admit Lynch violates §1981's ban on racial discrimination in contracting.

75. A job seeker enters a contract when he joins MUSE's directory. According to MUSE's privacy policy, when a directory applicant "submit[s] information to or through the Site," he is "consenting to the collection, processing, and retention of [his]

information as described in this Privacy Policy." In exchange for access to the valuable opportunities provided through the MUSE directory, directory members let MUSE use "[a]ny information [they] submit … for a variety of purposes." This contract also includes a choice-of-law clause that selects American law, not foreign law.

76. By refusing to let Lynch join its directory, MUSE is refusing to contract with Lynch. It is, at minimum, refusing to give Lynch the equal benefit of any contract he entered when he visited the website and applied to join the directory.

77. Separately, MUSE's failure to refer Lynch for employment and other contractual opportunities violates §1981. "By discriminating against the plaintiff through a refusal to refer him for jobs, [MUSE] intentionally deprived [Lynch] of the ability to enter into contracts with employers, and this manner of discrimination falls squarely within the prohibition of § 1981." *Daniels v. Pipefitters' Ass'n Loc. Union No. 597*, 945 F.2d 906, 915 (7th Cir. 1991).

78. MUSE is liable to Lynch for punitive damages. It has knowingly and maliciously chosen to exclude Lynch from its directory for no other reason than his race, when doing so was obviously in violation of federal law.

**COUNT III**
**42 U.S.C. §1981**
**(RISE Directory)**
**[By All Plaintiffs; Against Maestra]**

79. Plaintiffs repeat and reallege each of the prior allegations.

80. In addition to its sex-based directory, Maestra runs the RISE Theatre Directory.

81. Unlike the Maestra directory, which is limited to women and non-binary musicians, the RISE Theatre Directory is open to anyone who "work[s] backstage, behind-the-scenes" in theater.

82. Nevertheless, the RISE Theatre Directory is intended to benefit "people of color … theatre professionals."

83. The RISE Theatre Directory involves contracts. To join, members must read and accept an indemnification agreement, a choice-of-law clause that opts for New York law, and a forum-selection clause that opts for New York City.

84. Directory members also must agree to give RISE a license to "use information" that "you provide to us," "include[ing] information provided at the time of registering for our directory."

85. By its terms, §1981 prohibits differential racial treatment in the "performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. §1981(b). Lynch entered a contractual relationship with Maestra when he joined the RISE Directory in June 2023. RISE discriminates against Lynch based on race in the enjoyment of the benefits of that contractual relationship.

86. Since Lynch joined RISE, the directory has treated him differently because of his race. RISE classifies directory members by race and lets would-be employers sort and filter directory members by race. A how-to video by Maestra encourages this type of discrimination and instructs employers how to do it: "I'm specifically looking for a

producer. … I need someone based in New York City. … I would love someone who identifies as [Asian American or Pacific Islander] to be on my team. Okay, so I'm going to click that and see what comes in the search results. Okay so I have 57 results. Let's look at the first candidate."




87. The directory has a racially discriminatory purpose and effect. According to RISE, the directory was "intentionally designed for candidates from underrepresented backgrounds, including but not limited to people of color." The "mission" of the directory is "to increase diversity among the workforce that produces American theatre." RISE effectuates this mission in a way that disadvantages white theater professionals. Employers can select for different minority employees (AAPI, Black or African American, Hispanic or Latine/Latinx, Indigenous/Native American, MENA), but they cannot select for employees who do not fit one of these racial categories.

88. Maestra's RISE directory classifies Lynch by race and has provided him with fewer professional opportunities because of his race.

89. Maestra is liable to Lynch for punitive damages for this discrimination. Maestra flagrantly and intentionally chose to disadvantage some RISE directory members for no other reason than their race. And it has continued to do so in the wake of clear Supreme Court precedent holding that federal law forbids such racial classifications.

90. The RISE directory also injures AAER's other member, who wants to join and would join immediately, but cannot do so on equal terms because of RISE's discriminatory practices.

**COUNT IV**
**Title VII of the 1964 Civil Rights Act**
**(MUSE, Maestra, and RISE Directories)**
**[By Lynch; Against MUSE and Maestra]**

91. Plaintiffs repeat and reallege each of the prior allegations.

92. Plaintiff Lynch filed an EEOC charge relating to the discrimination he has faced from the MUSE, Maestra, and RISE directories. The EEOC issued its notice of right to sue on August 20, 2026, backdated to August 18.

93. Under Title VII, it is "an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color … sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color … sex, or national origin." 42 U.S.C. §2000e-2(b).

94. Here, "[t]he term 'employment agency' means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer." 42 U.S.C. §2000e(c).

95. Maestra is an employment agency. Under EEOC guidance, "newspapers that exercise control over discriminatory job listings rather than merely printing them" qualify as employment agencies. 1991 WL 11665181, at *2 (EEOC Sept. 20). And an entity that provided lists of candidates to those with hiring power in a specific field is likewise an employment agency: It "decides what names are on the lists and by what criteria those names w[ould] be chosen." *Scaglione v. Chappaqua Cent. Sch. Dist.*, 209 F. Supp. 2d 311, 317 (S.D.N.Y. 2002).

96. Maestra fits within this definition of "employment agency" because it actively curates a list of female and non-binary musicians looking for work in the theater industry. Maestra exercises control over which individuals are listed and the criteria by which these individuals are chosen for the directory. To qualify for Maestra's directory, an applicant must be "a woman or gender-expansive musician working in musical theater and/or opera." After an applicant "create[s] a personal profile page," that page will not be visible until Maestra "approve[s]" it and sends "confirmation." Maestra does not list individuals indiscriminately: It curates a list of approved candidates available to work in a small, relationship-driven industry. So it is regularly procuring employees for these employers.

97. MUSE is also an "employment agency." Like Maestra, MUSE curates a specific list of available hires using its own discretionary criteria. An applicant for the MUSE directory must be a "Person of Color who identifies as a musician." Applicants who do not meet these criteria are not "welcome." MUSE "approve[s]" profiles after review and provides "confirmation" to applicants for its referral services.

98. In curating their directories for specific qualities, Maestra and MUSE regularly refer their directory members to employers, including employers covered by Title VII. *See* 42 U.S.C. §2000e(b). For example, one hiring agent, who regularly hires for successful Broadway productions, touts that she uses the Maestra directory to find female musicians. Another woman with hiring power boasted that she "used the Maestra database to assemble a band comprised entirely of female and gender expansive musicians for a concert of my work at Joe's Pub." A music director for the New York City Center said that he used Maestra to achieve gender parity in his orchestra. According to the founder of Maestra, the directory grew out of, and is an extension of, her circle of friends, who benefit from Maestra's closed "networking events." One of the founding leaders of MUSE, a prominent Broadway music director, says that MUSE uses its directory to make direct referrals to his Broadway colleagues when they reach out for candidate recommendations. Broadway productions employ far more than 25 employees; on average, they employ over 80. Moreover, MUSE hosts networking events, runs mentoring programs, and provides "exclusive" job listings—all limited to members of its directory and thus to people of color.

99. By excluding Lynch from their directories, *supra* ¶¶27-33, MUSE and Maestra have refused to refer Lynch for employment based on sex and race, in violation of Title VII. They are liable to Lynch for punitive damages because they have knowingly and maliciously discriminated based on race and sex.

100. Maestra has also violated Title VII by classifying Lynch and other directory members by race and sex in its RISE directory. Title VII makes it illegal for an employment agency to "classify or refer for employment" based on race or sex. 42 U.S.C. §2000e-2(b).

101. Maestra's RISE directory classifies would-be employees by race and sex and is designed to let employers filter and sort employees based on race and sex. *See supra* ¶¶85-87. An employer who only wants to hire theater professionals of a specific race can check a box to view all the candidates of that race who qualify—a practice that Maestra actively encourages. Notably, it is not possible to select for white candidates (unless the employer is specifically looking to hire Middle Eastern or North African candidates). This filtering and sorting mechanism violates Title VII's ban on race- and sex-based classifications.

102. The RISE directory falls under Title VII because RISE is a "program of Maestra," which is itself an employment agency. RISE would also qualify as an employment agency on its own. The RISE directory touts itself as "a connector for employers to find potential candidates and collaborators that have been historically underrepresented." RISE also "promotes events hosted by our Network Partners and develops

programming centered around connecting our users and community throughout the year." These function as job fairs where RISE introduces its "diverse group of artists" to "industry leaders" with hiring power.

103. Lynch is already a member of the RISE directory. So he has experienced past harm and is continuing to experience ongoing harm from the RISE directory's race-based and sex-based filtering. For his past harms stemming from the RISE directory's intentional discrimination, Lynch is entitled to punitive damages.

**COUNT V**
**New York State Human Rights Law**
**N.Y. Exec. Law §296 & §296-c**
**(Music Director Experience)**
**[By Lynch; Against All Defendants]**

104. Plaintiffs repeat and reallege each of the prior allegations.

105. The New York State Human Rights Law prohibits "an employment agency" from "discriminat[ing] against any individual because of … [his] race, … color, … [or] sex … in receiving, classifying, disposing or otherwise acting upon applications for its services or in referring an applicant … to an employer or employers." N.Y. Exec. Law §296(1)(b). Like the rest of the NYSHRL, this provision is "construed liberally." N.Y. Exec. Law §300.

106. Maestra and MUSE are employment agencies. "The term 'employment agency' includes any person undertaking to procure employees or opportunities to work." N.Y. Exec. Law §292(2). Maestra and MUSE undertake to procure opportunities for musicians to work in the New York theater industry. They selectively curate

their lists of music-industry employees. They also seek to connect those employees with work through the directory leaders' industry connections and through directory-members-only professional networking events to which select industry hiring professionals are invited. *See supra* ¶96, ¶98.

107. The MUSE directory is an employment directory that matches musicians with suitable work in the theater industry. It allows prospective employers to screen would-be employees by experience (Broadway versus Off-Broadway versus Regional), expertise (Composer versus Music Director versus Librettist), instruments (cello versus flute versus saxophone), and racial identity ("African Descent" versus "Latine" versus "API" versus "Indigenous" versus "MENA"). A musician cannot "become a member" of the directory unless he satisfies the "Requiremen[t]" that he be a "Person of Color."

108. MUSE illegally discriminated against Lynch based on race. It refused to recommend him for employment—and declined to list him in its employment directory or let him attend the networking events associated with membership—because he is not a "Person of Color." Lynch suffered a completed legal violation at least in summer 2023, when he tried to create a profile in the MUSE employment directory. MUSE rejected his profile because he is white.

109. Maestra runs the Maestra directory—another employment directory that matches musicians with suitable work in the New York theater industry. The only salient difference between Maestra and its sister organization MUSE is that Maestra dis-

criminates based on sex too. The Maestra directory lets employers sort through hundreds of musician profiles, filtering them by experience, expertise, and instruments. It also allows them to view only "persons of color." Individuals cannot "Join The Maestra Directory" unless they "are … female or gender-expansive musician[s] who wor[k] in musical theater or opera."

110. Maestra illegally discriminated against Lynch based on sex. It refused to recommend him for employment—and declined to list him in the Maestra directory or admit him to the networking events associated with directory membership—because he is not "female or gender-expansive." Lynch is male and identifies as male. Lynch suffered a completed legal violation at least in summer 2023, when he tried to create a profile in the Maestra directory. After reviewing his profile and determining that he was male, Maestra removed it.

111. The NYSHRL authorizes punitive damages. *See* N.Y. Exec. Law §297(9) ("Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages, including, in cases of employment discrimination related to private employers … punitive damages."); *see also Diggs v. Oscar De La Renta, LLC*, 94 N.Y.S.3d 574, 576 (2d Dep't 2019). "A prevailing party is entitled to punitive damages under … the NYSHRL where defendants engaged in intentional discrimination with malice or reckless indifference to plaintiff's … rights." *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 100 (E.D.N.Y. 2020) (cleaned up). Lynch is entitled to punitive damages because Defendants contrived to conceal their

racial and sex-based discrimination and chose to discriminate based on race the very week the Supreme Court decided *Harvard*. *See supra* ¶69.

112. The NYSHRL also makes it unlawful to "refuse to hire … or to bar … from internship an intern … because of the intern's … race, … color, … [or] sex" and to "discriminate against an intern in receiving, classifying, disposing or otherwise acting upon applications for internships" on those grounds. N.Y. Exec. Law §296-c(2)(a)-(b). The Music Director Experience was at least an internship. It "provide[d] … training … [to] enhance … employability" in Manhattan theater; it "provide[d] experience for the benefit of" the person selected for the position; it "d[id] not displace regular employees" of Maestra, MUSE, and Wicked; and it was "performed under the close supervision of existing staff." §296-c(1)(c). As the Google application form explained: "Day to day duties … include[d] observing cast rehearsals, observing performances from both the orchestra pit and the sound board, studying one of the keyboard books from the show, and gaining practical playing and conducting experience by working with the Music Director one on one." It was a "3-week intensive shadowing engagement" intended to be a "pipeline program" for "emerging [music directors] looking to make a big leap in their [music director] journeys."

113. Indeed, MUSE and Maestra regularly offer and have offered many paid internships in partnership with Broadway musicals. For example, in 2021 "[t]he Broadway production Jagged Little Pill … teamed up with MUSE and MAESTRA to provide … a paid internship" for "[o]ne applicant." This paid internship was "for MUSE and

Maestra members only." The next year, "[t]he Broadway production of *Almost Famous* … team[ed] up with MUSE and MAESTRA to provide an exciting internship opportunity under the supervision of Almost Famous's composer, lyricist and orchestrator … as well as its music supervisor." This "internship [wa]s paid at a rate of $750/week for 4 weeks," according to MUSE's online listing. And it was only "open to MUSE and MAESTRA members."

114. Maestra, MUSE, and Wicked barred Lynch from the Music Director Experience and discriminated against him. They openly deterred him and other white males from applying, announced that such applicants were categorically ineligible, and refused to let him equally compete because he is a white male.

115. The NYSHRL likewise makes it illegal to "print or circulate or cause to be printed or circulated any statement, advertisement or publication, or to use any form of application for employment as an intern or to make any inquiry in connection with prospective employment, which expresses directly or indirectly, any limitation, specification or discrimination as to … race, … color, … [or] sex." N.Y. Exec. Law §296-c(2)(c). Maestra, MUSE, and Wicked violated this law by advertising the Music Director Experience position as being open only to Maestra and MUSE directory members—*i.e.*, female and nonbinary people of color. *See supra* ¶¶15-23.

116. Maestra, MUSE, and Wicked are liable to Lynch for punitive damages. They intentionally excluded him from the internship based on his race and sex and

intentionally advertised the internship in a discriminatory way—when it was clear that this was illegal.

**COUNT VI**
**N.Y. Civ. Rights Law §40-c**
**(Music Director Experience)**
**[By Lynch; Against All Defendants]**

117. Plaintiffs repeat and reallege each of the prior allegations.

118. Under the New York State Civil Rights Law, "[n]o person shall, because of race …, color … [or] sex … be subjected to any discrimination in his or her civil rights … by any other person or by any firm, corporation or institution." N.Y. Civ. Rights Law §40-c.

119. As a 501(c)(3) nonprofit that operates multiple professional directories, Maestra is a "firm, corporation, or institution" subject to the NYSCRL.

120. MUSE operates the professional directory of the 501(c)(3) nonprofit Arts Ignite Inc. MUSE and its parent organization each qualify as a "firm, corporation, or institution" subject to the NYSCRL.

121. Wicked is a limited liability company. As a "firm, corporation, or institution," it is subject to the NYSCRL.

122. "A valid cause of action based on a violation of the [New York State Human Rights Law] exposes the defendant to civil penalties under Section 40-c of the New York Civil Rights Law, recoverable by the person aggrieved." *Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 352 (E.D.N.Y. 2008) (cleaned up). So "facts sufficient to sustain a cause of action under [the New York State Human Rights Law] will support

a cause of action under section 40-c of the Civil Rights Law." *Id.* at 353. (cleaned up); *see also Gordon v. PL Long Beach*, 74 A.D.3d 880, 885 (2d Dep't 2010) (same).

123. Maestra, MUSE, and Wicked are liable under the Civil Rights Law, §40-c, for the same reasons they are liable under the State Human Rights Law, Exec. Law §296. *See supra* ¶¶105-17.

124. "Any person who shall violate [N.Y. Civ. Rights Law §40-c] … shall for each and every violation thereof be liable to a penalty of not less than one hundred dollars nor more than five hundred dollars," to be paid to the person "aggrieved thereby." N.Y. Civ. Rights Law §40-d.

125. Maestra, MUSE, and Wicked each owe Lynch a $500 penalty for refusing to consider him for an experience that was at least an internship. Maestra and MUSE each owe Lynch a separate $500 penalty for rejecting him from their directories. And Maestra, MUSE, and Wicked each owe Lynch separate penalties for every individual discriminatory statement or advertisement that they circulated themselves or caused to be circulated by others. *See, e.g.*, *supra* ¶¶15-23.

**COUNT VII**
**New York State Human Rights Law**
**N.Y. Exec. Law §296**
**(Maestra, MUSE, and RISE Directories)**
**[By All Plaintiffs; Against Maestra and MUSE]**

126. Plaintiffs repeat and reallege each of the prior allegations.

127. Under New York state law, "an employment agency" may not "discriminate against any individual because of … [his] race, … color, … [or] sex … in receiving,

classifying, disposing or otherwise acting upon applications for its services or in referring an applicant … to an employer or employers." N.Y. Exec. Law §296(1)(b); *see also Gordon*, 74 A.D.3d at 885 (facts sufficient for a New York State Human Rights Law claim also suffice for a New York Civil Rights Law claim).

128. Maestra and MUSE are employment agencies because they run employment directories whose purpose is to connect musicians with employment in the New York theater industry. *See* N.Y. Exec. Law §292(2). They selectively curate lists of employees that they then connect with select employers at closed networking events and whom they refer to specific industry hiring agents on request. *Supra* ¶¶96-98.

129. Maestra continues to violate the NYSHRL and N.Y. Civil Rights Law §40-c by excluding male musicians, including Lynch, from its directory. Maestra is also violating these laws by allowing employers to sort musicians, including Lynch, by race and sex in its separate RISE Directory.

130. MUSE continues to violate the NYSHRL and N.Y. Civil Rights Law §40-c by excluding white musicians, including Lynch, from its directory.

131. Lynch is suffering from Maestra's and MUSE's ongoing legal violations. He continues to seek music-related work in the New York theater industry. His career would benefit from his inclusion in both the Maestra and MUSE directories. These directories still openly exclude white male musicians like Lynch. If a court ordered them to stop discriminating, Lynch would immediately create profiles in both directories. But

his prior applications were denied, actually or constructively; and because he is not female, nonbinary, or a racial minority, reapplying would be futile.

132. Separately, Maestra's RISE directory violates the NYSHRL by "classifying" members by race and sex to benefit minorities and harm non-minorities. N.Y. Exec. Law §296(1)(b). It encourages and facilitates would-be employers to hire minority applicants but not white applicants. Plaintiff Lynch, a RISE directory member, experiences ongoing harm from this classification. *See supra* ¶¶85-88. And so does his fellow AAER member, who is ready and able to join RISE once it stops discriminating. *See supra* ¶¶52-54.

**COUNT VIII**
**New York City Human Rights Law**
**N.Y.C. Admin. Code §8-107**
**(Music Director Experience)**
**[By Lynch; Against All Defendants]**

133. Plaintiffs repeat and reallege each of the prior allegations.

134. The New York City Human Rights Law makes it unlawful for any employer "[t]o refuse to hire or employ or to bar … from employment" any person based on race, color, or gender. N.Y.C. Admin. Code §8-107(1)(a)(2). "The protections of this chapter relating to employees apply to interns, freelancers and independent contractors." §8-107(23). And an "intern" is defined to include an individual who works "on a temporary basis" and whose work "[p]rovides training … in an educational environment;" "[p]rovides experience for the benefit of the individual performing the work;"

or "[i]s performed under the close supervision of existing staff," regardless of whether or not the intern receives "a salary or wage." §8-102.

135. The Wicked Music Director Experience was at least an internship under this City ordinance. It provided educational training and experience for the benefit of the winner. The winner observed cast rehearsals, observed performances from the orchestra pit and sound board, and studied the keyboard books from the show. The winner also worked under the close supervision of existing Wicked staff. The winner gained playing and conducting experience by working with the Music Director one-on-one.

136. With the Music Director Experience, Maestra, MUSE, and Wicked all barred Lynch from at least an internship because he is a white male. *Supra* ¶¶14-38.

137. Separately, the NYCHRL also makes it unlawful for any employment agency "to discriminate against any person" because of his race, color, or gender—including "in referring an applicant … for its services to an employer or employers." N.Y.C. Admin. Code §8-107(1)(b).

138. MUSE and Maestra are employment agencies under this City ordinance, which defines an "employment agency" to "includ[e] any person undertaking to procure employees or opportunities to work." N.Y.C. Admin. Code §8-102. By curating lists of selected employees within a tight-knit industry, hosting members-only networking events for would-be employers to meet would-be employees, and referring specific

members to individuals with hiring power and to internships, MUSE and Maestra procure employees and opportunities for work. *Supra* ¶¶48-50, ¶¶95-98; *Secor v. City of New York*, 13 Misc. 3d 1220(A) (Sup. Ct. 2006).

139. An employment agency may not discriminate in referring an applicant. MUSE and Maestra violate this command by excluding Lynch from their directories—and thus also from their mentorship and networking events and other opportunities—because of his race and sex. *Supra* ¶¶33-35, ¶¶48-50.

140. New York City also makes it unlawful "[f]or any employer … or employment agency … to declare, print or circulate or cause to be declared, printed or circulated any statement, advertisement or publication, or to use any form of application for employment or to make any inquiry in connection with prospective employment, which expresses, directly or indirectly, any limitation, specification or discrimination as to" race, color, or gender "or any intent to make any such limitation, specification or discrimination." N.Y.C. Admin. Code §8-107(1)(d). These protections extend to internships too. §8-107(23).

141. Maestra, MUSE, and Wicked violated this ordinance when they jointly advertised the Music Director Experience in a way that excluded white male applicants. *Supra* ¶15, ¶19, ¶¶21-23. That discrimination injured Lynch both because he saw the advertisements and felt the stigma of exclusion and because it skewed the application and selection process for the Wicked experience against him.

142. "[P]unitive damages in discrimination cases are available under … the local Administrative Code." *Farias v. Instructional Sys.*, 259 F.3d 91, 101 (2d Cir. 2001). "[T]he standard for determining punitive damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 43 (2d Cir. 2025) (quoting *Chauca v. Abraham*, 89 N.E.3d 475, 477 (N.Y. 2017)). This standard is "lower than the federal standard." *Id.* For the reasons already explained, Maestra, MUSE, and Wicked owe Lynch punitive damages. *Supra* ¶69.

**COUNT IX**
**New York City Human Rights Law**
**N.Y.C. Admin. Code §8-107**
**(Maestra, MUSE, and RISE Directories)**
**[By All Plaintiffs; Against Maestra and MUSE]**

143. Plaintiffs repeat and reallege each of the prior allegations.

144. The NYCHRL makes it illegal for an "employment agency" to discriminate based on race, color, or sex "in referring an applicant or applicants for its services to an employer or employers," N.Y.C. Admin. Code §8-107(1)(b). It also makes it illegal to "circulate … any statement … which expresses … any limitation, specification or discrimination as to" race, color, or sex. *Id.* §8-107(1)(d).

145. Maestra is breaking this law by running the Maestra Directory, which excludes men. It is also breaking this law by running a separate employment directory, the

RISE Directory, which sorts potential employees by race and sex—but discourages employers from searching for white male employees.

146. MUSE is breaking this law by running an employment directory that excludes white people. It is also breaking this law by classifying potential employees by race within its directory.

147. Lynch has previously tried, without success, to join the Maestra and MUSE directories. Because of Maestra's and MUSE's blatant and intentional discrimination, it would currently be futile for him to re-apply. If a court ordered Maestra and MUSE to comply with the NYCHRL, Lynch would immediately join both directories.

148. Lynch is currently a member of the RISE directory and is experiencing harm from its racial and sex-based classifications. His fellow AAER member, the theater director, is not yet a member of the RISE directory but is ready and able to join as soon as it stops discriminating.

## PRAYER FOR RELIEF

149. Plaintiffs respectfully ask this Court to enter judgment in favor of Plaintiffs and against Defendants and to enter the following relief:

A. A declaratory judgment that the MUSE, Maestra, and RISE directories violate 42 U.S.C. §1981, Title VII, the New York State Human Rights Law, the New York State Civil Rights Law, and/or the New York City Human Rights Law;

B. A permanent injunction barring Maestra and MUSE from viewing or considering applicants' race or sex when deciding whether to add them to the directories;

C. A permanent injunction barring Maestra and MUSE from classifying individuals by race or sex within their directories;

D. Compensatory damages for Lynch;

E. Punitive damages for Lynch;

F. Nominal damages;

G. Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws; and

H. All other relief that Plaintiffs are entitled to.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Lynch demands a trial by jury of all issues so triable.

Dated: August 21, 2026

Respectfully submitted,

*/s/ Daniel M. Vitagliano*
Thomas R. McCarthy*
Cameron T. Norris*
Daniel M. Vitagliano†
(SDNY Bar No. 5856703)
Tyler A. Dobbs*†
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
tom@consovoymccarthy.com
cam@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
tdobbs@consovoymccarthy.com

* *Pro hac vice*
† *Supervised by principals of the firm admitted to practice in Virginia*