**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMERICAN ALLIANCE FOR EQUAL RIGHTS and KEVIN LYNCH,

*Plaintiffs*,

v.

MAESTRA MUSIC, INC.; ARTS IGNITE INC. d/b/a MUSICIANS UNITED FOR SOCIAL EQUITY (MUSE); and WICKED LLC,

*Defendants*.

Case No. 1:26-cv-04645-DLC

ORAL ARGUMENT REQUESTED

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WICKED LLC'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

MITCHELL SILBERBERG & KNUPP LLP

Jacob D. Albertson
Harrison A. Newman
437 Madison Ave., 25th Floor
New York, NY 10022
(212) 509-3900
j1a@msk.com
han@msk.com

Adam Levin (*pro hac vice*)
2049 Century Park East, 18th Floor
Los Angeles, CA 90067
(310) 312-3116
axl@msk.com

*Counsel for Defendant Wicked LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 3

I. The Parties ..... 3

II. The Music Director Experience ..... 3

III. This Lawsuit ..... 6

LEGAL STANDARD ..... 7

ARGUMENT ..... 7

I. Lynch Fails to Plead a Section 1981 Claim Against Wicked (Count I). ..... 8
  - A. The MD Experience Did Not Arise Under a Contract. ..... 8
  - B. Race Was Not a But-For Cause of Any Refusal by Wicked to Contract with Lynch. ..... 16

II. Lynch Fails to Plead NYSHRL and NYCHRL Claims Against Wicked (Counts V and VIII). ..... 20
  - A. The MD Experience Did Not Constitute an Internship Under the NYSHRL or NYCHRL. ..... 21
  - B. Neither Race Nor Gender Motivated Any Action Taken by Wicked. ..... 23
  - C. Wicked Did Not Circulate or Cause to Be Circulated Any Discriminatory Advertisement in Violation of the NYSHRL or NYCHRL. ..... 24

III. Lynch Fails to Plead a Section 40-c Claim Against Wicked (Count VI). ..... 25

CONCLUSION ..... 26

# TABLE OF AUTHORITIES

## CASES

*Adam v. Obama for Am.*,
210 F. Supp. 3d 979 (N.D. Ill. 2016) ....................13

*African Diaspora Maritime Corp. v. Golden Gate Yacht Club*,
109 A.D.3d 204 (1st Dep't 2013) ....................15, 16

*Allegheny Coll. v. Nat'l Chautauqua Cnty. Bank of Jamestown*,
159 N.E. 173 (N.Y. 1927) ....................10

*Amendola v. A.C. Electric Co.*,
201 A.D.2d 689 (2d Dep't 1994) ....................14

*American Alliance for Equal Rights v. Fearless Fund Management, LLC*,
103 F.4th 765 (11th Cir. 2024) ....................14, 15, 16

*Andrews v. Blick Art Materials, LLC*,
268 F. Supp. 3d 381 (E.D.N.Y. 2017) ....................26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................7, 17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................7

*Cityview Partners, LLC v. Mercedes*,
2023 WL 1929716 (E.D.N.Y. Feb. 10, 2023) ....................10

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
589 U.S. 327 (2020) ....................16

*Davis v. Mich. Dep't of Treas.*,
489 U.S. 803 (1989) ....................25

*Doe v. Columbia Univ.*,
831 F.3d 46 (2d Cir. 2016) ....................7

*Domino's Pizza, Inc. v. McDonald*,
546 U.S. 470 (2006) ....................9

*Francis v. Kings Park Manor, Inc.*,
992 F.3d 67 (2d Cir. 2021) ....................19

*Gen. Bldg. Contractors Ass'n v. Pennsylvania*,
458 U.S. 375 (1982) ....................18, 19

*Glatt v. Fox Searchlight Pictures, Inc.*,
811 F.3d 528 (2d Cir. 2016)....22

*Gooden v. Joseph P. Addabbo Fam. Health Ctr., Inc.*,
2023 WL 2709735 (E.D.N.Y. Mar. 30, 2023)....24

*Hirsch v. Arthur Andersen & Co.*,
72 F.3d 1085 (2d Cir. 1995)....23

*Hollander v. Sears, Roebuck & Co.*,
450 F. Supp. 496 (D. Conn. 1978)....12, 13

*Hyman v. Cornell Univ.*,
834 F. Supp. 2d 77 (N.D.N.Y. 2011), *aff'd*, 485 F. App'x 465 (2d Cir. 2012)....26

*Juarez v. Northwestern Mutual Life Insurance Co.*,
69 F. Supp. 3d 364 (S.D.N.Y. 2014)....14

*Lauture v. Int'l Bus. Machines Corp.*,
216 F.3d 258 (2d Cir. 2000)....9

*Lee v. Riverbay Corp.*,
751 F. Supp. 3d 259 (S.D.N.Y. 2024)....23

*Leonard v. PepsiCo, Inc.*,
88 F. Supp. 2d 116 (S.D.N.Y. 1999), *aff'd*, 210 F.3d 88 (2d Cir. 2000)....16

*Mansion v. United States*,
945 F.2d 1115....12

*Marvelli v. Chaps Cmty. Health Ctr.*,
193 F. Supp. 2d 636 (E.D.N.Y. 2002)....13

*McDonald v. Santa Fe Trail Transp. Co.*,
427 U.S. 273 (1976)....8

*Mihalakis v. Cabrini Medical Center (CMC)*,
151 A.D.2d 345 (1st Dep't 1989)....14

*Moy v. Napoli Shkolnik, PLLC*,
2024 WL 3498131 (S.D.N.Y. July 22, 2024)....26

*Overseers of Town of Guilderland v. Overseers of Town of Knox*,
5 Cow. 363 (N.Y. Sup. Ct. 1826)....14

*Reynolds v. Barrett*,
685 F.3d 193 (2d Cir. 2012)....17

*Sargent v. New York Daily News, L.P.*,
42 A.D.3d 491 (2d Dep't 2007) ....................15, 16

*Singh v. City of New York*,
524 F.3d 361 (2d Cir. 2008)....................21, 22

*Soto v. Disney Severance Pay Plan*,
26 F.4th 114 (2d Cir. 2022) ....................7

*Startech, Inc. v. VSA Arts*,
126 F. Supp. 2d 234 (S.D.N.Y. 2000)....................12

*United States v. Bestfoods*,
524 U.S. 51 (1998)....................19

*Velarde v. GW GJ, Inc.*,
914 F.3d 779 (2d Cir. 2019)....................23

*Village of Freeport v. Barrella*,
814 F.3d 594 (2d Cir. 2016)....................16

## Statutes

42 U.S.C.
§ 1981.................... *passim*
§ 1981(a)....................8
§ 1981(b)....................9

New York City Admin. Code
§ 8-102 ....................21
§ 8-107 ....................21
§ 8-107(1)(d)....................25
§ 8-107(23)....................21, 25

New York Executive Law
§ 292....................26
§ 296....................20
§ 296-c ....................20, 25
§ 296-c(1)....................21
§ 296-c(2)(a) ....................21
§ 296-c(2)(b) ....................21
§ 296-c(2)(c) ....................21, 25

New York State Civil Rights Law § 40-c ....................26

## Restatements & Treatises

Restatement (Second) of Contracts (A.L.I. 1981)
§ 3....................9

§ 17 .......... 9
§ 71(1) .......... 9
§ 71(2) .......... 11

3 Williston on Contracts § 7:19 (4th ed. updated May 2026) .......... 10, 11

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Wicked LLC ("Wicked") respectfully submits this Memorandum of Law in support of its Motion to Dismiss the First Amended Complaint (Dkt. No. 54, "FAC") filed by Plaintiffs American Alliance for Equal Rights and Kevin Lynch.

## INTRODUCTION

In 2023, the Broadway musical *Wicked* hosted an educational shadowing opportunity allowing an aspiring music director to observe a Broadway production. Plaintiff Kevin Lynch was not selected for that opportunity. Lynch now alleges that his application to Defendants Maestra Music, Inc. ("Maestra") and Arts Ignite Inc., d/b/a Musicians United for Social Equity ("MUSE") was rejected for discriminatory purposes—namely, that he is white and male—and he seeks to hold Wicked (the company that stages the *Wicked* musical) liable for discrimination. Lynch fails to state a claim against Wicked as a matter of law.[1]

The shadowing opportunity in question, called the Music Director ("MD") Experience, was a "three-week intensive" offering opportunities for the recipient to "[o]bserv[e]" rehearsals and performances, "[s]tudy[]" part of the musical score, and "[g]ain[] practical playing and conducting experience" behind-the-scenes. FAC ¶ 15. The participant also received a "modest paid weekly stipend." *Id.*

The MD Experience was designed, advertised, and administered by Defendants Maestra and MUSE. Maestra and MUSE are non-profit organizations that manage music directories for musicians. Lynch alleges that Maestra's primary directory is limited to musicians who identify as female or nonbinary and that MUSE's directory is limited to persons of color. As alleged,

---

[1] Lynch's allegations of discrimination are also untrue. But for purposes of this Motion, Wicked treats the FAC's factual allegations, except for those that are conclusory or contradicted by documents incorporated therein, as if they are true.

Wicked's sole connection to Maestra, MUSE, or the MD Experience is that it hosted the one-time, three-week shadowing experience. Critically, the FAC is devoid of any factual allegations suggesting that Wicked established, administered, enforced, or required any race- or sex-based eligibility criteria for the MD Experience; that Wicked reviewed or rejected Lynch's application; or that Wicked selected the participant.

Every claim against Wicked arises from a decision that Wicked did not make. Lynch nevertheless seeks to impose liability on Wicked for MUSE's and Maestra's purported eligibility restrictions, over which Wicked had (and has) no control. He brings claims under the federal statute forbidding racial discrimination in contracting and state and city laws forbidding race and gender discrimination in employment. But even on the facts Lynch alleges, his claims against Wicked all fail. Lynch's federal contract-based claim fails because: (1) Wicked did not enter into any contract, as it received no consideration in exchange for hosting the MD Experience; (2) Lynch's new theory that the MD Experience was a "contest" fails because Lynch does not plead any binding rules to the purported contest, which is necessary to state a claim; and (3) Wicked did not impose any racial criteria in relation to the MD Experience, and thus was not a "but for" cause of the alleged discrimination. Lynch's state and city law intern employment discrimination claims fail because: (1) the MD Experience did not involve the performance of "work" for Wicked; and (2) Wicked took no actions based on Lynch's race or gender. Having failed to plausibly allege an intern relationship or discriminatory intent, Lynch cannot invoke these employment discrimination statutes. And those same deficiencies foreclose Lynch's state and city law advertising-based claims.

These defects are fatal to each claim against Wicked, and because further amendment could not cure any of these defects, the Court should dismiss the FAC with prejudice.

## FACTUAL BACKGROUND

### I. The Parties

Plaintiff American Alliance for Equal Rights ("AAER") is a nationwide membership organization that states it is dedicated to ending illegal discrimination across the United States. FAC ¶ 10. Its members include Plaintiff Kevin Lynch, a white male composer and musician in the New York tristate area with a music degree. *Id.* ¶¶ 11, 24. Although he aspires to be a Broadway music director, Lynch's only specific previous experience as a music director is on "regional and community theater productions." *Id.* ¶ 24; *accord id.* ¶ 38.

Defendant Maestra is a Manhattan-based nonprofit that runs employment directories for female and nonbinary musicians in the New York theater industry and individuals who work backstage in theater. *Id.* ¶¶ 7, 81.

Defendant MUSE is also a Manhattan-based nonprofit and is a sister organization to Maestra. *Id.* ¶ 8. MUSE runs an employment directory for musicians of color. *Id.* ¶ 8.

Defendant Wicked is the company that stages the Broadway musical *Wicked*. *Id.* ¶ 9. The FAC does not allege that Wicked operates or controls any employment directory or that Wicked creates, administers, or enforces any hiring criterion, whether based on race, sex, or any other characteristic, relevant to the directories or the MD Experience. *See id.* ¶¶ 7–9, 28, 30.

### II. The Music Director Experience

The MD Experience was a one-time, three-week shadowing opportunity. *Id.* ¶ 15. Maestra announced the opportunity in June 2023 on its public Facebook page, explaining that it was "teaming up" with MUSE to sponsor the "Music Director Experience with the Broadway blockbuster WICKED" and linking to the application. *Id.* ¶¶ 14, 18. The opportunity was structured as a "three-week intensive" for "aspiring music directors looking to make a big leap in their [music director] journeys." *Id.* ¶ 15. The FAC alleges, without any supporting factual

allegations, that, "[t]ogether with Wicked, Maestra and MUSE determined the tasks that the intern would be assigned." *Id.* ¶ 16; *see also id.* ¶¶ 37, 63 (alleging, without supporting factual allegations, that the three Defendants "jointly set the rules" and "terms" of the MD Experience). Specifically, the participant would "get the opportunity to shadow engagement in-person in New York City," including "[o]bserving cast rehearsals," "[o]bserving performances from both the orchestra pit and the sound board," "[s]tudying one of the keyboard books from the show," and "[g]aining practical playing and conducting experience by working with the Music Director one-on-one." *Id.* ¶ 15. The participant would also receive from Wicked "a modest paid weekly stipend" of $300 for each of the three weeks. *Id.* ¶¶ 15–16.

A graphic accompanying Maestra's Facebook post noted that the MD Experience was "for MUSE and Maestra directory members," *id.* ¶ 17, and Lynch alleges that it must have been "approved by and circulated on behalf of" all three Defendants because it included Wicked's trademarked logo, *id.* The same post and graphic allegedly appeared with "insignificant variations" on other websites and social-media pages "belonging to or associated with Maestra, MUSE, and Wicked." *Id.* ¶ 19. Wicked allegedly posted about the MD Experience on "its official social-media pages" and posted a *Playbill* article linking to the application form. *Id.* ¶¶ 21–22. Various Broadway trade publications also posted about the MD Experience, allegedly "at the urging of Maestra, MUSE, and Wicked, who provided the publications information about the position to get the word out." *Id.* ¶ 23. Lynch further alleges that Stephen Oremus, Wicked's music supervisor, "chose to solicit applications for the [MD Experience] and to require membership in Maestra or MUSE," and that he served on MUSE's executive committee and was aware of MUSE's and Maestra's membership practices. *Id.* ¶ 20.

The online application specified that the MD Experience was being offered "exclusively to NYC (Tri-State) area MUSE and MAESTRA Directory members" and could not be completed unless the applicant had first joined either the MUSE or Maestra directory. *Id.* ¶¶ 17, 25–26 (emphasis omitted). Maestra's directory stated that individuals should register only if they are "female or non-binary musician[s] working in the theater." *Id.* ¶ 28. MUSE's directory stated that individuals should register only if they are "Person[s] of Color who identif[y] as … musician[s]." *Id.* ¶ 30.

On June 28, 2023, Lynch applied to the MD Experience. *Id.* ¶¶ 24, 27, 32. In doing so, he attempted to sign up for both the MUSE and Maestra directories. *Id.* ¶¶ 27–32. Lynch received a link to his privately visible profile in the Maestra directory and also registered for a MUSE profile. *Id.* ¶¶ 29, 31. He used the link to his Maestra directory profile to complete and submit his application to the MD Experience. *Id.* ¶ 32.

On July 5, 2023, Lynch asked Maestra when his profile would be made public in its directory. Maestra responded that his profile application had been denied for two reasons: (1) his pending profile remained incomplete for too long, and (2) his application did not indicate that his profile belonged in the Maestra community. *Id.* ¶ 33. Lynch alleges that he completed his profile, so, according to him, Maestra rejected him for being male. *Id.* His private Maestra directory profile was then removed. *Id.* ¶ 34. Also on July 5, 2023, Lynch asked MUSE about the status of his directory profile. *Id.* ¶ 35. MUSE never responded, and his profile never appeared in the directory. *Id.*

"Maestra and MUSE organized a selection committee to review applications," and their "selection committee chose" the winning applicant for the MD Experience. *Id.* ¶ 37. In August 2023, Maestra and MUSE announced the winning applicant, whom the FAC identifies as "a

female and nonbinary person of color" and a member of Maestra's and MUSE's directories. *Id.* ¶ 36. The FAC quotes two unidentified committee members, neither of whom it alleges was affiliated with Wicked, who confirmed that they reviewed and considered Lynch's application. *Id.* ¶ 37.

**III. This Lawsuit**

Plaintiffs filed their original Complaint on June 3, 2026. Dkt. No. 3. On July 30, 2026, each of the three Defendants separately moved to dismiss the Complaint in its entirety. Dkt. Nos. 45–46 (MUSE), 48–49 (Wicked), 52–53 (Maestra). Rather than oppose those motions, Plaintiffs filed the operative FAC on August 21, 2026. Dkt. No. 54.

The FAC asserts nine claims for relief under the following statutes: 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law ("NYSHRL"), the New York State Civil Rights Law ("NYSCRL"), and the New York City Human Rights Law ("NYCHRL"). Four of the claims—Counts I, V, VI, and VIII—arise solely from the 2023 MD Experience and are brought by Lynch against all three Defendants. FAC ¶¶ 55–69, 104–116, 117–125, 133–142. The remaining five—Counts II, III, IV, VII, and IX—arise from the ongoing operation of the Maestra, MUSE, and RISE directories and are asserted only against Maestra and/or MUSE. *Id.* ¶¶ 70–78, 79–90, 91–103, 126–132, 143–148.

Lynch seeks declaratory and injunctive relief only as to the Maestra and MUSE directories. *Id.* ¶ 149(A)–(C). The only relief the FAC seeks relating to the MD Experience (and thus, against Wicked) is monetary: nominal, compensatory, and punitive damages, as well as costs and attorneys' fees. *Id.* ¶ 149(D)–(G).

## LEGAL STANDARD[2]

"The role of the court at this [Rule 12(b)(6)] stage of the proceedings is not in any way to evaluate the truth as to what really happened, but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed." *Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir. 2016). To survive a motion to dismiss, a complaint must allege sufficient facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[B]lanket assertion[s]," "labels and conclusions, and a formulaic recitation of the elements of a cause of action" fail to satisfy this threshold. *Twombly*, 550 U.S. at 555 n.3. This standard thus "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. "Although [courts] accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor, [courts] must dismiss a claim if a plaintiff pleads himself out of court by alleging facts which show that he has no claim." *Soto v. Disney Severance Pay Plan*, 26 F.4th 114, 120 (2d Cir. 2022).

## ARGUMENT

The FAC's allegations defeat every claim Lynch brings against Wicked. To the extent the FAC alleges discriminatory conduct or intent with any factual specificity, it correctly attributes that conduct and intent only to MUSE and Maestra. Lynch seeks to hold Wicked liable not for any decision Wicked made, but for decisions that Maestra and MUSE allegedly made in designing and administering their directories and selecting the participant. And any benefits

[2] In case citations, unless otherwise noted, all internal citations, quotation marks, and alterations and emphases in original are omitted.

arising from the three-week shadowing experience accrued only to the participant, not Wicked; therefore, the MD Experience was not an internship under the governing law. This Court should accordingly dismiss the FAC against Wicked.

**I. Lynch Fails to Plead a Section 1981 Claim Against Wicked (Count I).**

Lynch's Section 1981 claim rests on the erroneous theory that the MD Experience arose from a contract to which all three Defendants were parties. The FAC proposes two theories of contract: (1) the participant would devote their "time, attention, and energy" to performing "[d]ay-to-day duties" in exchange for a "modest … weekly stipend" of $300 and "other valuable benefits" related to networking, FAC ¶¶ 60–61; and (2) the MD Experience "was at least a contest" constituting a contract offer, which Lynch accepted and as to which Defendants "jointly set the rules," *id.* ¶¶ 62–63.

As against Wicked, Count I fails for two independent reasons. First, the Complaint does not plead a contract between Wicked and the MD Experience participant because Wicked never received any consideration or agreed to be bound by contractual contest rules. Second, the FAC's allegations establish that race was not a but-for cause of anything Wicked did because MUSE—not Wicked—imposed the only racial criterion for eligibility. Either deficiency alone requires dismissal as to Wicked.

**A. The MD Experience Did Not Arise Under a Contract.**

Lynch's Section 1981 claim should be dismissed because there is no requisite contract undergirding his claim. Section 1981 guarantees "[a]ll persons within the jurisdiction of the United States … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. § 1981(a); *see also McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286–87 (1976) (holding that statute also applies to racial discrimination in private employment against white persons). Section 1981 defines "make and enforce contracts" to include "the

making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Any Section 1981 claim must therefore "initially identify an impaired 'contractual relationship,' under which the plaintiff has rights"—one that either exists or that the plaintiff sought to form. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (quoting 42 U.S.C. § 1981(b)).

Here, the FAC does not plead a prospective contractual relationship between Lynch and Wicked because it does not and cannot allege that Wicked would have received any consideration in return for Lynch engaging in the MD Experience. Lynch alleges that he sought to contract with Maestra, MUSE, and Wicked by exchanging his performance of "[d]ay-to-day duties" as (what he terms) "an apprentice music director" for a "modest … weekly stipend" of $300 and "access to the Wicked network and mentorship from the Wicked music director." FAC ¶¶ 60–61. But that desired relationship does not create a contract because it does not result from any bargained-for exchange and thus lacks consideration.

For purposes of Section 1981, the term "contract" carries "its ordinary meaning." *Lauture v. Int'l Bus. Machines Corp.*, 216 F.3d 258, 261 (2d Cir. 2000). Interpreting that meaning, the Second Circuit has looked to the Restatement (Second) of Contracts, which defines a "contract" as "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." *Id.* (quoting Restatement (Second) of Contracts § 1 (A.L.I. 1979)). With exceptions not relevant here, contract formation requires more than just an "agreement … of mutual assent"; it requires consideration, which is a "bargain … to exchange promises or to exchange a promise for a performance or to exchange performances." Restatement (Second) of Contracts §§ 3, 17 (A.L.I. 1981); *see also id.* § 71(1)

("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.").

A contractual obligation arises from "words of condition in a promise" only if those words "indicate a request for consideration," but not if they "state a mere condition in a gratuitous promise." 3 Williston on Contracts § 7:19 (4th ed. updated May 2026). The touchstone is whether "the happening of the condition will benefit the promisor"; if it will, "it is a fair inference that the happening was requested as a consideration." *Id.* But where "the happening of the condition not only will not benefit the promisor but is obviously for the purpose of enabling the promisee to receive a benefit (a gift)," the condition is not consideration, even if the promisee brought it about in reliance on the promise. *Id.*; *accord Allegheny Coll. v. Nat'l Chautauqua Cnty. Bank of Jamestown*, 159 N.E. 173, 176 (N.Y. 1927) (Cardozo, C.J.). Nevertheless, "[i]n close cases," courts sometimes look to "whether the promisee has incurred a detriment on the faith of the promise or has conferred a benefit on the promisor in bringing about the condition." 3 Williston on Contracts § 7:19. In all cases, "the promise and the consideration must purport to be the motive for the other, in whole or at least in part." *Cityview Partners, LLC v. Mercedes*, 2023 WL 1929716, at *2 (E.D.N.Y. Feb. 10, 2023) (quoting *Allegheny Coll.*, 159 N.E. at 174).

The conditions Wicked imposed on the MD Experience's "opportunity to shadow" at the *Wicked* production, FAC ¶ 15, benefited the participant (not Wicked) by fostering the participant's professional development: what Lynch calls "[d]ay-to-day duties" consisted of "[o]bserving cast rehearsals," "[o]bserving performances from both the orchestra pit and the sound board," "[s]tudying one of the keyboard books from the show," and "[g]aining practical playing and conducting experience by working with the Music Director one-on-one." *Id.*

Indeed, the program's launch announcement specified that those aspects of the experience were offered to provide the participant with "invaluable training and access." *Id.* ¶ 15. Plainly, the other alleged attributes of the experience—a modest $300 weekly stipend and "access to the Wicked network and mentorship from the Wicked music director," *id.* ¶¶ 15, 60, also benefitted the participant (not Wicked).

On the other hand, Wicked received no legally cognizable benefit in exchange. The FAC does not and cannot allege that Wicked's participation in the MD Experience was motivated even in part to obtain the participant's labor or services "as an apprentice music director." *Id.* ¶ 60. Nor does the FAC allege that the participant incurred any detriment in reliance on Wicked's promise to host the shadowing opportunity. That Wicked allegedly would not have paid the stipend had the participant "not been present and completed the assigned tasks" of shadowing, *id.* ¶ 61; *accord id.* ¶ 15, states a condition of Wicked's gratuitous promise, not a benefit Wicked bargained for. *See* 3 Williston on Contracts § 7:19 ("[A]ny event might be named in a promise as fixing the moment, on the happening of which a promisor (not in exchange for the happening but as a mere coincidence in time) will perform a promise intended and understood by both parties to be gratuitous.").

Recognizing this deficiency in their Complaint, Plaintiffs now allege in the FAC that the MD Experience participant's "performance" gave Wicked "goodwill and the opportunity to vet and hire someone." *Id.* ¶ 60. As an initial matter, Lynch's allegations regarding "goodwill" are wholly vague and devoid of any factual support. Regardless, neither the alleged goodwill nor the alleged future hiring opportunity was a product of—or even the subject of—a bargain between Wicked and the MD Experience applicants. Restatement (Second) of Contracts § 71(2) (A.L.I. 1981) (consideration must be "sought by the promisor in exchange for his promise"). At most,

such incidental benefits "might provide [the promisor] with a motive for making the promise," and "such a motivation could easily support a gratuitous promise" but does not suffice for consideration. *Startech, Inc. v. VSA Arts*, 126 F. Supp. 2d 234, 237 (S.D.N.Y. 2000).

Nowhere does the FAC allege that Wicked offered the MD Experience in exchange for the opportunity to hire the participant in the future or to garner "goodwill"—there is no allegation that Lynch made any promises relating to future employment by Wicked or that Wicked requested the same. The same is true with respect to "goodwill." An unbargained-for benefit is a consequence of the arrangement, not consideration. *Cf. Mansion v. United States*, 945 F.2d 1115, 1118 & 1119 n.5 (9th Cir. 1991) (declining to treat "the benefit of improved labor relations" as consideration for permission to enter property, particularly where there was no "identifiable exchange, agreement or even promisor as typically required for a finding of consideration").

Courts within the Second Circuit have reached the same conclusion even where a paid internship program was expressly designed "to stimulate applicant flow." *See Hollander v. Sears, Roebuck & Co.*, 450 F. Supp. 496 (D. Conn. 1978). In *Hollander*, the court entered judgment for Sears on a white male plaintiff's Section 1981 claim arising from Sears's refusal to consider him for a paid, eleven-week summer internship program offered only to minority students. *Id.* at 498–99. Although the court noted that the internship "may have many indicia of an employment contract," it held that the internship was "in substance, realistically different," because the interns "were not paid … to fill regular positions" but were instead "paid to come in and observe the performance of such jobs, to try them out for short periods, and to be taught the relationships among various positions." *Id.* at 504. The payment, the court explained, was not

intended "to have [the intern] work as an employee … rather, it was payment to secure his attention to the manner in which [the company's] regular employees worked." *Id.* at 504–05.

The MD Experience bears even fewer indicia of a contract for services than the Sears internship did. While Sears interns performed services like those performed by employees—they were required to "try … out" various Sears employment roles, *Hollander*, 450 F. Supp. at 504—the MD Experience participant did not. Instead, they merely "[o]bserv[ed]," "[s]tud[ied]," and "[g]ain[ed]" limited playing and conducting experience in one-on-one sessions with the Music Director. FAC ¶ 15. And while the Sears internship program was expressly designed "to stimulate applicant flow" and generated dozens of full-time hires, *Hollander*, 450 F. Supp. at 498, the FAC alleges, at most, an incidental benefit that had no basis in the alleged goals of or communications about the MD Experience: Wicked hired the participant as a musician—an entirely different position—after they had completed the MD Experience and had been employed on more than a dozen other Broadway shows. FAC ¶¶ 41–45, 60. If the Sears internship "was not a contract for services between an employer and employee," *Hollander*, 450 F. Supp. at 505, then necessarily, neither was the MD Experience.

More recent decisions dismissing Section 1981 claims based on internships likewise confirm that the MD Experience does not support such a claim. *See, e.g.*, *Adam v. Obama for Am.*, 210 F. Supp. 3d 979, 986 (N.D. Ill. 2016) (on motion to dismiss: "Since OFA cannot be said to have 'exchanged' the opportunity to work as an intern for [the plaintiff's] work performance, 'the internship itself' is not consideration and cannot form the basis of a contract."); *Marvelli v. Chaps Cmty. Health Ctr.*, 193 F. Supp. 2d 636, 659 (E.D.N.Y. 2002) (two-month interns who received "no salary and no benefits" or promise of employment failed to state a claim under Section 1981).

Although the FAC cites a handful of cases for the proposition that paid internships and apprenticeships can create contracts under Section 1981, none supports Lynch's claim. FAC ¶ 59. *Mihalakis v. Cabrini Medical Center (CMC)*, 151 A.D.2d 345 (1st Dep't 1989) involved a written agreement governing full-time hospital internship employment undertaken after medical school and required for medical licensure. *Id.* at 345. *Amendola v. A.C. Electric Co.*, 201 A.D.2d 689 (2d Dep't 1994) involved a written agreement specifying "wages" for apprentice electricians employed by an electrical company. *Id.* at 689. *Juarez v. Northwestern Mutual Life Insurance Co.*, 69 F. Supp. 3d 364 (S.D.N.Y. 2014) decided nothing about whether an internship creates a contractual relationship because the defendant there "d[id] not dispute" that "the alleged discrimination concerned one of § 1981's enumerated activities," leaving the court to resolve only whether alleging a facially discriminatory hiring policy suffices to plead purposeful discrimination. *Id.* at 368. And *Overseers of Town of Guilderland v. Overseers of Town of Knox*, 5 Cow. 363 (N.Y. Sup. Ct. 1826) held only that "[a]n agreement, for consideration, that an apprentice shall serve another, is binding as between the parties"—in the context of one master transferring an indentured apprentice to another. *Id.* at 363.

Lynch's alternative theory that the MD Experience "was at least a contest," FAC ¶ 62, also fails for two independent reasons. First, a contest-based contract still requires consideration running from the entrant to the sponsor, and as explained above, the FAC alleges none. The FAC alleges that "[t]he application process required applicants to draft an original essay, provide other application materials, and perform an audition piece for the judges." FAC ¶ 62. That is insufficient as a matter of law because assembling an application is neither a legal detriment to the applicant nor a benefit to Wicked. *American Alliance for Equal Rights v. Fearless Fund Management, LLC*, 103 F.4th 765 (11th Cir. 2024), which is cited in the FAC, underscores this

point. *Fearless Fund* held that a grant contest was a contract because the winner "obtain[ed] $20,000 and valuable mentorship *and, in return*, grant[ed] Fearless permission to use its idea, name, image, and likeness … and agree[d] to indemnify Fearless [and] to arbitrate any disputes." *Id.* at 775 (emphasis added). Unlike the *Fearless Fund* entrant, MD Experience applicants did not grant Wicked any rights in their essay or audition, agree to indemnify or arbitrate, or undertake any other legal obligation.

Second, the contest theory Lynch invokes requires a written agreement in the form of contest rules binding both parties, yet the FAC alleges none here. *Fearless Fund* featured written contest rules specifying the parties' duties to each other and "warn[ing] applicants, in no uncertain terms, that 'BY ENTERING THIS CONTEST, YOU AGREE TO THESE OFFICIAL RULES, WHICH ARE A CONTRACT.'" 103 F.4th at 775. *Sargent v. New York Daily News, L.P.*, 42 A.D.3d 491 (2d Dep't 2007), which the FAC cites, recognized a contract based on the contest's "official rules," which "established the terms governing the contractual relationship between the parties" and "provided that, by participating in the contest, participants agreed to be bound by the official rules." *Id.* at 493. *African Diaspora Maritime Corp. v. Golden Gate Yacht Club*, 109 A.D.3d 204 (1st Dep't 2013), which the FAC also cites, recognized a contract based on written "rules, i.e. a protocol" governing entrance to compete in the America's Cup sailing regatta, which "create[d] a mutual obligation between [the defendant] and [applicants, including the plaintiff]: a[n applicant] is obligated to abide by the Protocol and [the defendant] is obligated to administer the Protocol in good faith." *Id.* at 212. The protocol demonstrated the defendant's "unequivocal intent to be bound" by specifying, in "definite and certain" detail, the application window, required documentation, and a $25,000 entry fee. *Id.* at 211–12. Here, by contrast, the FAC alleges only a social-media graphic and a Google form for applicants—neither of which

includes a definite and certain set of contest rules, nor any language by which Wicked manifested an intent to be bound to applicants. FAC ¶¶ 17–19, 25–26. A promotional announcement is not an offer unless, unlike here, it is "clear, definite, and explicit, and leaves nothing open for negotiation." *Leonard v. PepsiCo, Inc.*, 88 F. Supp. 2d 116, 123–24 (S.D.N.Y. 1999), *aff'd*, 210 F.3d 88 (2d Cir. 2000).

The FAC's generalized references to "the competition rules" and to criteria "stated to be" necessary for consideration, *id.* ¶¶ 38–39, do not supply what is missing. The FAC alleges that "the competition rules" required applicants to live in the New York Tri-State area and that prior music-directing experience was "stated to be 'necessary to be considered.'" *Id.* ¶¶ 38–39. Both describe conditions of eligibility that an applicant had to satisfy to be considered. *Fearless Fund*, *Sargent*, and *African Diaspora* did not turn on conditions of eligibility; each turned on rules that bound the sponsor as well as the entrant. *Fearless Fund*, 103 F.4th at 775; *Sargent*, 42 A.D.3d at 493; *Afr. Diaspora*, 109 A.D.3d at 212. The FAC alleges no terms obligating Wicked to do anything for anyone who applied or giving rise to a legal detriment to the applicant.

Accordingly, Count I should be dismissed as against Wicked because the MD Experience did not arise under any contract for purposes of Section 1981.

**B. Race Was Not a But-For Cause of Any Refusal by Wicked to Contract with Lynch.**

Independently, Lynch's Section 1981 claim should be dismissed because Wicked's alleged actions were not a but-for cause of any racial discrimination. Section 1981 requires a plaintiff to plead "that [his] injury would not have occurred 'but for' the defendant's unlawful conduct." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 329 (2020). That alleged unlawful conduct is "racial discrimination in public or private employment." *Village of Freeport v. Barrella*, 814 F.3d 594, 604 (2d Cir. 2016). But Lynch does not plead that

but for *Wicked's*—as opposed to MUSE's—conduct, he would have been able to contract for the MD Experience.[3]

Lynch's discriminatory-intent theory is that Wicked, along with Maestra and MUSE, "facially discriminated based on race" by "limit[ing] eligibility for the position to members of the MUSE directory—who are necessarily people of color." FAC ¶ 64. But the FAC's specific allegations attribute that criterion to MUSE alone. Applicants were eligible only if they belonged to the MUSE or Maestra directories, *id.* ¶ 25, and the sole racially exclusionary requirement alleged is MUSE's: that its directory's members be "Person[s] of Color," *id.* ¶ 30; *accord id.* ¶ 107. MUSE—not Wicked—runs that directory. *Id.* ¶ 8. Lynch understood that: when he followed up on his pending directory application, he contacted MUSE, not Wicked. *Id.* ¶ 35. And it was "Maestra and MUSE," without Wicked, that "publicly announced the winning applicant." *Id.* ¶ 36.

The FAC nowhere alleges that Wicked created, set, or controlled the "person of color" criterion; that Wicked operated the directory or decided who was admitted to it; that Wicked reviewed MD Experience applications, including Lynch's, or selected the winner; or that Wicked knew Lynch's race, much less acted because of it. Two sets of allegations purport to fill that gap, and each fails for a different reason.

*First*, the FAC relies on "mere conclusory statements, [which] do not suffice" to establish a connection between Wicked and MUSE's "person of color" requirement. *Iqbal*, 556 U.S. at 678. Lynch alleges that Maestra and MUSE set "the eligibility requirements, duties, and compensation for the internship in consultation with Wicked and with Wicked's approval." *Id.*

[3] There is no claim for "disparate impact" discrimination under Section 1981. *See Reynolds v. Barrett*, 685 F.3d 193, 201–02 (2d Cir. 2012) (a plaintiff pursuing a "disparate impact theory of liability" under Section 1981 "must show that the [racial] discrimination was intentional").

¶ 37. But the FAC alleges no supporting facts: not what Wicked was consulted about, not what it approved, not when, not through whom. Plaintiffs' new allegation that two unidentified committee members had some positive things to say about Lynch's application is of no moment—Plaintiffs do not allege that either panelist had any connection to Wicked or that they were more enthusiastic about him than any other applicant. Furthermore, the FAC confirms the actual decisionmakers: "Maestra and MUSE organized a selection committee," and "Maestra and MUSE's selection committee chose the winner." *Id.*

*Second*, the FAC fails to establish the requisite agency relationship that could render Wicked liable for the alleged acts of other independent entities. The FAC asserts that "Maestra, MUSE, and Wicked" "limit[ed] eligibility for the position to members of the MUSE directory," that the "three entities" "'team[ed] up' to create the contest," *id.* ¶¶ 63–64, and that Wicked "collaborated with Maestra and MUSE to create and run" the MD Experience, *id.* ¶ 9. But a collaborative relationship is not an agency relationship. *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 393–94 (1982) (under Section 1981, rejecting argument that a "power to oppose" another entity's conduct equals a "right to control" it, which "would convert every contractual relationship into an agency relationship"). None of these allegations describes any control by Wicked over the MUSE directory or its membership criterion.

The fact that Plaintiffs allege some overlap between Wicked and MUSE employees (other than Stephen Oremus, none are identified) does not establish agency. The FAC alleges, without any factual support, that Oremus served as Wicked's music supervisor and "chose to solicit applications for the Music Director Experience and to require membership in Maestra or MUSE." FAC ¶ 20. The FAC also alleges that Oremus served as a member of MUSE's executive committee and "was aware of the discriminatory membership practices of MUSE and

its sister organization, Maestra." *Id.* Under well-settled law, these allegations are insufficient to impute MUSE's actions onto Wicked, including Oremus's acts on behalf of MUSE. *See United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (individuals holding positions with even two corporate affiliates "can and do 'change hats' to represent the two corporations separately"); *see also Gen. Bldg. Contractors*, 458 U.S. at 392 (Section 1981 does not "support the imposition of liability on a defendant based on the acts of a party with whom it had no agency or employment relationship"). Nor does the FAC allege any facts demonstrating anything beyond Oremus's mere awareness "of MUSE's and Maestra's illegal discrimination," FAC ¶ 20, which does not suffice to establish causation under Section 1981, *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 80 (2d Cir. 2021) (Section 1981 "reach[es] only purposeful discrimination" by the defendant itself). Plaintiffs allege nothing other than mere corporate overlap, which is insufficient as a matter of law to establish an agency relationship between Oremus and Wicked.

The FAC's allegation that "MUSE's founding members include at least five *Wicked* employees, some of whom hold hiring power within Wicked," *id.* ¶ 20, fails for the same reason. This allegation also describes nothing more than an overlap in membership, but with even less factual support. The FAC does not allege that any of those unidentified five had any role in the MD Experience or that any of them acted for Wicked in any dealing with MUSE. *See Bestfoods*, 524 U.S. at 70 (a plaintiff must show that dual actors "were acting in their capacities as [one entity's] officers and directors, and not as [the other's] officers and directors, when they committed those acts"); *Gen. Bldg. Contractors*, 458 U.S. at 395 (under Section 1981, funding another entity's activities "does not render [it] the [funder's] servant or agent," and a "right of control" is not "inferable merely from the power … to appoint half of [an entity's] trustees").

As set forth in detail above, Lynch specifically and correctly alleges that MUSE alone set the racial criterion for the MUSE directory, which is the sole racial barrier alleged in the FAC. *Id.* ¶¶ 30, 107. Remove Wicked from the picture entirely, and that racial barrier still stood; conversely, Wicked's alleged conduct toward Lynch would have been no different had Lynch been a different race.

Accordingly, Count I should be dismissed as against Wicked because Wicked's actions were not a but-for cause of any discrimination Lynch alleges.

## II. Lynch Fails to Plead NYSHRL and NYCHRL Claims Against Wicked (Counts V and VIII).

Count V asserts race- and sex-based discrimination under the NYSHRL, N.Y. Exec. Law §§ 296, 296-c. The Complaint alleged that the MD Experience "was an employment opportunity" and that "[a]ll three entities were joint employers under New York law." Compl. ¶¶ 61, 63. After Wicked argued in its motion to dismiss that the MD Experience did not constitute employment, *see* Dkt. No. 49 at 16–21, the FAC abandoned those employment-based allegations. As now pleaded, the only NYSHRL provisions Lynch invokes against Wicked are the intern provisions: he alleges that the MD Experience "was at least an internship," that Defendants "barred Lynch from the Music Director Experience," and that they advertised it in violation of Section 296-c(2)(c). FAC ¶¶ 112, 114–115.[4]

Count VIII asserts parallel claims under the NYCHRL, N.Y.C. Admin. Code § 8-107. Lynch alleges that the MD Experience "was at least an internship under this City ordinance," that Defendants "barred Lynch from at least an internship because he is a white male," and that they

[4] The FAC's remaining Section 296 allegations concern "employment agenc[ies]" and are directed only at Maestra and MUSE. *Id.* ¶¶ 105–110.

"jointly advertised" it "in a way that excluded white male applicants." *Id.* ¶¶ 135–136, 141. Here, too, the FAC no longer alleges that the MD Experience was an employment opportunity.

Counts V and VIII fail as a matter of law for several reasons. The position Lynch sought was not an internship with Wicked. Neither race nor gender motivated any action by Wicked. And the advertising provisions do not apply here in the absence of an internship. Lynch's NYSHRL and NYCHRL claims against Wicked should therefore be dismissed.

### A. The MD Experience Did Not Constitute an Internship Under the NYSHRL or NYCHRL.

Both the NYSHRL and NYCHRL forbid discrimination on the basis of race and sex against an "intern." N.Y. Exec. Law § 296-c(2)(a)–(b); N.Y.C. Admin. Code § 8-107(23). And both statutes define an "intern" as a person "who performs work for an employer" under specified conditions. N.Y. Exec. Law § 296-c(1); N.Y.C. Admin. Code § 8-102.

The New York State Legislature and New York City Council have not explicitly defined what constitutes "work" under the NYSHRL and NYCHRL, respectively, just as "Congress has never explicitly defined what constitutes work under the [Fair Labor Standards Act ('FLSA')]." *Singh v. City of New York*, 524 F.3d 361, 367 (2d Cir. 2008) (Sotomayor, J.). In the absence of New York case law interpreting the term under either provision, federal case law interpreting the term under the FLSA is instructive, as New York courts routinely construe identical statutory terms the same way across state and federal statutes. *See, e.g.*, *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 534 (2d Cir. 2016) ("Because the [New York Labor Law ('NYLL') and FLSA] define 'employee' in nearly identical terms, we construe the NYLL definition as the same in substance as the definition in the FLSA.").

To determine whether a covered individual's activity is compensable "work" under the FLSA, courts ask whether the activity consists of "physical or mental exertion … controlled or

required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Singh*, 524 F.3d at 367 (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944)). The Supreme Court later clarified that exertion is not strictly required, and that "the issue is 'whether the time is spent predominantly for the employer's benefit or for the employee's.'" *Id.* (quoting *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944)).

As set forth in detail above, even as alleged, the MD Experience was structured and advertised as a "three-week intensive" solely to benefit the selected participant. FAC ¶ 15. The program's express aim was to "provide[] invaluable training and access to aspiring music directors," *id.*, not to secure labor for Wicked. The "tasks that the" participant "would be assigned" likewise reflect that altruistic aim. *Id.* ¶ 16; *see id.* ¶ 15 (alleging "[d]ay-to day duties" consisted of "[o]bserving" cast rehearsals and performances, "[s]tudying" the show's keyboard book, and getting an opportunity to play and conduct in "one-on-one" sessions with the show's music director). The FAC's scattered references to the participant's "work" as an "apprentice music director," *id.* ¶ 60, "need not be credited" because its specific allegations describe only observation and self-directed practice. *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).

As the Supreme Court held in finding that "trainees" in a railroad's program for prospective brakemen were not employees, the FLSA "was not intended to penalize railroads for providing, free of charge, the same kind of instruction at a place and in a manner which would most greatly benefit the trainees." *Velarde v. GW GJ, Inc.*, 914 F.3d 779, 784 (2d Cir. 2019)

(quoting *Walling v. Portland Terminal Co.*, 330 U.S. 148, 153 (1947)). The same principle is true, under the NYSHRL and NYCHRL, for the owner and operator of a Broadway musical.[5]

**B. Neither Race Nor Gender Motivated Any Action Taken by Wicked.**

The FAC also fails to allege that Lynch's race or gender motivated Wicked not to select Lynch for the MD Experience. "To state a claim for discrimination under the NYCHRL, and for causes of action that accrue after October 11, 2019, under the NYSHRL," a plaintiff must allege that he was "treated less well because of a discriminatory intent, *i.e.*, that the unequal treatment was based, at least in part, on a protected characteristic." *Lee v. Riverbay Corp.*, 751 F. Supp. 3d 259, 275 (S.D.N.Y. 2024). Under that standard, the discriminatory motive must be "one of the motivating factors" for the challenged conduct. *Id.*

Here, however, the FAC does not allege that either race or gender motivated any of Wicked's actions. As set forth above with respect to race, *see supra* Section I.B, the FAC's conclusory allegation that Wicked, Maestra, and MUSE "barred Lynch from at least an internship because he is a white male," FAC ¶ 136, is refuted by the FAC's specific allegations. The same is true with respect to gender. The FAC does not allege that Wicked took any action based in any part on race or gender (or even knew Lynch's race or gender). To the contrary, the FAC makes clear that MUSE and Maestra, not Wicked, set the only racial and gender-based eligibility criteria, respectively. *See id.* ¶ 30 (alleging that MUSE sets the race-based eligibility requirement for its directory and manages the directory); *id.* ¶¶ 28, 109 (alleging that Maestra sets the gender-based eligibility requirement for its directory and manages the directory); *see*

[5] Plaintiffs also allege, briefly, that MUSE and Maestra have partnered with other Broadway productions to offer "paid internships." FAC ¶ 113. That allegation has no relevance here. Plaintiffs do not allege what work those internships entailed, nor do they allege that those internships were similar in any way to the MD Experience. Alleged arrangements for different opportunities at productions with no alleged connection to Wicked have no bearing on whether the MD Experience participant performed work for Wicked.

*also id.* ¶¶ 33–34, 110 (alleging that Maestra removed Lynch's profile from its directory after determining he was male and refused to recommend him for employment or list him in its directory); *id.* ¶¶ 33, 110 (alleging that Lynch contacted Maestra alone to advocate for his eligibility on its directory and that he "was rejected for being male" based on those discussions). And it was MUSE and Maestra that publicly announced the selected participant. *Id.* ¶ 36. Wicked hosted the opportunity; it did not decide the underlying eligibility criteria or select the participant.

In short, the FAC does not contain a single non-conclusory allegation that Wicked bore any discriminatory intent or took any discriminatory action. That failure is fatal under the "motivating factor" standard, which requires a discriminatory intent behind the *defendant's own* conduct, not the conduct of its co-defendants. The FAC's "bald assertions of discrimination" by Wicked without specific factual allegations "from which a court could infer that [it] possessed a discriminatory motive, are implausible and insufficient to survive a motion to dismiss." *Gooden v. Joseph P. Addabbo Fam. Health Ctr., Inc.*, 2023 WL 2709735, at *4 (E.D.N.Y. Mar. 30, 2023) (dismissing gender discrimination claims brought by male plaintiff under NYSHRL and NYCHRL).

### C. Wicked Did Not Circulate or Cause to Be Circulated Any Discriminatory Advertisement in Violation of the NYSHRL or NYCHRL.

Wicked did not circulate or cause to be circulated any discriminatory advertisement in violation of either the NYSHRL or NYCHRL. The NYSHRL and NYCHRL ban discriminatory advertising and inquiries by employers and employment agencies, who may not print, circulate, or cause to be printed or circulated any statement, advertisement, or publication, or use any employment or internship application or inquiry, "in connection with prospective employment," that directly or indirectly expresses a race- or sex-based limitation, specification, or

discrimination, or intent to discriminate. N.Y. Exec. Law § 296-c(2)(c) (internships); N.Y.C. Admin. Code § 8-107(1)(d), (23) (internships). The advertising ban applies only to advertisements for employment or internship opportunities because each provision appears within a subdivision of the relevant statute that governs only intern discrimination, N.Y. Exec. Law § 296-c; N.Y.C. Admin. Code § 8-107(23), and each applies only to an "employer" or "employment agency," *see Davis v. Mich. Dep't of Treas.*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

The FAC alleges that Defendants violated these provisions "by advertising the Music Director Experience position as being open only to Maestra and MUSE directory members—*i.e.*, female and nonbinary people of color," FAC ¶ 115, and "jointly advertised" it "in a way that excluded white male applicants," *id.* ¶ 141. It also alleges that Wicked advertised on "its official social-media pages," posted a *Playbill* article, and must have approved a graphic advertising the MD Experience because it included Wicked's "trademarked logo." *Id.* ¶¶ 17, 21–22.

Lynch's advertising-based claims fail because the underlying opportunity the advertising describes is not covered by the statute. For the reasons explained above, the MD Experience referenced in the advertisements was not an internship within the meaning of either the NYSHRL or NYCHRL. *See supra* Section II.A. That Wicked allegedly posted about the opportunity, FAC ¶¶ 21–22, urged trade publications to do the same, *id.* ¶ 23, and approved use of a trademark, *id.* ¶ 17, is therefore irrelevant.

## III. Lynch Fails to Plead a Section 40-c Claim Against Wicked (Count VI).

Count VI asserts a claim under NYSCRL § 40-c "for the same reasons" Defendants are allegedly liable under the NYSHRL (Count V), *id.* ¶¶ 122–123, and fails as a matter of law for the same reasons Count V fails (as set forth in detail above).

Courts refer to NYSCRL § 40-c and New York Executive Law § 292 with "the collective term NYSHRL." *Moy v. Napoli Shkolnik, PLLC*, 2024 WL 3498131, at *4 n.4 (S.D.N.Y. July 22, 2024). In other words, the NYSHRL includes both "the New York Executive Law §§ 292 *et seq.* (which provides the substance of the law) and the New York Civil Rights Law §§ 40 *et seq.* (which provides for penalties)." *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 398 (E.D.N.Y. 2017). "Where a plaintiff cannot support a claim under the [NYSHRL], the defendant will not be exposed to liability under § 40-c." *Hyman v. Cornell Univ.*, 834 F. Supp. 2d 77, 84 (N.D.N.Y. 2011), *aff'd*, 485 F. App'x 465 (2d Cir. 2012). Because Lynch fails to state a NYSHRL claim against Wicked, his Section 40-c claim against Wicked necessarily fails as well.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the FAC against Wicked with prejudice. Lynch has already amended once in response to Wicked's motion and still cannot state a claim.

DATED: New York, NY
September 18, 2026

Respectfully submitted,

MITCHELL SILBERBERG & KNUPP LLP

*<u>/s/ Jacob D. Albertson</u>*

Jacob D. Albertson
Harrison A. Newman
437 Madison Ave., 25th Floor
New York, NY 10022
(212) 509-3900
j1a@msk.com
han@msk.com

Adam Levin (*pro hac vice*)
2049 Century Park East, 18th Floor
Los Angeles, CA 90067
(310) 312-3116
axl@msk.com

*Counsel for Defendant Wicked LLC*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of S.D.N.Y. Local Civil Rule 7.1(c) because it contains 8,099 words, excluding the portions exempted by S.D.N.Y. Local Civil Rule 7.1(c).

DATED: New York, NY
September 18, 2026

*/s/ Jacob D. Albertson*
Jacob D. Albertson