**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMERICAN ALLIANCE FOR EQUAL RIGHTS and KEVIN LYNCH,

Plaintiffs,

-against-

MAESTRA MUSIC, INC.; ARTS IGNITE INC. d/b/a Musicians United for Social Equity (MUSE); and WICKED LLC,

Defendants.

Case No. 1:26-cv-04645-DLC

**PLAINTIFFS' COMBINED OPPOSITIONS TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

Table of Authorities ii

Introduction 1

Background 2

Argument 8

I. The complaint states a claim against Maestra and MUSE for their directories. 10

A. The MUSE and RISE directories plausibly violate §1981. [Counts II-III] 10

B. All three directories plausibly violate Title VII. [Count IV] 18

C. All three directories plausibly violate state and city law. [Counts VII, IX] 28

II. The complaint states a claim against all Defendants for the Music Director Experience. 31

A. Defendants plausibly violated §1981. [Count I] 32

B. Defendants plausibly violated state and city law. [Counts V-VI, VIII] 41

III. This Court should not dismiss without leave to amend. 46

Conclusion 49

Certificate of Compliance 50

# TABLE OF AUTHORITIES

## Cases

*100,000 Victim Fams. Note Holders v. Schulte Roth & Zable*,
108 F. Supp. 2d 252 (S.D.N.Y. 2000) .......... 47, 48

*AAER v. ABA*,
2026 WL 161596 (N.D. Ill. Jan. 21) .......... 34, 36

*AAER v. Fearless Fund*,
103 F.4th 765 (11th Cir. 2024) .......... 11, 34, 38

*AAER v. Founders First*,
2024 WL 3625684 (N.D. Tex. July 31) .......... 34, 41

*AAER v. HSF*,
2026 WL 2948910 (D.D.C. Sept. 30) .......... 13, 14, 32, 41

*Adam v. Obama for Am.*,
210 F. Supp. 3d 979 (N.D. Ill. 2016) .......... 36, 37

*Adames v. Mitsubishi Bank Ltd.*,
751 F. Supp. 1565 (E.D.N.Y. 1990) .......... 25, 28

*Adia v. Grandeur Mgmt.*,
933 F.3d 89 (2d Cir. 2019) .......... 8

*Adler v. Pataki*,
185 F.3d 35 (2d Cir. 1999) .......... 39

*Alessi Equip. v. Am. Piledriving Equip.*,
578 F. Supp. 3d 467 (S.D.N.Y. 2022) .......... 36

*Ali v. Al-Nahyan*,
808 F. Supp. 3d 88 (D.D.C. 2025) .......... 48

*Ames v. Ohio DYS*,
605 U.S. 303 (2025) .......... 1

*Anthracite Cap. v. MP-555 W. Fifth Mezzanine*,
2004 WL 27722 (S.D.N.Y. Jan. 6) .......... 18

*Apfel v. Prudential-Bache Sec. Inc.*,
616 N.E.2d 1095 (N.Y. 1993) .......... 37

*Areu v. Fox News Network*,
2021 WL 4124226 (S.D.N.Y. Sept. 9) .......... 45

*Bell v. Publix Super Markets*,
982 F.3d 468 (7th Cir. 2020) .......... 9

*Bennett v. Time Warner Cable*,
138 A.D.3d 598 (2016) .......... 30

*Berk v. Choy*,
607 U.S. 187 (2026) .......... 9

*Brown v. Parkchester S. Condominiums*,
287 F.3d 58 (2d Cir. 2002) .......... 27

*Camreta v. Greene*,
563 U.S. 692 (2011) .......... 35

*Caudill v. N.C. Symphony Soc'y*,
750 F. Supp. 3d 531 (E.D.N.C. 2024) .......... 20

*Cerame v. Slack*,
123 F.4th 72 (2d Cir. 2024) .......... 8

*Cherry v. Stars Model Mgmt.*,
2006 WL 6632706 (N.Y.C. Com. Hum. Rts. Mar. 7) .......... 29

*CITGO Petroleum Corp. v. Ascot Underwriting Ltd.*,
158 F.4th 368 (2d Cir. 2025) .......... 33

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) .......... 20

*Cobaugh v. Klick-Lewis, Inc.*,
561 A.2d 1248 (Pa. Super. Ct. 1989) .......... 39

*Cook v. Arrowsmith Shelburne*,
69 F.3d 1235 (2d Cir. 1995) .......... 26

*Cuoco v. Moritsugu*,
222 F.3d 99 (2d Cir. 2000) .......... 48

*Daniels v. Pipefitters' Ass'n Loc. Union No. 597*,
945 F.2d 906 (7th Cir. 1991) .......... 15, 16, 33

*Deravin v. Kerik*,
335 F.3d 195 (2d Cir. 2003) .......... 25

*Deveaux v. Skechers USA*,
2020 WL 1812741 (S.D.N.Y. Apr. 9) .......... 30

*Diamond Alt. Energy v. EPA*,
606 U.S. 100 (2025) .......... 17

*DiFolco v. MSNBC Cable*,
622 F.3d 104 (2d Cir. 2010) .......... 9

*Do No Harm v. NAEMT*,
2025 WL 973614 (S.D. Miss. Mar. 31, 2025) ............................................................ 34

*Doe v. Trump Corp.*,
6 F.4th 400 (2d Cir. 2021) .......................................................................................... 23

*Dorce v. NYC*,
2 F.4th 82 (2d Cir. 2021) ............................................................................................ 17

*Duverny v. Hercules Med. P.C.*,
2020 WL 1033048 (S.D.N.Y. Mar. 3) ........................................................................ 26

*Egelston v. State Univ. Coll. at Geneseo*,
535 F.2d 752 (2d Cir. 1976) ........................................................................................ 24

*Ermolaou v. Flipside, Inc.*,
2004 WL 503758 (S.D.N.Y. Mar. 15) ........................................................................ 39

*Fero v. Excellus Health Plan*,
236 F. Supp. 3d 735 (W.D.N.Y. 2017) ....................................................................... 18

*Fonte v. Bd. of Managers of Cont'l Towers Condo.*,
848 F.2d 24 (2d Cir. 1988) .......................................................................................... 48

*Fullilove v. Klutznick*,
448 U.S. 448 (1980) ..................................................................................................... 35

*Fullilove v. Kreps*,
584 F.2d 600 (2d Cir. 1978) ........................................................................................ 35

*Geinosky v. Chicago*,
675 F.3d 743 (7th Cir. 2012) ................................................................................... 9, 48

*Glatt v. Fox Searchlight Pictures*,
811 F.3d 528 (2d Cir. 2016) ........................................................................................ 44

*Glob. Network Commc'ns v. NYC*,
458 F.3d 150 (2d Cir. 2006) .......................................................................................... 8

*Goodman v. Heublein, Inc.*,
645 F.2d 127 (2d Cir. 1981) ........................................................................................ 25

*Gorzynski v. JetBlue Airways Corp.*,
596 F.3d 93 (2d Cir. 2010) .......................................................................................... 32

*Gottlieb v. Tropicana Hotel & Casino*,
109 F. Supp. 2d 324 (E.D. Pa. 2000) ......................................................................... 12

*Gratz v. Bollinger*,
539 U.S. 244 (2003) ............................................................................................... 18, 34

*Gulino v. N.Y. Educ. Dep't*,
460 F.3d 361 (2d Cir. 2006) ........................................ 20

*Gundogdu v. LinkedIn,*
2024 WL 1597781 (11th Cir. Apr. 12) ........................................ 22

*Hamer v. Sidway*,
124 N.Y. 538 (1891) ........................................ 37

*Havens v. James*,
76 F.4th 103 (2d Cir. 2023) ........................................ 22

*Henricks v. Flywheel Sports*,
2020 WL 1285453 (S.D.N.Y. Mar. 18) ........................................ 11

*Henry v. Daytop Vill., Inc.*,
42 F.3d 89 (2d Cir. 1994) ........................................ 39

*Hollander v. Sears*,
450 F. Supp. 496 (D. Conn. 1978) ........................................ 34, 35

*Hughes v. Twenty-First Century Fox*,
304 F. Supp. 3d 429 (S.D.N.Y. 2018) ........................................ 44

*Illiano v. Mineola Union Free Sch. Dist.*,
585 F. Supp. 2d 341 (E.D.N.Y. 2008) ........................................ 42

*In re Columbia Coll. Rankings Action*,
2024 WL 1312511 (S.D.N.Y. Mar. 26) ........................................ 17

*In re Elec. Books Antitrust Litig.*,
859 F. Supp. 2d 671 (S.D.N.Y. 2012) ........................................ 8, 9

*In re Jetblue Airways Corp. Priv. Litig.*,
379 F. Supp. 2d 299 (E.D.N.Y. 2005) ........................................ 12

*In re Weiss Multi-Strategy Advisors,*
664 B.R. 492 (Bankr. S.D.N.Y. 2024) ........................................ 13

*Juarez v. Nw. Mut. Life Ins. Co.*,
69 F. Supp. 3d 364 (S.D.N.Y. 2014) ........................................ 16, 32

*Kuriakose v. Mt. Vernon*,
41 F. Supp. 2d 460 (S.D.N.Y. 1999) ........................................ 35

*L.A. Dep't of Water & Power v. Manhart*,
435 U.S. 702 (1978) ........................................ 18

*Landron & Vera v. Somoza-Colombani*,
2013 WL 2422807 (D.P.R. June 3) ........................................ 33

*Lauture v. Int'l Bus. Machs. Corp.*,
216 F.3d 258 (2d Cir. 2000) .......... 15

*Lebedev v. Blavatnik*,
42 N.Y.S.3d 511 (App. Div. 2021) .......... 36

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*,
797 F.3d 160 (2d Cir. 2015) .......... 49

*Lucente v. IBM*,
310 F.3d 243 (2d Cir. 2002) .......... 47

*Malave v. Bolger*,
599 F. Supp. 221 (D. Conn. 1984) .......... 25

*Malone v. Pipefitters' Ass'n*,
774 F. Supp. 490 (N.D. Ill. 1991) .......... 16

*Mayo v. Sec. Indus. Ass'n*,
1995 WL 608291 (S.D.N.Y. Oct. 17) .......... 24

*McDonald v. Santa Fe Trail Transp.*,
427 U.S. 273 (1976) .......... 10

*Miller v. Syracuse Univ.*,
662 F. Supp. 3d 338 (N.D.N.Y. 2023) .......... 13

*Mohasco Corp. v. Silver*,
447 U.S. 807 (1980) .......... 24

*Moody v. Queens Ballpark Co.*,
838 F. Supp. 3d 299 (E.D.N.Y. 2026) .......... 16

*Moreno v. Marbil Prods.*,
296 F.2d 543 (2d Cir. 1961) .......... 39

*Morrow v. Miss. Publishers Corp.*,
1972 WL 236 (S.D. Miss. Nov. 27) .......... 20

*NCUA Bd. v. RBS Sec.*,
112 F. Supp. 3d 61 (S.D.N.Y. 2015) .......... 9

*Nielsen v. Flower Hosp.*,
639 F. Supp. 738 (S.D.N.Y. 1986) .......... 27

*NYC Comm'n on Hum. Rts. v. Boll*,
1974 WL 2796 (N.Y. Sup. Ct. Aug. 8) .......... 30, 31

*Ofori-Tenkorang v. Am. Int'l Grp.*,
460 F.3d 296 (2d Cir. 2006) .......... 15

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012) .......... 48

*Patterson v. McLean Credit Union*,
491 U.S. 164 (1989) .......... 34

*Pavillion Agency v. Spitzer*,
802 N.Y.S.2d 879 (Sup. Ct. 2005) .......... 30

*Payne v. McGettigan's Mgmt. Servs.*,
2020 WL 2731996 (S.D.N.Y. May 26) .......... 26, 27

*Pegues v. Miss. Emp. Serv.*,
699 F.2d 760 (5th Cir. 1983) .......... 18

*Register.com v. Verio*,
356 F.3d 393 (2d Cir. 2004) .......... 12

*Ricciuti v. N.Y.C. Transit Auth.*,
941 F.2d 119 (2d Cir. 1991) .......... 47

*Richardson Emp. Agency v. NYSDHR*,
40 A.D.2d 585 (4th Dep't 1972) .......... 29

*Ritchie Cap. Mgmt. v. Coventry First LLC*,
2007 WL 2044656 (S.D.N.Y. July 17) .......... 47

*Rivers v. Roadway Exp.*,
511 U.S. 298 (1994) .......... 35

*Runyon v. McCrary*,
427 U.S. 160 (1976) .......... 34

*Sacerdote v. NYU*,
9 F.4th 95 (2d Cir. 2021) .......... 9

*Sandler v. Benden*,
159 N.Y.S.3d 677 (App. Div. 2022) .......... 45

*Sandler v. Benden*,
129 N.Y.S.3d 259 (N.Y. Sup. Ct. 2020) .......... 45

*Scaglione v. Chappaqua Cent. Sch. Dist.*,
209 F. Supp. 2d 311 (S.D.N.Y. 2002) .......... 19, 20, 21

*Secured Worldwide LLC v. Kinney*,
2015 WL 1514738 (S.D.N.Y. Apr. 1) .......... 40

*Shapiro v. Prudential Theaters*,
328 N.Y.S.2d 28 (Dist. Ct.) .......... 38, 40, 41

*Shapiro v. Prudential Theaters*,
75 Misc. 2d 752, 348 N.Y.S.2d 812 (App. Term 1972) ....................38

*Silver v. Mohasco Corp.*,
602 F.2d 1083 (2d Cir. 1979) .................... 24, 25

*Vakharia v. Swedish Covenant Hosp.*,
765 F. Supp. 461 (N.D. Ill. 1991) ....................16

*Vega v. Hempstead Union Free Sch. Dist.*,
801 F.3d 72 (2d Cir. 2015) ....................9

*Walker v. Linklaters LLP*,
948 F. Supp. 2d 396 (S.D.N.Y. 2013) ....................27

*Wang v. Phoenix Satellite Television US*,
976 F. Supp. 2d 527 (S.D.N.Y. 2013) ....................44

*Werner v. Werner*,
154 N.Y.S. 570 (App. Div. 1915) ....................37

*Williams v. Citigroup*,
659 F.3d 208 (2d Cir. 2011) .................... 47, 48

*Williams v. NYC Hous. Auth.*,
458 F.3d 67 (2d Cir. 2006) ....................26

*Williamson v. Amica Mut. Ins. Co.*,
2025 WL 1796324 (D. Conn. June 30) ....................24

*Zipes v. Trans World Airlines*,
455 U.S. 385 (1982) ....................23

**Statutes**

29 U.S.C §206 ....................36

42 U.S.C. §1981 .................... 10, 11, 14, 15, 34

42 U.S.C. §2000e .................... 18, 19, 20

Civil Rights Act of 1991, 105 Stat. 1071 ....................34

N.Y. Exec. Law §292 ....................29

N.Y. Exec. Law §296 .................... 28, 42

N.Y. Exec. Law §296-c ....................42, 43, 45, 46

N.Y. Lab. Law §511 ....................20

N.Y. Lab. Law §652 ....................36

N.Y. Workers' Comp. Law §2 ....................20

N.Y.C. Admin. Code §8-102 .......... 29, 31, 43, 45, 46
N.Y.C. Admin. Code §8-107 .......... 28, 31, 41, 42

**Other Authorities**

29 C.F.R. §1601.12 .......... 24, 25, 26
Fed. R. Civ. P. 15 .......... 48
Fed. R. Civ. P. 8 .......... 8
1 *Data Sec. & Privacy Law* (2026-27) .......... 12
17A *Am. Jur. 2d Contracts* .......... 37
22 *N.Y. Jur. 2d Contracts* .......... 40
3 *Williston on Contracts* (4th ed.) .......... 38
5B Fed. Prac. & Proc. Civ. (Wright & Miller, 4th ed.) .......... 47
Decision No. N-917.002, 1991 WL 11665181 (EEOC Sept. 20) .......... 20

## INTRODUCTION

Defendants do not deny their racial discrimination, only whether any law bans their racial discrimination. Rather than denying their discrimination or claiming it's somehow protected, Defendants challenge only whether the hooks for the laws banning discrimination are met, like "contract," "employment agency," and "internship." Defendants hope this Court will narrow these thresholds, perhaps out of sympathy for Defendants' mission of expanding access for women and minorities. Expanding access *is* noble, but not when it takes the crude form of wholesale excluding and filtering out some musicians based on their skin color or sex. And if courts weaken the *thresholds* for applying antidiscrimination laws, then they necessarily weaken those protections for *all* races and sexes. Every argument in Defendants' motions would apply equally to a directory structured like Defendants', where the directory let only white males join or let employers click a button that let them see only white males. Because the complaint against that directory would go forward, this complaint must go forward. *See generally Ames v. Ohio DYS*, 605 U.S. 303, 309-10 (2025) (reiterating, unanimously, that antidiscrimination law "draws no distinction" and "does not vary" based on majority versus minority status).

On the thresholds, Defendants just view the facts differently. Where Plaintiffs see contracts, Defendants see boilerplate or gifts. Where Plaintiffs see employment agencies that curate candidates and actively arrange jobs, Defendants see LinkedIn. And where Plaintiffs see a paid internship, Defendants see a networking event. But those debates can't be resolved on a motion to dismiss, where *Plaintiffs'* facts are accepted and all inferences are drawn in *Plaintiffs'* favor. They must be resolved on the evidence, at summary judgment.

## BACKGROUND

Maestra and MUSE (a project of Arts Ignite) are "sister" organizations based in Manhattan. Am.-Compl. ¶8. The two entities run three directories that get musicians jobs on Broadway. All three directories classify musicians based on race or sex (or both).

MUSE's directory is open only to "'Person of Color … musicians.'" ¶30. To join, musicians must agree to MUSE's "Privacy Policy + Terms." *Privacy Policy*, MUSE (last updated Oct. 19, 2020), perma.cc/UQ69-95CG (*MUSE Privacy Policy*). This policy applies "when you submit information to or through the Site," including and especially to MUSE's directory—the primary feature of the website, something members must join to access most of the website, and the only part of the website where users meaningfully "submit information." *Id.*; Am.-Compl. ¶¶75-76. When a musician joins, the privacy policy says "you are consenting to the collection, processing and retention of your information," which MUSE can then use "for a variety of purposes." *MUSE Privacy Policy*; Am.-Compl. ¶75. And the policy makes musicians waive certain legal rights, including rights under foreign laws. *MUSE Privacy Policy*; Am.-Compl. ¶75. For its part, MUSE agrees to let users "use" its platform and to "only use the information you provide to us in a manner that is consistent with" the rules in the "Privacy Policy." *MUSE Privacy Policy*.

Maestra runs two directories. Its main directory is open only to "female or non-binary musician[s]." Am.-Compl. ¶28. Maestra also runs another directory called RISE, short for "Representation, Inclusion, and Support for Employment." ¶49. Unlike MUSE and Maestra's main directory, RISE does not outright bar any race or sex from joining. But RISE was "intentionally designed for candidates from underrepresented backgrounds,

including but not limited to people of color," with the "mission" of "increas[ing] diversity among the workforce that produces American theatre." ¶87. To advance this mission, RISE classifies musicians and lets employers filter candidates by race and sex—except employers cannot filter for "white" or "male." ¶87. Maestra encourages that filtering, including with a how-to video on RISE's website showing employers how to do it. ¶¶86-87. Maestra says this "amplification" makes RISE "particularly powerful for those who are often overlooked, including but not limited to people of color," allowing "*these* professionals to be discovered and identified for employment and opportunities by producers, general managers, theaters and various employers." *Join the Directory*, RISE, perma.cc/UNB6-3SCN (archived Sept. 29, 2026) (emphasis added) (*Join RISE*) [Ex.1-E]; Am.-Compl. ¶87.

To join RISE, musicians must check a box stating, "I have read and accept the RISE Theater Directory Terms and Conditions and Privacy Policy" (where "Terms and Conditions" and "Privacy Policy" are hyperlinks in different-colored font). *Join RISE*; Am.-Compl. ¶¶83-84. Those agreements require musicians to give Maestra a license to "use" "information provided at the time of registering for our directory." Am.-Compl. ¶84. They also contain an indemnification agreement, a choice-of-law clause that picks New York, a forum-selection clause that opts for New York City, and more—which is why Maestra warns that the agreements are "a binding contract between you and [Maestra]." *Terms of Use*, RISE (May 12, 2023), perma.cc/UV4U-9YA3 (*RISE Terms*); Am.-Compl. ¶¶83-84.

All three directories take an active role in getting their preferred demographics jobs on Broadway. MUSE and Maestra carefully curate their directories. Foremost, they require

musicians to be racial minorities or women, respectively. Am.-Compl. ¶3, ¶28, ¶30. Maestra and MUSE also dictate the categories of information that musicians put on their profiles, like "Professional experience," "Hireable as," and "Interested in Touring?" *E.g.*, *PJ Ju*, Maestra, perma.cc/L62W-7V4J (archived Oct. 14, 2026) (*Ju Maestra Profile*) [Ex.5]; *PJ Ju*, MUSE, perma.cc/7GA5-VWG9 (archived Oct. 13, 2026) (*Ju MUSE Profile*) [Ex.6]. And they insist on "review[ing]" and "approv[ing]" each profile before adding any musician to their directories. Am.-Compl. ¶29, ¶31. Maestra also classifies musicians by race and sex on RISE, including the filtering mechanism that it created and encourages employers to use. ¶¶86-87. And Maestra bars musicians from being searchable on RISE unless they "have at least one verifiable production credit." *Homepage*, RISE, perma.cc/8WSR-QHM7 (archived Oct. 13, 2026) (*RISE Homepage*) [Ex.7]. All this curation is intentional, according to Defendants, as it gives would-be employers the confidence that the directory has real musicians who are really minorities. *See New Organization MUSE Is About to Level the Playing Field for BIPOC Artists*, Maestra, perma.cc/U3VB-HQ4D (archived Oct. 14, 2026) (*New Organization*) [Ex.8] ("Following the example of … Maestra …, MUSE features an easy-to-use directory of qualified artists of color. Gone are the days of saying, 'I'd hire a person of color, but I don't know who they are.'").

The directories succeed at getting their preferred musicians hired. The leaders of Maestra and MUSE are "all music directors, orchestrators, arrangers, composers at the top of [their] fields" who themselves have hiring power and connections to others with hiring power. *New Organization*; Am.-Compl. ¶20, ¶50, ¶98. So they also draw from their

directories to make direct referrals to Broadway colleagues. ¶98. Hiring agents and music directors say how much they use Maestra, for example, to hire female musicians. ¶98. And a dozen hiring managers pledged to start every search for hiring musicians by consulting RISE. ¶49. Maestra and MUSE maintain job portals that are visible only to members of their directories, where employers can post jobs using Defendants' form. ¶50, ¶95, ¶98. That form includes categories like "Job Type" (where employers must select "Paid" or "Internship"); and Maestra and MUSE insist on reviewing and approving each of these job posts as well. *Post a Job*, MUSE, perma.cc/8YV8-R38Q (archived Oct. 13, 2026) (*MUSE Post a Job*) [Ex.14]; *Post a Job*, Maestra, perma.cc/7P6J-MDVP (archived Oct. 14, 2026) (*Maestra Post a Job*) [Ex.15]. Maestra and MUSE also team up with Broadway shows to create internships open only to members of their directories. Am.-Compl. ¶113.

In the summer of 2023, Maestra and MUSE joined forces with the Broadway musical *Wicked* to create the "Music Director Experience." ¶9. The MD Experience was a "three-week intensive" for "aspiring music directors" to gain "invaluable" training and real-world experience on a prominent show. ¶15. According to Defendants, the winner had to commit 6-12 hours per week of the winner's time. ¶61; Lynch-Decl. Ex.4 (Stitt-Decl. ¶6). During that time, the winner performed "[d]ay-to-day duties," including "[s]tudying one of the keyboard books from the show," "observing," "playing," "conducting," and "working with the Music Director one-on-one." Am.-Compl. ¶15; *MUSE/Maestra MD Experience Application*, perma.cc/YFC3-XGTE (archived May 26, 2026) (*MD Experience Application*) [Ex.1-B]. The position was "paid" through a stipend of $300 per week. Am.-Compl. ¶¶15-

16, ¶61. MUSE, Maestra, and Wicked all agreed that the MD Experience would be open only to "MUSE and Maestra directory members." ¶17, ¶20. Because those directories are expressly closed to musicians who aren't racial minorities or women, Defendants knew this eligibility requirement would exclude white males. ¶20, ¶¶68-69, ¶116. Yet Defendants listed this race- and sex-based requirement in their joint advertisements for the MD Experience. ¶¶14-23.

Plaintiff Kevin Lynch is a composer, musician, and aspiring music director. ¶11, ¶24. He is a member of RISE's directory and is actively looking for employment and internships on Broadway. ¶¶46-47, ¶¶49-51. He is also a member of the other plaintiff, the American Alliance for Equal Rights. ¶11.

After Lynch saw an advertisement for the MD Experience with Wicked, he tried to apply through the online application portal. ¶24. Lynch quickly discovered that he could not submit an application unless he first became a member of MUSE's or Maestra's directory. ¶25. Lynch tried to register with both. While his application with Maestra was pending, he received a temporary link to an unlisted profile that he used to apply to the MD Experience. ¶27, ¶29, ¶32. But Lynch is a white male. ¶29, ¶31. So Maestra later denied his attempt to join its directory. ¶¶33-34. And to date, MUSE has never approved his attempt to join its directory. ¶31. In August 2023, Defendants announced the sole winner for the MD Experience: PJ Ju. ¶¶36-37. The winner was a female, nonbinary person of color who belonged to both MUSE's and Maestra's exclusive directories. ¶36, ¶¶38-39. The winner

was much less qualified than Lynch and was inexperienced as a music director, even though Defendants said that past music-director experience was "necessary to be considered." ¶39.

In June 2026, Plaintiffs filed this suit under several laws that ban discrimination based on race and sex. ¶4. In their amended complaint, Plaintiffs contend that the MUSE, Maestra, and RISE directories discriminate based on race and sex, including against multiple members of the Alliance. ¶¶70-90. Lynch separately contends that Defendants discriminated against him when they excluded him from the MD Experience based on race and sex. ¶64, ¶99.

With respect to the directories, one of Plaintiffs' claims arises under Title VII, ¶¶91-103, which usually requires plaintiffs to exhaust their claims with the EEOC. In July 2023, Lynch filed a charge with the New York State Division of Human Rights. Lynch-Decl. ¶3 & Ex.1-H. He was not assisted or represented by counsel at the time. Lynch-Decl. ¶5. The body of Lynch's pro-se charge with the NYSDHR accused Maestra and MUSE of excluding him from their directories—and thus the MD Experience—based on his race and sex. Ex.1-H. A month later, the NYSDHR confirmed that it had dual-filed that charge with the EEOC. Lynch-Decl. ¶4 & Ex.2. Maestra and MUSE soon learned of the charge, as the two organizations hired the same counsel (who threatened to countersue Lynch in August 2023) and that counsel filed a response to Lynch's NYSDHR charge in October 2023. ¶8 & Ex.3.

After failing to get movement from the agencies on his pro-se charges, Lynch retained counsel. Lynch-Decl. ¶10. With the EEOC's permission, his lawyers promptly

submitted a new lawyer-drafted charge in August 2025, which became the "official" charge. ¶11 & Exs.1-I, 1-J. This lawyer-drafted charge accused MUSE and Maestra of discriminating based on race and sex in all three of their directories. Ex.1. The EEOC began investigating, including by interviewing Lynch, asking him follow-up questions, and collecting documents. ¶12. But after Defendants moved to dismiss his complaint in this case and this Court warned that Plaintiffs might get only one chance to amend, Lynch asked the EEOC to quickly issue his right-to-sue letters so he could file his Title VII claims here. ¶13. On August 20, 2026, the EEOC issued Lynch multiple notices of right to sue (backdated to August 18), including one against Maestra and one against MUSE. Am.-Compl. ¶92; Lynch-Decl. ¶14.

After Defendants moved to dismiss and the EEOC issued the notices, Plaintiffs amended their complaint to add a claim under Title VII. All three Defendants now move to dismiss the amended complaint under Rule 12(b)(6).

## ARGUMENT

Rule 12(b)(6) tests whether a complaint satisfies Rule 8, which in turn requires only a "short and plain statement." Fed. R. Civ. P. 8; *see Glob. Network Commc'ns v. NYC*, 458 F.3d 150, 155 (2d Cir. 2006). Rule 8 requires "notice, not technicality, and therefore is 'not meant to impose a great burden upon a plaintiff.'" *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 680 (S.D.N.Y. 2012) (Cote, J.). "Specific facts are not necessary," *Adia v. Grandeur Mgmt.*, 933 F.3d 89, 92 (2d Cir. 2019), and the Court must "presume that general allegations embrace those specific facts that are necessary to support the claim," *Cerame v. Slack*, 123 F.4th 72, 81-82 (2d Cir. 2024) (cleaned up).

When applying this standard, the Court must "'accep[t] all factual allegations in the complaint as true,'" "construe [the complaint] liberally," and draw "all reasonable inferences in [the] plaintiffs' favor." *NCUA Bd. v. RBS Sec.*, 112 F. Supp. 3d 61, 63 (S.D.N.Y. 2015); *Sacerdote v. NYU*, 9 F.4th 95, 106-07 (2d Cir. 2021). After all that accepting, construing, and presuming, the question is whether a legal violation is "'plausible.'" *Berk v. Choy*, 607 U.S. 187, 188 (2026). Plausible means a "'reasonable inference'" of liability, not probable or more plausible than alternatives. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86-87 (2d Cir. 2015); *Elec. Books*, 859 F. Supp. 2d at 681, 688. "By design, this system of pleading makes it relatively easy for plaintiffs" to avoid dismissal, "even for claims that are likely to fail." *Berk*, 607 U.S. at 194.

Though Rule 12(b)(6) usually bars courts from considering matters outside the complaint, Defendants say this Court can consider anything on Maestra's or MUSE's websites. *See* MUSE-MTD 7 n.2 ("the Court can consider the totality of [MUSE's] website in consideration of the instant motion to dismiss"); Wicked-MTD 1 n.1 (similar). Plaintiffs do not object to the Court considering Defendants' websites. Plaintiffs also use those websites in this opposition to "illustrate the facts [Plaintiffs] expec[t] to be able to prove," *Geinosky v. Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012), without "convert[ing] the motion to one for summary judgment," *Bell v. Publix Super Markets*, 982 F.3d 468, 480 n.2 (7th Cir. 2020). But this Court still must draw all inferences in favor of Plaintiffs and cannot use these websites to *contradict* any of Plaintiffs' factual allegations in the complaint. *Elec. Books*, 859 F. Supp. 2d at 686; *accord DiFolco v. MSNBC Cable*, 622 F.3d 104, 111, 113 (2d Cir. 2010)

("even if a document is 'integral' to the complaint," it is "imprope[r]" for a court to "ch[o]ose between reasonably competing interpretations" at the pleading stage).

In their amended complaint, Plaintiffs plausibly allege claims against Defendants for two categories of conduct: Maestra and MUSE run race- and sex-based directories. And Maestra, MUSE, and Wicked ran a Music Director Experience that excluded Lynch based on race and sex. Defendants have a different view of the facts, but none of their contrary assertions are reasons to dismiss this case at the threshold. And at a minimum, Plaintiffs should get leave to amend to add anything this Court deems missing.

## I. The complaint states a claim against Maestra and MUSE for their directories.

MUSE and Maestra run directories that get musicians jobs but that exclude whites (MUSE), exclude males (Maestra), or classify and filter musicians by race and sex (RISE). Because MUSE and RISE use and facilitate contracts, their racial discrimination plausibly violates 42 U.S.C. §1981. And because all three plausibly act as employment agencies, Plaintiffs state claims under Title VII and New York's state and city laws.

### A. The MUSE and RISE directories plausibly violate §1981. [Counts II-III]

Section 1981 bans racial discrimination in contracting. It covers discrimination by "nongovernmental" actors, like Maestra and MUSE. 42 U.S.C. §1981(c). And it covers discrimination for and against any race. *McDonald v. Santa Fe Trail Transp.*, 427 U.S. 273, 295 (1976). Defendants don't dispute those principles or most of §1981's elements. Defendants don't dispute that the MUSE and RISE directories intentionally discriminate based on race, both on their face and in their purpose and effect. *See* Am.-Compl. ¶¶70-90.

Defendants don't dispute that their race-based practices have caused injuries to Plaintiffs—racially excluding Lynch from MUSE's directory and racially classifying and limiting Lynch's opportunities on RISE's directory. ¶¶30-31, ¶35, ¶47, ¶¶49-54. And Defendants don't dispute that their discrimination fails strict scrutiny, ¶¶66-68, or raise any other defense that could make their discrimination lawful.

Defendants also never meaningfully dispute that they "contrac[t]" with musicians who join their directories. 42 U.S.C. §1981(a)-(b). Maestra doesn't contest that its "Terms of Use and Privacy Policy" for RISE are contractual. *See* Maestra-MTD 13. Nor could it. To join, musicians must create a profile, which they cannot do unless they check a box stating, "I have read and accept the RISE Theater Directory Terms and Conditions and Privacy Policy" (where "Terms and Conditions" and "Privacy Policy" are hyperlinks in different-colored font). *Join RISE*; *see Henricks v. Flywheel Sports*, 2020 WL 1285453, at *5 (S.D.N.Y. Mar. 18) (these facts create a contract). Both the terms and the privacy policy, Maestra warns musicians, are "a binding contract between you and [Maestra]." *RISE Terms*. They are, since they make musicians agree to indemnify Maestra, waive the right to invoke a choice of law other than New York, and waive the right to sue in a venue other than New York. Am.-Compl. ¶83; *RISE Terms*; *Privacy Policy*, RISE (archived Oct. 13, 2026), perma.cc/MR8U-R6HP (*RISE Privacy Policy*); *see AAER v. Fearless Fund*, 103 F.4th 765, 775 (11th Cir. 2024) (finding similar agreements to be contracts).

MUSE hardly contests that its "Privacy Policy + Terms" are contractual: In two conclusory sentences, it says this agreement lacks "manifestation of a bargained-for

exchange" and "just identifies Arts Ignite's rights." MUSE-MTD 7. Even if those flimsy arguments were preserved, they fail.

It's not clear why MUSE thinks this agreement lacks "manifestation of a bargained-for exchange," MUSE-MTD 7; but it is clear that, in a future contract dispute with a musician, MUSE would be "estopped" from denying the contractual nature of its own policy that it drafted. 1 *Data Sec. & Privacy Law* §9:119 & n.2 (2026-27). At a minimum, MUSE would have a contract with Lynch, since he is fully aware of MUSE's privacy policy and would consent to the terms when he signs up for the directory. Am.-Compl. ¶75; *see In re Jetblue Airways Corp. Priv. Litig.*, 379 F. Supp. 2d 299, 325 (E.D.N.Y. 2005); *Register.com v. Verio*, 356 F.3d 393, 403 (2d Cir. 2004).

Far from a mere statement of "Arts Ignite's rights," MUSE-MTD 7, the terms tell users to "read this Privacy Policy carefully because when you submit information to or through the Site, *you* are *consenting* to the collection, processing and retention of your information," *MUSE Privacy Policy* (emphases added); Am.-Compl. ¶75. MUSE can then use that information "for a variety of purposes," including to "improve" its website and to "conduct marketing." *MUSE Privacy Policy*. MUSE also makes users "waive" other rights, including any broader privacy rights under the laws of other jurisdictions. *Id.* And MUSE undertakes obligations of its own, like its agreement to "only use the information you provide to us in a manner that is consistent with this Privacy Policy." *Id.* These terms at least contain a license, waiver, and privacy commitment—each a contract. *See Gottlieb v. Tropicana Hotel & Casino*, 109 F. Supp. 2d 324, 329-30 (E.D. Pa. 2000) ("permitting the [defendant]

to gather information"); *In re Weiss Multi-Strategy Advisors,* 664 B.R. 492, 524-25 (Bankr. S.D.N.Y. 2024) (forbearance of legal right); *Miller v. Syracuse Univ.*, 662 F. Supp. 3d 338, 363-64 (N.D.N.Y. 2023) (privacy policy); *cf. AAER v. HSF*, 2026 WL 2948910, at *12 (D.D.C. Sept. 30) (explaining that terms creating a "right to use an applicant's materials for [defendant's] own purposes" would be contractual under §1981).

Defendants cannot dismiss these contracts as somehow disconnected from their race-based directories. MUSE says its agreement concerns "the use of MUSE's website generally, not access to the Directory specifically." MUSE-MTD 7-8. And Maestra says Lynch's rights under its agreement are not "impaired" by RISE's race-based filtering on the directory. Maestra-MTD 13. Both Defendants are mistaken.

For MUSE, its Privacy Policy + Terms cover a musician's use of the directory. This agreement kicks in when individuals "submit information to or through the Site," *MUSE Privacy Policy*, which is what musicians do when they join the directory, "create a personal profile page," and submit the personal information that becomes their profile, *Become a Directory Member*, MUSE, perma.cc/8HWQ-7Z2J (archived Oct. 12, 2026) [Ex.16]; *e.g.*, *Ju MUSE Profile*. The directory is also a unique section of MUSE's website, which only selected musicians can edit and where only selected musicians can maintain personal profiles. *See Directory*, MUSE, perma.cc/2XLB-WSDW (archived Oct. 13, 2026) [Ex.17]; *see also MUSE Privacy Policy* (stressing that only certain users get "access to certain features of the Site"). Section 1981 bars discrimination both in the "making" of contracts and in the "performance" and "enjoyment of all benefits, privileges, terms, and conditions of the

contractual relationship." 42 U.S.C. §1981(b). At a minimum, then, MUSE sets different terms and provides different benefits based on race: Its Privacy Policy + Terms protect nonwhite musicians across the entire website, including the directory; but by banning white musicians from the directory, these musicians get less access and fewer benefits based on race. Am.-Compl. ¶¶76-77.

In fact, other than the directory, MUSE's website contains little else. Aside from perfunctory descriptions of the organization, the website contains a "Find a Job" page, but even that page cannot be accessed unless musicians first become members of MUSE's directory. *See Find a Job*, MUSE, perma.cc/TXV5-PHJ9 (archived Oct. 13, 2026) [Ex.9] ("MUSE Members Only: If you'd like to take a look at our Jobs Board, consider becoming a member"). The website also contains a "Programs" page, but all the programs are limited to members of MUSE's directory. *See Programs*, MUSE, perma.cc/58QY-M8KH (archived Oct. 13, 2026) [Ex.18]; *Mentorship Programs*, MUSE, perma.cc/TA3K-M2Q9 (archived Oct. 13, 2026) (*MUSE Mentorship Programs*) [Ex.11]; *Scholarship*, MUSE, perma.cc/89TP-7EUS (archived Oct. 13, 2026) [Ex.19]. Because white musicians cannot "use [MUSE's] website just as any other [musician] can," MUSE's privacy policy and terms implicate §1981. *HSF*, 2026 WL 2948910, at *10.

The relationship between Maestra's terms of use and privacy policy and RISE's racial discrimination is also clear. Being listed on the "directory" is the key benefit that convinces musicians to give up so many rights to Maestra. *RISE Privacy Policy*; *see* Am.-Compl. ¶47, ¶49, ¶¶80-84; *About*, RISE, perma.cc/53ZB-HPBJ (archived Oct. 13, 2026) [Ex.20]

(describing "the RISE Theater Directory" as "RISE's largest tool"). But once musicians are listed, Maestra intentionally deprives white musicians of certain "benefits"—race-based filtering on RISE and the employment opportunities it provides—based on race. 42 U.S.C. §1981(b). And that race-based filtering is an additional "benefi[t]" and "privileg[e]" of Maestra's website that it provides to some races but not others. *Id.*

Though this Court can rely solely on the contracts above, Defendants give short shrift to an independent reason their directories implicate §1981: Even if Defendants had no relevant contract with the musicians who join their directories, Defendants facilitate contracts between musicians and third parties. *See* Am.-Compl. ¶77, ¶¶86-88. The whole point of RISE and MUSE's directory is to get musicians jobs. ¶¶49-50; *infra* I.B.i, I.C. Though §1981 is not limited to employment, contracts for employment (and other contractual positions short of employment, like independent-contractor gigs and paid internships) are covered by the statute's bar on racial discrimination—even when the employment is at will. *See Ofori-Tenkorang v. Am. Int'l Grp.*, 460 F.3d 296, 300-01 (2d Cir. 2006); *Lauture v. Int'l Bus. Machs. Corp.*, 216 F.3d 258, 262 (2d Cir. 2000). That the contracts here are between the musician and a third party, not between the musician and Defendants, "does not insulate [Defendants] from §1981 liability." *Daniels v. Pipefitters' Ass'n Loc. Union No. 597*, 945 F.2d 906, 914-15 (7th Cir. 1991). Section 1981 has no "privity of contract requirement." *Id.* at 914. The "relationship between the plaintiff and the third party-interferer is irrelevant; as long as the interference prevents or impedes the formation of a

contract, it is covered by section 1981." *Vakharia v. Swedish Covenant Hosp.*, 765 F. Supp. 461, 471 (N.D. Ill. 1991).

Defendants cannot "absolve [themselves] of responsibility for overseeing a job referral system that discriminates on account of race" under §1981 "by pointing out that [Plaintiffs] could have sought jobs on [their] own." *Malone v. Pipefitters' Ass'n*, 774 F. Supp. 490, 493 (N.D. Ill. 1991). Even if Lynch received some opportunities outside MUSE's directory or through RISE's directory, he has a claim under §1981 because Defendants' discrimination barred him from getting opportunities through MUSE and reduced his opportunities on RISE. *See, e.g.*, *Vakharia*, 765 F. Supp. at 471 (§1981 covers an "alleged reduction in the quantity" of contracting opportunities with third parties); *Daniels*, 945 F.2d at 914-15 (§1981 bans defendants from preventing individuals from "forging new contracts with employers *through referrals*" (emphasis added)). "Put differently, a plaintiff can state a claim under §1981 by alleging that defendant imposed an additional burden on a [race], even if some members of the [race] are able to overcome that burden." *Juarez v. Nw. Mut. Life Ins. Co.*, 69 F. Supp. 3d 364, 370 n.9 (S.D.N.Y. 2014). Because Plaintiffs plausibly allege that Defendants' use of "race" is "a but-for cause" of their inability to contract with more employers through the directories, Defendants are liable for blocking Plaintiffs' access to those third-party contracting opportunities under §1981. *Moody v. Queens Ballpark Co.*, 838 F. Supp. 3d 299, 309-11 (E.D.N.Y. 2026); *see* Am.-Compl. ¶77, ¶¶86-88.

Maestra does not respond to this independent basis for applying §1981; and while MUSE arguably responds to it, its oblique response cites no cases and contradicts its own

position. MUSE seems to argue that, even if MUSE had allowed Lynch to join its directory, the odds that an employer would have used the directory to hire Lynch are speculative. *See* MUSE-MTD 12. But MUSE doesn't get to make that argument, especially at the pleading stage. MUSE repeatedly touts its directory's ability to get musicians jobs—something the directory does well and why the directory was created and still exists. Am.-Compl. ¶3, ¶50, ¶98; *accord Homepage*, MUSE (archived Oct. 14, 2026), perma.cc/PX8Q-45SG [Ex.21] ("MUSE's mission is to expand opportunities," and "Search here to find people of color who are hirable."). MUSE cannot say its directory gets people jobs and then turn around and say a plaintiff who wants access to those jobs is only speculating. *See Diamond Alt. Energy v. EPA*, 606 U.S. 100, 122-24 (2025).

The exact number and size of contracting opportunities that Lynch would receive if the directories stopped discriminating is not something he must plead at this early stage. At most, it goes to the scope of his damages, a question of relief rather than pleading. *In re Columbia Coll. Rankings Action*, 2024 WL 1312511, at *17 (S.D.N.Y. Mar. 26). Plaintiffs independently seek forward-looking relief. Am.-Compl. prayer (B)-(C). And they have alleged "a substantial risk" that MUSE's exclusion will cause "*future*" harm by preventing them from creating at least one contract with an employer who uses the directory, which is all that's required for forward-looking relief. *City of Perry v. Procter & Gamble Co.*, 188 F. Supp. 3d 276, 284 (S.D.N.Y. 2016); *see* Am.-Compl. ¶¶71-77, ¶¶80-88. MUSE's "'imposition of [its race-based] barrier'" has "denied [Plaintiffs] the opportunity to compete" for those contracts on an equal basis, which lets Plaintiffs challenge this racial exclusion

regardless of whether they will lose a specific "'contract.'" *Gratz v. Bollinger*, 539 U.S. 244, 262, 276 n.23 (2003) (applying §1981). Defendants never address this distinction.

If any doubts remain, Plaintiffs note once again that this case is at the pleading stage. The plausibility standard requires only that "[i]t is possible to read" these agreements and websites the way that Plaintiffs do. *Anthracite Cap. v. MP-555 W. Fifth Mezzanine*, 2004 WL 27722, at *3 (S.D.N.Y. Jan. 6) (Cote, J.); *see, e.g.*, *Fero v. Excellus Health Plan*, 236 F. Supp. 3d 735, 761 (W.D.N.Y. 2017) (finding the low bar of plausibility satisfied because "the statements from the privacy policies identified by Plaintiffs plausibly could be read to reflect a definite promise"). And any "ambiguity," including on questions like "consideration," must be resolved in Plaintiffs' favor. *Anthracite*, 2004 WL 27722, at *3. Defendants' arguments all ask this Court to resolve the facts and construe the relevant arrangements in their favor. That debate should be "renew[ed]" later, after "discovery." *Id.* at *4.

### B. All three directories plausibly violate Title VII. [Count IV]

Title VII makes it illegal for an "employment agency" to "classify or refer for employment any individual" or to "fail or refuse to refer for employment, or otherwise to discriminate against, any individual" based on race or sex. 42 U.S.C. §2000e-2(b). MUSE and Maestra do not deny that all three directories classify candidates based on race and sex and refuse to provide equal services to candidates based on race and sex. Am.-Compl. ¶¶99-101; *see L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 709 (1978) (employment agencies' "classifications based on sex … or race" violate Title VII); *Pegues v. Miss. Emp. Serv.*, 699 F.2d 760, 768-69 (5th Cir. 1983) (employment agencies' refusing to refer candidates for certain jobs based on sex violates Title VII).

MUSE and Maestra raise only one-and-a-half arguments for dismissing Lynch's Title VII claim. The one argument is that these defendants are not "employment agencies." *See* MUSE-MTD 15-17; Maestra-MTD 18-19. The half argument—too undeveloped to be preserved—is that Lynch did not timely exhaust his administrative remedies with the EEOC. *See* MUSE-MTD 14-15; Maestra-MTD 18 n.6. Neither argument works.

**i. Defendants plausibly are employment agencies.**

The complaint plausibly alleges that MUSE and Maestra act as employment agencies. The question is not whether MUSE and Maestra *are* employment agencies. At this stage, the question is whether Plaintiffs' allegations are sufficient to infer that Defendants "at least may be" employment agencies when they operate their discriminatory directories. *Scaglione v. Chappaqua Cent. Sch. Dist.*, 209 F. Supp. 2d 311, 316 (S.D.N.Y. 2002). Plaintiffs clear that pleading bar. Under Title VII, an "employment agency" includes "any" entity that is "regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer." 42 U.S.C. §2000e(c). Defendants plausibly meet this definition.

Defendants do not contest that their directories "regularly" lead to employment. *Id.* Per the complaint, all three directories regularly facilitate the employment of "orchestra members" and "musicians" by "music director[s]," "music coordinator[s]," and "composer[s]," as well as the employment of "music director[s]" by theaters. *See* Am.-Compl. ¶¶48-50 (giving specific examples). Maestra and MUSE agree. Maestra concedes that employers "frequently us[e] the Maestra Directory when looking for musicians" to employ. ¶48. On the directories themselves, MUSE has musicians fill out fields like "Interested in

touring?" and "Hireable as." *Ju MUSE Profile*. Both MUSE and Maestra call their curated postings "jobs." *MUSE Post a Job*; *Maestra Post a Job*. And Maestra has successfully encouraged industry employers to "start" "each hiring process" by searching RISE—which, tellingly, stands for "Representation, Inclusion, and Support for *Employment*." Am.-Compl. ¶49. RISE has "120+ job categories" and "connect[s] candidates" with "potential employers." *FAQ*, RISE, perma.cc/TX4G-GSUM (archived Oct. 14, 2026) [Ex.22].

The opportunities that these directories facilitate are overwhelmingly for employment. State law defines these "professional musician[s]" and people "otherwise engaged in the performing arts" as employees. N.Y. Lab. Law §511(1)(1-a); N.Y. Workers' Comp. Law §2(4). And in any case, the "principal guidepost" of employment—"the common-law element of control"—is satisfied when Broadway productions hire professional musicians. *Gulino v. N.Y. Educ. Dep't*, 460 F.3d 361, 371 (2d Cir. 2006); *see Caudill v. N.C. Symphony Soc'y*, 750 F. Supp. 3d 531, 550-52 (E.D.N.C. 2024) (allowing symphony musicians to sue under Title VII). It's hard to think of a profession where more of the work is performed under the "direction" of a "producer." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 741 (1989).

The directories also "procure" employment opportunities. 42 U.S.C. §2000e(c). Entities that maintain lists of prospective employees with the purpose of matching them with prospective employers are employment agencies if they "decid[e] what names are on the lists and by what criteria those names will be chosen." *Scaglione*, 209 F. Supp. 2d at 317. Even "newspapers that exercise control over discriminatory job listings rather than merely

printing them" are employment agencies. 1991 WL 11665181, at *2 (EEOC Sept. 20); *accord, e.g.*, *Morrow v. Miss. Publishers Corp.*, 1972 WL 236, at *3 (S.D. Miss. Nov. 27) (newspaper that "participates in the decision" to classify job listings based on protected characteristics is an employment agency).

Per the complaint, the directories take an active role in screening, classifying, and referring employees to employers. MUSE and Maestra do not simply publish job listings. They screen every applicant and do not admit or display a candidate's profile until the candidate's application has been reviewed and approved. Am.-Compl. ¶¶96-97. By enforcing registration criteria, MUSE and Maestra control which employee names "are on the lists" of candidates and which employees "will be chosen." *Scaglione*, 209 F. Supp. 2d at 317. MUSE and Maestra also "revie[w]" and must "approv[e]" the jobs that employers can post on the directory, using Defendants' designed forms. *MUSE Post a Job*; *Maestra Post a Job*; Am.-Compl. ¶29, ¶31, ¶108, ¶110. And "MUSE's leaders make personal references" from its curated candidate pool "when their colleagues in the New York theatre industry reach out with staffing needs." Am.-Compl. ¶50. MUSE also offers its members "exclusive access" to curated employment opportunities, an "exclusiv[ity]" that could be offered only if MUSE first coordinated with an employer. ¶50. The directories are designed and well-positioned to get their people jobs because their leaders "are all music directors, orchestrators, arrangers, composers at the top of our fields." *New Organization*; Am.-Compl. ¶50, ¶98. RISE likewise curates its directory, including by requiring that "[m]embers must have at least one verifiable production credit to appear in searches." *RISE Homepage*. RISE also

classifies employees by protected characteristics and creates mechanisms for "prospective employers" to "filter directory members by race and sex," even encouraging them and showing them how to use these tools. Am.-Compl. ¶47.

Though MUSE and Maestra try to portray themselves as passive publishers of job listings, Maestra-MTD 18-19; MUSE-MTD 15-17, this Court must credit Plaintiffs' facts and draw all inferences in their favor—not read the complaint against Plaintiffs to adopt Defendants' alternative framing. *Havens v. James*, 76 F.4th 103, 116-17 (2d Cir. 2023). Defendants mostly rely on *Gundogdu v. LinkedIn* to deny that they take an active role. 2024 WL 1597781 (11th Cir. Apr. 12). But the Eleventh Circuit relied on forfeiture in *Gundogdu* and thus did not decide whether LinkedIn qualified as an "employment agency" under Title VII. *Id.* at *2. As just explained, MUSE and Maestra take a far more active role than simply "'provid[ing] job-search functionality on [their] platform[s].'" *Id.* at *1 (cleaned up). LinkedIn does not prescreen every profile, approving only the ones that meet its stated demographic and minimum-qualification requirements. LinkedIn does not classify members by race and sex, let alone create and promote mechanisms that let employers filter candidates by those protected characteristics. LinkedIn is not staffed by leaders with hiring power in its members' specific industry. And LinkedIn does not coordinate with employers to procure employment opportunities exclusively for its members or make personal references. Because Plaintiffs allege that Defendants do all those things and more, it is plausible that MUSE and Maestra "'facilitate employment relationships between employers and

employees'" and thus act as employment agencies when operating their directories. MUSE-MTD 15.

**ii. Lynch timely exhausted his administrative remedies.**

While neither defendant makes a developed argument, MUSE suggests (and Maestra might suggest) that Lynch's Title VII claim is untimely. *See* MUSE-MTD 14-15; Maestra-MTD 18 n.6. MUSE claims that its alleged discrimination occurred in August 2023 when Lynch was rejected from the MD Experience, that the 300-day deadline to file a charge with the EEOC was June 2024, and that Lynch filed his charge in August 2025. This argument, which ignores the key facts and makes no attempt to cite or meet the relevant legal standards, is too cursory to be preserved. It is also wrong.

Defendants' timeliness argument is forfeited. Because "filing a timely charge" with the EEOC is "not a jurisdictional prerequisite" to suing under Title VII, timeliness objections are "subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines*, 455 U.S. 385, 393 (1982). Maestra forfeits timeliness by not arguing the point at all—save for a single footnote with no citations, where it argues untimeliness only "[t]o the extent Lynch seeks to assert a claim under Title VII based on the MD Experience" (which he does not). Maestra-MTD 18 n.6.

Though MUSE invokes timeliness above the line, it also forfeits the point by ignoring the key facts and failing to make arguments under the relevant legal standards. MUSE-MTD 14-15; *see Doe v. Trump Corp.*, 6 F.4th 400, 410 (2d Cir. 2021). MUSE says Lynch was late because his lawyer-drafted charge in August 2025 was more than 300 days after Lynch was rejected for the MD Experience—that's it. MUSE-MTD 14-15. MUSE omits that

Lynch's Title VII claims involve not his rejection from the MD Experience, but Defendants' *ongoing* discrimination against him via the directories. Am.-Compl. ¶¶99-101. MUSE also omits that Lynch's lawyer-drafted charge amended a "*pro se* charge" that Lynch "filed with the New York Division of Human Rights on July 11, 2023." Lynch-Decl., Ex. 1 n.1; Doc. 59-1, at 2 n.1. MUSE doesn't dispute that Lynch's pro-se charge satisfied all timeliness requirements, since the NYSDHR dual-filed with the EEOC in August 2023 and the EEOC did not dispose of that charge until August 2026. Lynch-Decl. ¶14 & Ex.2; *see Mayo v. Sec. Indus. Ass'n*, 1995 WL 608291, at *4 n.3 (S.D.N.Y. Oct. 17). Nor does MUSE argue that Lynch's dual-filed charge in 2023 is somehow insufficient under the relation-back or identity-of-interest doctrines (discussed below). This Court should not credit any new theories in Defendants' replies. *See Williamson v. Amica Mut. Ins. Co.*, 2025 WL 1796324, at *3 (D. Conn. June 30).

Even if Defendants had developed a timeliness argument, Lynch's charge was timely. The Second Circuit takes a "flexible stance" toward "Title VII's procedural provisions," since they are "usually triggered by laymen," *Egelston v. State Univ. Coll. at Geneseo*, 535 F.2d 752, 754-55 (2d Cir. 1976); and it takes that "same flexible approach" with both the "filing requirements" and "in interpreting Title VII complaints," *Silver v. Mohasco Corp.*, 602 F.2d 1083, 1090 (2d Cir. 1979), *rev'd in other part*, 447 U.S. 807 (1980). No defendant disputes that Lynch's lawyer-drafted charge from 2025 covers all the Title VII claims he now brings against Maestra and MUSE. That 2025 charge is timely for at least three independent reasons.

First, Lynch's lawyer-drafted charge from 2025 "relate[s] back" to Lynch's pro-se charge from 2023. 29 C.F.R. §1601.12(b). Maestra and MUSE do not mention the relation-back doctrine, let alone dispute that Lynch meets it. He does. An amended charge relates back to the original charge when it amplifies the original allegations or adds conduct that grows out of the original subject matter. *See id.*; *Adames v. Mitsubishi Bank Ltd.*, 751 F. Supp. 1565, 1572-73 (E.D.N.Y. 1990). Lynch's pro-se charge—filed with the NYSDHR in July 2023 and dual-filed with the EEOC in August 2023—alleged that Maestra and MUSE excluded him from their directories because of his race and sex. Lynch-Decl., Ex.1-H. His 2025 charge rests on that same core misconduct: It supplies additional legal theories, but it accuses the same two entities of the same types of discrimination based on their directories. *Compare* Ex.1-H, *with* Ex.1. "Title VII claimants should not be held to the precision of a code pleader." *Silver*, 602 F.2d at 1090; *accord Deravin v. Kerik*, 335 F.3d 195, 202 (2d Cir. 2003) (allowing "'loose pleading'" in EEOC charges). And Defendants do not claim to suffer any "prejudice." *Adames*, 751 F. Supp. at 1573. The lawyer-drafted charge thus relates back to the timely, pro-se charge. Or under a related doctrine, Lynch's broader allegations against the directories are "reasonably related" to the misconduct alleged in his pro-se charge, so Lynch can proceed on those allegations based on his indisputably timely charge from 2023. *Malave v. Bolger*, 599 F. Supp. 221, 222 (D. Conn. 1984) (citing *Goodman v. Heublein, Inc.*, 645 F.2d 127, 131 (2d Cir. 1981)).

MUSE might have argued—but didn't—that Lynch's pro-se charge lists only Maestra in the box for respondent. That argument wouldn't make Lynch's charge untimely as

to MUSE, since pro-se charges are construed liberally and the body of Lynch's charge clearly covers both MUSE and Maestra. Lynch-Decl., Ex.1-H; *see Williams v. NYC Hous. Auth.*, 458 F.3d 67, 71 (2d Cir. 2006) (requiring only that the "factual underpinnings" appear in the body of the charge); 29 C.F.R. §1601.12(b) (charges need only provide "a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of").

Even if MUSE had been omitted entirely, Lynch's charge against Maestra counts as a charge against MUSE because the two have an "identity of interests." *Cook v. Arrowsmith Shelburne*, 69 F.3d 1235, 1241 (2d Cir. 1995). Once again, MUSE does not cite the identity-of-interests standard or make any argument under it. That standard is easily met. Lynch identified MUSE in the body of his charge, which a pro-se party would reasonably deem sufficient—especially since Maestra publicly describes MUSE as its "sister" organization. Am.-Compl. ¶109; Lynch-Decl., Ex.1-H; *see Duverny v. Hercules Med. P.C.*, 2020 WL 1033048, at *9 (S.D.N.Y. Mar. 3) (Cote, J.) (finding identity of interest where one defendant "represented" it "was interchangeable with" the other). The interests of MUSE and Maestra are also "substantially similar," since both run directories that discriminate on a ground that Title VII forbids (race and sex, respectively). *Duverny*, 2020 WL 1033048, at *9; *accord Payne v. McGettigan's Mgmt. Servs.*, 2020 WL 2731996, at *4 (S.D.N.Y. May 26) (Cote, J.) (finding identity of interest where the absent party "exercised control" over the alleged misconduct). MUSE had "notice" of Lynch's charge, as it was represented by the same counsel and its leadership heavily overlaps with Maestra's. *Duverny*, 2020 WL 1033048, at

*9; *see* Lynch-Decl. ¶¶7-9 & Exs.3-4. And MUSE "suffered no prejudice because conciliation before the EEOC was not held." *Payne*, 2020 WL 2731996, at *4; *see* Lynch-Decl. ¶13. "Plaintiff's Title VII claims against [MUSE] may therefore proceed." *Payne*, 2020 WL 2731996, at *4.

Second, Lynch should at least get the benefit of equitable tolling—stopping the clock from his pro-se charge in August 2023 through his lawyer-drafted charge in August 2025. Equitable tolling applies when, for example, "the plaintiff 'actively pursued judicial remedies' but filed a defective pleading during the specified time period." *Brown v. Parkchester S. Condominiums*, 287 F.3d 58, 60 (2d Cir. 2002). Despite proceeding pro se, Lynch acted as diligently as possible, filing his original charge with the NYSDHR and EEOC almost immediately after his inability to be listed on Defendants' directories caused him to miss out on the MD Experience. Lynch-Decl. Ex.1-H. If that pro-se charge was missing certain legal theories or types of misconduct, that kind of uncertainty over how to frame the legal theories or supplement a charge is exactly the sort of understandable confusion that justifies tolling. *Walker v. Linklaters LLP*, 948 F. Supp. 2d 396, 400 (S.D.N.Y. 2013). Defendants also had actual "notice" of Lynch's allegations from the 2023 charge throughout, and they claim no "prejudice" if the time limit is tolled from 2023 to 2025. *Nielsen v. Flower Hosp.*, 639 F. Supp. 738, 748 n.12 (S.D.N.Y. 1986). When Lynch retained counsel in August 2025, the EEOC told his lawyers that they could file a new charge, which would then be treated as "official." Lynch-Decl., Ex.1-J. So an untimeliness ruling would be unfair to Lynch and would serve none of the purposes of the EEOC's exhaustion requirement. *Walker*, 948 F.

Supp. 2d at 400. The period between the 2023 and 2025 charges thus should be tolled, rendering Lynch's lawyer-drafted charge timely.

Third, even looking at Lynch's lawyer-drafted charge in isolation, that charge was timely because it accuses Defendants of a "continuing violation." *Adames*, 751 F. Supp. at 1575. Maestra, for example, does not suggest that August 2025 was too late for Lynch to file a charge with the EEOC over RISE—or make even a suggestion of any untimeliness with respect to RISE. *See* Maestra-MTD 18 n.6. If the argument weren't forfeited, it would fail. With respect to RISE, Lynch claims that Maestra violates Title VII based on its race- and sex-based filtering. Every day that an employer uses RISE to filter musicians based on race or sex, it discriminates against Lynch anew. In other words, because Lynch accuses Maestra of running an ongoing "'discriminatory system,'" "'no discrete act of discrimination, i.e., a hiring, a firing, a refusal to promote, within the charge-filing period is required.'" *Adames*, 751 F. Supp. at 1575. "'[E]ach day during which the discriminatory system exists [i]s a separate violation of Title VII.'" *Id.* For all these reasons, Defendants have no preserved or legitimate timeliness objection under Title VII.

### C. All three directories plausibly violate state and city law. [Counts VII, IX]

Like Title VII, New York's state and city human-rights laws prohibit "an employment agency" from "discriminat[ing] against any individual because of … [his] race, … color, … [or] sex … in receiving, classifying, disposing or otherwise acting upon applications for its services or in referring an applicant … to an employer or employers." N.Y. Exec. Law §296(1)(b); *accord* N.Y.C. Admin. Code §8-107(1)(b) (same). Also like Title VII,

"any person undertaking to procure employees or opportunities to work" qualifies as an "employment agency" under NYSHRL and NYCHRL. N.Y. Exec. Law §292(2); *accord* N.Y.C. Admin. Code §8-102 (same).

As with Title VII, Defendants do not contest that their race- and sex-based directories discriminate within the meaning of these laws. As explained, MUSE and Maestra outright reject applicants from their directories based on race and sex. Am.-Compl. ¶30, ¶28. And all three directories classify employees by race and sex, including through RISE's race- and sex-based filtering. ¶31, ¶¶33-35, ¶87, ¶99. MUSE and Maestra thus intentionally use discriminatory eligibility criteria to refuse to "refe[r] an applicant … to an employer or employers." ¶105, ¶108, ¶110. And RISE discriminates based on race in how it "act[s] upon" and refers candidates to employers, excluding "white" employees from its filters. ¶87. All this alleged misconduct violates both state and city law. *See Cherry v. Stars Model Mgmt.*, 2006 WL 6632706, at *2 (N.Y.C. Com. Hum. Rts. Mar. 7) (employment agency violated city law by announcing that "Blacks are not welcome [or wanted] here"); *Richardson Emp. Agency v. NYSDHR*, 334 N.Y.S.2d 653, 654 (App. Div. 1972) (employment agency violated state law by "code mark[ing] employment applications of black men and women" and "inform[ing] employers of their race").

Employment agencies that themselves impose discriminatory criteria are not insulated from state or city law by the fact that "employers may independently search the directories and decide for themselves whom to contact and whom to hire." *Cf.* Maestra-MTD 19. That defense "would permit an employment agency to discriminate against

prospective job applicants under the guise that they were merely filling the requirements of the prospective employer," an outcome that New York does not tolerate. *Pavillion Agency v. Spitzer*, 802 N.Y.S.2d 879, 883-84 (Sup. Ct. 2005).

Though Defendants again deny they are employment agencies, MUSE-MTD 18-20; Maestra-MTD 20-21, Plaintiffs plausibly allege that they are—for all the same reasons they are employment agencies under Title VII. *Supra* I.B.i. But even if something in the Title VII caselaw gave this Court pause, Plaintiffs' claims under state and city law would remain plausible. The city law "must be construed broadly in favor of plaintiffs alleging discrimination and assessed under more liberal standards, going beyond the counterpart state or federal civil rights laws." *Bennett v. Time Warner Cable*, 138 A.D.3d 598, 599 (2016). And as of 2019, this same liberal construction applies to the state law. *See Deveaux v. Skechers USA*, 2020 WL 1812741, at *3 (S.D.N.Y. Apr. 9) (NYSHRL claims after the statute's 2019 amendments "should be construed liberally 'regardless of whether federal civil rights law, including those laws with provisions worded comparably to the provisions of this article, have been so construed'"). Given this liberal construction, entities can be "employment agencies" under these laws even if they are not under Title VII. *See NYC Comm'n on Hum. Rts. v. Boll*, 1974 WL 2796, at *2 (N.Y. Sup. Ct. Aug. 8) (requiring the statutory definition of "employment agency" to "be liberally construed"). An entity can be an employment agency under these laws even if, for example, it has not been "shown to have actually produced opportunities to work." *Id.* Even clubs that merely meet weekly to provide networking opportunities, career advice, and notice of employment opportunities count under

these laws. *Id.* at *1. And here, the complaint alleges that MUSE and Maestra do far more than that. *See* Am.-Compl. ¶¶95-98, ¶138; *supra* I.B.i.

City law differs from Title VII in one other way that increases the plausibility of Defendants' liability: As explained more fully below, city law bans discrimination in employment *and internships*. Because city law states that its protections "relating to employees apply to interns," N.Y.C. Admin. Code §8-107(23), an entity is an employment agency if it "undertak[es] to procure [interns] or opportunities to [intern]," §8-102. Per the complaint, both Maestra and MUSE regularly procure what even they concede are "internships" on Broadway. Am.-Compl. ¶113. Indeed, MUSE says its "mission" includes facilitating "internships." *MD Experience Application*. And both MUSE and Maestra's directories let employers post jobs, where the listing options are "PAID" or "INTERNSHIP," *MUSE Post a Job*; *Maestra Post a Job*. Because Defendants procure both employment and internships, city law makes them even more plausibly employment agencies.

## II. The complaint states a claim against all Defendants for the Music Director Experience.

Aside from the ongoing discrimination on MUSE's and Maestra's directories, Lynch challenges all three Defendants' past discrimination against him when they excluded him from the MD Experience with Wicked by requiring applicants to be members of MUSE (nonwhite) or Maestra (nonmale). Because the MD Experience was plausibly a contract—duties performed in exchange for money—Plaintiffs state a claim under §1981. And because the MD Experience was plausibly an internship under state and city law, Plaintiffs state a claim under those laws as well.

### A. Defendants plausibly violated §1981. [Count I]

Lynch states a claim under §1981 against all three Defendants based on the MD Experience. Though Wicked and Maestra try to blame MUSE for the racial discrimination, no defendant contests that the MD Experience racially discriminated. It did by requiring membership in either a directory for women or a directory for racial minorities—a requirement that males could satisfy only if they were not white. Am.-Compl. ¶¶25-26, ¶28, ¶30. No defendant contests that requiring membership in MUSE is racially discriminatory; if it weren't, any defendant could "escap[e] liability simply by creating an organization available only to white people and then administering a [program] open only to members of that organization." *HSF*, 2026 WL 2948910, at *17. And no defendant argues that the experience's exclusion of white males is somehow lawful because the experience did not exclude white females. Discrimination based on race and sex is still fully discrimination based on race (and still fully discrimination based on sex). *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010); *Juarez*, 69 F. Supp. 3d at 369-70.

Nor does any defendant contest that the use of race plausibly caused Lynch's injuries, both by making him unable to compete on an equal footing and by denying him the benefits of participating. *See* Am.-Compl. ¶¶64-65. Defendants' motions do not argue that Lynch's application for the MD Experience was denied on race-neutral grounds—an affirmative defense that could not be resolved at the pleading stage anyway. *See Juarez*, 69 F. Supp. 3d at 370-71 (when the defendant has "a policy that expressly discriminates," its argument that "the discrimination was on the basis of X rather than the protected trait …

fails at [the] pleadings stage"); *Landron & Vera v. Somoza-Colombani*, 2013 WL 2422807, at *8 (D.P.R. June 3) (collecting cases).

MUSE does not contest its role in the racial discrimination against Lynch, and Maestra and Wicked cannot get themselves dismissed at this stage by pointing the finger at MUSE. These defendants claim that MUSE is solely responsible for excluding musicians from its directory based on race. *See* Maestra-MTD 12; Wicked-MTD 16-20. But this Court must credit the complaint's allegations, which state that all three Defendants are responsible for their joint decision to make membership in MUSE's directory—which they knew only certain races could join—an eligibility requirement for the MD Experience. As the complaint alleges, all three Defendants were necessary actors in creating and running a program that discriminated based on race and sex. Maestra, Wicked, and MUSE "team[ed] up" to organize and run the MD Experience as a joint "initiative." Am.-Compl. ¶14, ¶¶17-18. Maestra, Wicked, and MUSE "jointly set the rules." ¶63. And like MUSE, Maestra and Wicked exercised their control over the selection process to impose a "blanket ban on white male applicants." ¶63, ¶68, ¶20. Maestra and Wicked were not "unrelated third part[ies]." *Daniels*, 945 F.2d at 915. They were jointly responsible for "rendering Lynch ineligible and denying him a fair opportunity to apply and compete." Am.-Compl. ¶63, ¶11, ¶68, ¶114; *see also CITGO Petroleum Corp. v. Ascot Underwriting Ltd.*, 158 F.4th 368, 390 (2d Cir. 2025) ("There can be multiple but-for causes"). And it doesn't matter which Defendant(s) formally contracted with the winner, since liability under §1981 does not require contractual "privity." *Daniels*, 945 F.2d at 914.

Though Defendants again deny that the MD Experience involved a contract under §1981, their arguments again fail. Defendants sometimes suggest that the MD Experience was not a contract because it was not "employment," Maestra-MTD 8; MUSE-MTD 8-12; Wicked-MTD 12; but that argument is a red herring. "§1981 covers all types of contracts, not just employment contracts." *Patterson v. McLean Credit Union*, 491 U.S. 164, 183 (1989), *abrogated in other part by* Civil Rights Act of 1991, 105 Stat. 1071. The text contains no exception for any kind of "contracts." 42 U.S.C. §1981(a)-(b). When contracts are involved, the statute covers admission to a private preschool, *Runyon v. McCrary*, 427 U.S. 160, 172-73 (1976); grant contests run by nonprofits, *Fearless*, 103 F.4th at 775-76; *AAER v. Founders First*, 2024 WL 3625684, at *1, *3 (N.D. Tex. July 31); admission to a public university, *Gratz*, 539 U.S. at 275-76 & n.23; scholarships run by private associations, *AAER v. ABA*, 2026 WL 161596, at *6-8 (N.D. Ill. Jan. 21); *Do No Harm v. NAEMT*, 2025 WL 973614, at *1-2 (S.D. Miss. Mar. 31); and more.

True, courts once debated whether §1981 might exclude certain contracts; but that debate ended decades ago. In 1978, the district court in *Hollander v. Sears* said, "The Supreme Court has not yet been asked to rule on whether certain kinds of relationships, *although contractual in form*, may be of a kind as not to fall within the ambit of §1981." 450 F. Supp. 496, 504 (D. Conn. 1978) (emphasis added; citing two concurrences from *Runyon*). The *Sears* court remarked that a race-based internship "was not a contract for services *between an employer and employee*," was "not in the strictest sense an *employment* opportunity," and "did not deprive [the plaintiff] of a *job*." *Id.* at 505 (emphasis added). And the court

then resolved the case on other grounds: that the pro-se plaintiff "proved no injury" because he "obtained another summer job which paid him more money" and alleged no other kind of harm, *id.* at 505 & n.15, and that Sears's race-based discrimination was permissible "affirmative action," *id.* at 505-06. The court's musing that some contracts might not be covered by §1981 because they are too unlike employment was later rejected. After Congress broadened §1981 in 1991, the Supreme Court confirmed that "§1981" is "not limited to employment" but broadly "covers *all* contracts." *Rivers v. Roadway Exp.*, 511 U.S. 298, 304 (1994). Defendants' extensive citations to the pre-1991 case *Sears* and their broader focus on employment "overlook" these developments. *Kuriakose v. Mt. Vernon*, 41 F. Supp. 2d 460, 469 (S.D.N.Y. 1999); *cf.* MUSE-MTD 10-12; Wicked-MTD 12-13.*

As Plaintiffs plausibly allege, the MD Experience had the key elements of an ordinary contract: "mutual assent" and "consideration." Maestra-MTD 6. Defendants do not challenge mutual assent, including offer and acceptance. Nor could they. Defendants set the terms of the experience, solicited applications, and chose a winner, who fulfilled the stated duties and received the promised stipend. *See* Am.-Compl. ¶¶14-23, ¶¶38-44, ¶61.

Defendants challenge consideration, but they never deny that *they* gave consideration. They at least offered the winner a valuable experience, and they promised to pay that

* Contra MUSE, *Sears* has not been "upheld" by later decisions. MUSE-MTD 10 n.4 (citing two district-court decisions, which cannot "uphold" anything, *see Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)). Despite its vintage, *Sears* has been cited by other courts only six times—and usually only for its affirmative-action holding. The Second Circuit has cited it once and only for the proposition that a person "who is denied an opportunity to compete for a certain amount of business on account of his race would have a cause of action under 42 U.S.C. §1981." *Fullilove v. Kreps*, 584 F.2d 600, 607 n.11 (2d Cir. 1978), *aff'd sub nom. Fullilove v. Klutznick*, 448 U.S. 448 (1980). On *that* principle, *Sears* remains persuasive.

person a stipend. Am.-Compl. ¶15. Per the application, that stipend was paid for the winner's performance of various "duties," ¶¶15-16, and specifically *not* for "travel" or "housing," *MD Experience Application*. The idea behind the stipend, according to MUSE, was "to round out the 'notoriously underpaid' job" of working as an "assistant" to the musical director. *Broadway Music Leaders Form Coalition to Diversify the Industry*, MUSE, perma.cc/5GJE-EAZR (archived Sept. 30, 2026) (*Broadway Music Leaders*) [Ex.13]. Though Defendants call the stipend "modest," it was $300 per week for 6-12 hours of work over three weeks, meaning as high as $16.67 per hour (higher than the minimum wage in New York City in 2023) or as low as $8.33 per hour (higher than the federal minimum wage in 2023). *See* N.Y. Lab. Law §652(1); 29 U.S.C. §206(a)(1). Regardless, basic contract law says courts cannot assess the adequacy of consideration. The law does "'not even permit inquiry into the adequacy of the consideration,'" *ABA*, 2026 WL 161596, at *6, and "even a peppercorn" is "enough," *Alessi Equip. v. Am. Piledriving Equip.*, 578 F. Supp. 3d 467, 500 (S.D.N.Y. 2022); *accord Lebedev v. Blavatnik*, 42 N.Y.S.3d 511, 517 (App. Div. 2021) ("'The slightest consideration is sufficient to support the most onerous obligation.'").

Though Defendants challenge whether the winner gave consideration, they ignore their own caselaw. As Defendants' few cases from the last half-century explain, the fact that a position is "paid" "creat[es] a strong basis for the existence of a 'contractual relationship.'" *Adam v. Obama for Am.*, 210 F. Supp. 3d 979, 987 n.2 (N.D. Ill. 2016). That out-of-circuit case about an unpaid internship was distinguishing the in-circuit case *Juarez*, where this Court applied §1981 to a *paid* internship. *Id.* Though the *Adam* court noted that

*Juarez* did not expressly "analyze whether the plaintiff has a 'contractual relationship' with the defendant," *Adam* chalked that silence up to the question being easy "because" the position in *Juarez* was "paid." *Id.* Payment overwhelmingly signals consideration, since it "belie[s] any claim" that the services provided are "lacking in value" or were not bargained for by the parties. *Apfel v. Prudential-Bache Sec. Inc.*, 616 N.E.2d 1095, 1097 (N.Y. 1993). Do Defendants really suggest that, after the winner showed up every day and performed all the duties, Wicked could refuse to pay the stipend? Of course not: The winner could sue for breach of contract.

Here, too, the winner of the MD Experience gave consideration. Per Defendants, the winner had to perform several "duties," a word that signifies obligations. Am.-Compl. ¶15. The winner also had to sacrifice valuable time, as the experience was a "3-week intensive shadowing engagement" that required showing up and performing those duties for several hours per week. ¶112, *see* ¶¶15-16, ¶61. Though Defendants say the winner's contributions did not benefit Defendants, that argument again ignores basic contract law. Consideration requires only "a benefit to the promisor *or* a detriment to the promisee." 17A Am. Jur. 2d Contracts §101 (emphasis added); *accord Werner v. Werner*, 154 N.Y.S. 570, 575 (App. Div. 1915) ("There is consideration if the promisee does anything legal which he is not bound to do, or refrains from doing anything which he has a right to do, whether there is any actual loss or detriment to him or actual benefit to the promisor"). That principle is (literally) hornbook law. *See Hamer v. Sidway*, 124 N.Y. 538, 545 (1891). The winner of the MD Experience suffered a detriment by coming to Wicked for several hours over three

weeks and performing the duties demanded. *See Fearless*, 103 F.4th at 775 (agreeing to do "a particular thing" is consideration). And the parties bargained for that detriment, which is why Defendants expressly tied the payment of the stipend to the performance of those duties. Am.-Compl. ¶¶15-16, ¶¶60-61. Again, do Defendants really suggest that, if the winner of the MD Experience had not shown up or refused to do anything Wicked required, Wicked still would have paid the winner the stipend? Again, no. ¶61.

In all events, Defendants did benefit from this arrangement. *See* 3 *Williston on Contracts* §7:19 (4th ed.) (explaining that, where "the promisee has incurred a detriment" or "conferred a benefit on the promisor," courts are "loath to regard the promise as a mere gratuity and the detriment incurred or benefit conferred as merely a condition"). By making membership in MUSE or Maestra's directories an eligibility requirement, those defendants both grew their directories by inducing new musicians to join (as Lynch tried to do) and enhanced the value of their directories by creating exclusive opportunities with prominent Broadway productions for existing members. Am.-Compl. ¶60. Wicked also got the winner's services, as well as a close professional connection with an "aspiring music directo[r]" who learned its "boo[k]"—which, no surprise, in fact led to the winner ultimately getting hired to perform with Wicked. ¶15, ¶44, ¶60. And all Defendants "utilized the prestige of the 'contest' and used the perso[n] of the [winner] in their" own materials. *Shapiro v. Prudential Theaters*, 328 N.Y.S.2d 28, 29-30 (Dist. Ct.), *aff'd*, 75 Misc. 2d 752, 348 N.Y.S.2d 812 (App. Term 1972); *accord Cobaugh v. Klick-Lewis, Inc.*, 561 A.2d 1248, 1250 (Pa. Super. Ct.

1989) (defendant "benefitted from the publicity" and induced entrants to "perform an act [they] were under no legal duty to perform"); *see, e.g.*, Am.-Compl. ¶36.

At the very least, the MD Experience was a contest—which alone would make it a contract under §1981. Am.-Compl. ¶¶62-63. If Defendants are right that the MD Experience was not a job or even an internship, then it must have been a contest—a prize for the winner who crafted the best submission. Contra Maestra, the Federal Rules let Plaintiffs plead alternative theories, even logically inconsistent theories, *Adler v. Pataki*, 185 F.3d 35, 41 (2d Cir. 1999), "especially … in civil rights cases," *Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95 (2d Cir. 1994). And pleading this way does not "highlight" anything about Plaintiffs' lead theory that, because the MD Experience was a paid position with duties, it was a contract. *Cf.* Maestra-MTD 9 n.4. Nor are Plaintiffs being inconsistent. Their point is simply that, even assuming the Court could credit Defendants' alternate framing of the facts, the MD Experience would remain a contract.

Though the parties will develop the facts in discovery, the contest theory is at least plausible. Contests are typically "unilateral" contracts, where the operator offers a chance to win a prize and the contestant accepts via performance. *Ermolaou v. Flipside, Inc.*, 2004 WL 503758, at *3 (S.D.N.Y. Mar. 15); *Moreno v. Marbil Prods.*, 296 F.2d 543, 544 (2d Cir. 1961). Defendants made the offer here not only by advertising the experience, but also by soliciting applications via a formal online form and describing the rules and expectations on many websites. Am.-Compl. ¶¶14-19, ¶¶25-26, ¶38; *cf.* Maestra-MTD 2-3. Defendants also described the MD Experience in the language of winning a contest: Both Defendants

and Ju used the term "winner." *E.g.*, *Ju Maestra Profile* (emphasis added); *Ju MUSE Profile* (emphasis added); Lynch-Decl. Ex.10 ("MUSE and Maestra are excited to announce the inaugural winner of the Music Director Experience with the Broadway blockbuster @wicked_musical"); Am.-Compl. ¶36, ¶43.

Maestra tries to distinguish the MD Experience from other contests that discriminated based on race, but none of its distinctions matter under the law of contracts. It doesn't matter if the prize was "substantial," *contra* Maestra-MTD 9-10, though a one-on-one intensive with the music director of one of the biggest Broadway shows is substantial (especially when also compensated with money), Am.-Compl. ¶15, ¶43, ¶135; *see Secured Worldwide LLC v. Kinney*, 2015 WL 1514738, at *21 (S.D.N.Y. Apr. 1) (consideration can be "nominal"). And it doesn't matter if the rules were contained in a single "document," *cf.* Maestra-MTD 10, though the rules here were written down on many websites, Am.-Compl. ¶¶14-23, ¶¶25-26, ¶38; *see* 22 *N.Y. Jur. 2d Contracts* §33 ("An offer may be made by words or acts. No particular form is necessary"); *Shapiro*, 328 N.Y.S.2d at 29 (contest created by a "promotional campaign" of various "ads and circulars"). Those rules involved "an express exchange of rights," *cf.* Maestra-MTD 11, where applicants agreed to submit essays and other audition pieces by stated deadlines and perform the stated "duties" at specific times—and in exchange Defendants agreed to give "priceless" opportunities and a "paid weekly stipend," Am.-Compl. ¶43, ¶60. And this program, like the one in *Fearless Fund*, was entirely closed to white males—even though Lynch was briefly able to submit a futile application. *Cf.* Maestra-MTD 4; *see* Am.-Compl. ¶¶32-35.

MUSE and Wicked again dispute whether the winner gave "consideration," MUSE MTD 14; Wicked MTD 9-10, but those arguments again fail. As MUSE concedes, "the 'prize' was the experience itself." MUSE-MTD 14. But to get that prize, the winner had to incur many detriments, including registering with a directory, drafting an original essay, playing a musical number, and—most importantly—showing up and performing the listed "duties." Am.-Compl. ¶¶60-62. "[M]any" contests are "unilateral offers to contract that can be accepted by performance," including contests—like the one in *Founders First*—where "'the program offer[ed] contestants a [benefit] *in exchange for their time*.'" *HSF*, 2026 WL 2948910, at *13 (quoting *Founders First*, 2024 WL 3625684). As explained, the time spent carrying out the winner's duties was either a detriment to the winner, a benefit to Defendants, or both. And again, Defendants could have been sued for breach of contract if a person went through this process, got selected, was ready to perform all the duties, and then was arbitrarily told to go home with no experience or stipend. *See Shapiro*, 328 N.Y.S.2d at 28-30. By excluding Lynch from competing for this contract, Defendants plausibly violated §1981.

### B. Defendants plausibly violated state and city law. [Counts V-VI, VIII]

Both the state and city human-rights laws "forbid discrimination on the basis of race and sex against an 'intern.'" Wicked-MTD 21. Though the city's law is phrased in terms of employees, the law makes clear that "[t]he protections of this chapter relating to employees apply to interns." N.Y.C. Admin. Code §8-107(23). And all agree that, when the state human-rights law is violated, §40-c of the New York State Civil Rights Law is also

violated. *Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 353 (E.D.N.Y. 2008); *see* Am.-Compl. ¶122; Maestra-MTD 22; MUSE-MTD 23-24; Wicked-MTD 25-26.

Defendants don't dispute that, if the MD Experience was an internship, then Defendants violated these laws' bans on limiting internships based on race or sex. N.Y. Exec. Law §296-c(2)(a)-(b); N.Y.C. Admin. Code §8-107(23). By requiring membership in MUSE's directory (that excludes whites) or Maestra's directory (that excludes males), Defendants ran an internship that excluded one race and sex. Am.-Compl. ¶17, ¶20, ¶26, ¶¶28-30. Once again, Wicked cannot escape liability by foisting all responsibility onto MUSE and Maestra. *Cf.* Wicked-MTD 23-26. While MUSE and Maestra chose to exclude whites and males from their directories, all three Defendants intentionally chose to make membership in those directories a requirement for the MD Experience. Am.-Compl. ¶17, ¶20, ¶114, ¶136. It is hard to fathom how Wicked can disclaim responsibility for the MD Experience *with Wicked*. Its attempt to pass the buck not only impermissibly contradicts the complaint, but also makes no difference under state or city law. These laws make Defendants equally liable for "[a]iding and abetting" each other's violations. N.Y.C. Admin. Code §8-107(6); N.Y. Exec. Law §296(6).

Defendants also don't dispute that, if the MD Experience was an internship, then Defendants violated the bans in these laws on circulating any statement expressing a race- or sex-based limitation on internships. N.Y. Exec. Law §296-c(2)(c); N.Y.C. Admin. Code §8-107(1)(d). Wicked, MUSE, and Maestra published advertisements for the MD Experience that limited applications to members of the MUSE and Maestra directories, which

again are expressly closed to one race or one sex. Am.-Compl. ¶¶15-23. Defendants don't deny that they ran those ads or that those ads expressed a race- and sex-based eligibility requirement. Though Wicked claims it "did not circulate or cause to be circulated any discriminatory advertisement in violation of either the NYSHRL or NYCHRL," it just repeats its argument that the MD Experience was not an "internship" to begin with. Wicked-MTD 24-25; *see also* MUSE-MTD 23 (same). Or it is trying to impermissibly contradict the complaint's specific allegations that Wicked did circulate and cause to be circulated these discriminatory ads. *See* Am.-Compl. ¶¶21-23, ¶17.

Plaintiffs plausibly allege that the MD Experience was an internship. "Intern" is a defined term in state and city law, and Defendants challenge only whether Plaintiffs alleged that the winner of the MD Experience performed "work" under those definitions. N.Y. Exec. Law §296-c(1)(a)-(b); N.Y.C. Admin. Code §8-102; *see* MUSE-MTD 22-23; Maestra-MTD 17-18; Wicked-MTD 21-23. The complaint plausibly does so. Defendants themselves said that the winner, among many other "duties," would be "*working with* the Music Director one on one." Am.-Compl. ¶112 (emphasis added). Those "duties" also included "playing," "conducting," and "studying one of the keyboard books from the show"—all work for a musician. ¶112. Defendants called all these duties "intensive." ¶15. And though Defendants did not necessarily pay "wages," N.Y. Exec. Law §296-c(1)(b), the winner was paid a stipend, revealing both that the winner contributed value to Wicked, Am.-Compl. ¶61, and that the experience was no mere "networking" opportunity (people aren't usually paid to network), *cf.* MUSE-MTD 22. That the stated criteria said some music directing

experience was "necessary to be considered" likewise bolsters Plaintiffs' allegations that the winner was expected to contribute, not just sit back and watch. Am.-Compl. ¶39; *cf.* Maestra-MTD 17-18; MUSE-MTD 11-12. And still today, MUSE says a "strong *work* ethic" and an "ability to *work* well with others" are "eligibility" requirements for the MD Experience. *MUSE Mentorship Programs* (emphases added). MUSE also designed the program to be a "fellowship to assist music assistants of color." *Broadway Conductors & Arrangers Will Foster Inclusion in the Pit*, MUSE, perma.cc/G6NL-N64J (archived Sept. 30, 2026) [Ex.12]. Per MUSE, a music assistant "work[s]" with people on Broadway shows, and these "hires often go on to conduct that show and others, and eventually take on musical director positions." *Broadway Music Leaders*. The winner of the MD Experience did just that. Am.-Compl. ¶¶40-43.

Defendants distort these statutes by construing "work" to require work akin to employment—even asking this Court to consult the definition of work under state and federal labor law, which "apply only to employees." *Glatt v. Fox Searchlight Pictures*, 811 F.3d 528, 534 (2d Cir. 2016); *see* MUSE-MTD 20-24; Maestra-MTD 14-18; Wicked-MTD 20-24. That argument flies in the face of the 2014 amendments to New York's human-rights laws. In 2013, this Court held that the city law applied only to "employees" and did "not extend to unpaid interns." *Wang v. Phoenix Satellite Television US*, 976 F. Supp. 2d 527, 537 (S.D.N.Y. 2013). In direct response to *Wang*, the state and city legislatures amended the human-rights laws to expressly cover interns. *See Hughes v. Twenty-First Century Fox*, 304 F. Supp. 3d 429, 445 (S.D.N.Y. 2018) ("The 2014 amendments were designed to protect … internships");

*Sandler v. Benden*, 129 N.Y.S.3d 259 (Sup. Ct. 2020) ("Executive Law 296 was amended on July 22, 2014 to include unpaid interns."), *aff'd as modified*, 159 N.Y.S.3d 677 (App. Div. 2022). As Defendants' cases confirm, "the NYSHRL" and "the NYCHRL" now protect "'interns,'" who are "non-employees.'" *Areu v. Fox News Network*, 2021 WL 4124226, at *10 (S.D.N.Y. Sept. 9). So importing definitions of "work" from statutes covering employment would unravel this legislative overhaul. Indeed, the state human-rights law *denies* the applicability of labor law, precisely because there is no "employment relationship between an employer and an intern." N.Y. Exec. Law §296-c(5). And it requires that interns *not* do "work" that "regular employees" do. §296-c(1)(c)(3).

As state and city law make clear, the relevant "work" for purposes of the bans on discrimination in internships is the work of an intern. The relevant "employment" is "employment as an intern." N.Y. Exec. Law §296-c(2)(a)-(b). And the relevant "work" is "for the benefit of the person performing the work," §296-c(1)(c)(2), with no requirement that it also be "for the benefit of the employer," *cf.* Maestra-MTD 17; MUSE-MTD 22; Wicked-MTD 21-22. When describing the work of an intern, the laws say the work provides "training" for the intern, enhances "the employability of the intern," and "provides experience for the benefit of the [intern]." N.Y. Exec. Law §296-c(1)(c)(1)-(2); N.Y.C. Admin. Code §8-102. All these benefits are intern-focused, and benefit to the employer is conspicuously absent from the list.

These intern-focused benefits were all present with the MD Experience. The MD *Experience* of course provided "experience" to the winner. Am.-Compl. ¶112; N.Y.C.

Admin. Code §8-102. Even if the program had involved only "shadowing," "mentorship," and "observation," *cf.* Maestra-MTD 17; MUSE-MTD 21; Wicked-MTD 22, those activities are classic features of internships, as they are a valuable form of "training," "experience," and "educatio[n]," N.Y.C. Admin. Code §8-102; N.Y. Exec. Law §296-c(1)(c). And enhancing the winner's "employability" was the MD Experience's conceded purpose. N.Y. Exec. Law §296-c(1)(c); N.Y.C. Admin. Code §8-102. The experience was for "aspiring music directors" and was designed to create a "pipeline" that would give them a "big leap" in their "journey" to become a music director. Am.-Compl. ¶15, ¶112; *accord Broadway Music Leaders* (MUSE calling music-assistant fellowships "a critical inroad to the industry").

In short, Defendants created a program to help aspiring music directors get experience and training that would, in turn, help them get hired as music directors. The winner of this experience did, in fact, get training and experience that did, in fact, turn into employment as a music director. It is telling that Defendants' only response to this claim is to change the definition of intern until it means employee again, reverting New York to the state of law before the 2014 amendments protected interns. That move will not be permissible at any stage, and Defendants' attempt to have this Court credit their spin on the facts is not permissible at this stage.

## III. This Court should not dismiss without leave to amend.

Defendants do not ask this Court to grant their motions to dismiss without leave to amend. Out of an abundance of caution, Plaintiffs ask the Court not to deny leave to amend sua sponte. If the Court is inclined to dismiss any claim or theory, its dismissal should grant leave to amend, *e.g.*, *Ritchie Cap. Mgmt. v. Coventry First LLC*, 2007 WL 2044656, at *3 n.2

(S.D.N.Y. July 17) (Cote, J.)—or at least not deny leave to amend before letting Plaintiffs file a motion for leave to amend and a proposed amended complaint after they have the benefit of this Court's ruling.

Rule 15(a)(2) directs courts to "freely give leave" to amend "when justice so requires." When a motion to dismiss is granted, "the usual practice is to grant leave to amend"; and "[w]here the possibility exists that the defect can be cured, leave to amend at least once should normally be granted." *100,000 Victim Fams. Note Holders v. Schulte Roth & Zable*, 108 F. Supp. 2d 252, 256 (S.D.N.Y. 2000). Absent undue delay, bad faith, repeated failure to cure, prejudice, or futility, a refusal to grant leave "is merely [an] abuse of … discretion." *Williams v. Citigroup*, 659 F.3d 208, 213-14 (2d Cir. 2011). Plaintiffs must be given "every opportunity to cure a formal defect in the pleading" because the Federal Rules adopt a "policy of deciding cases on the basis of the substantive rights involved rather than on technicalities." 5B Fed. Prac. & Proc. Civ. §1357 (Wright & Miller, 4th ed.). Courts are especially unlikely to deny leave to amend when, as here, the suit implicates civil rights. *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991).

Leave to amend should not be denied here, let alone before Plaintiffs file a motion for leave to amend and attach a proposed amendment that reacts to this Court's decision. Amendment is futile only if the proposed claim "could not withstand" another "motion to dismiss," *Lucente v. IBM*, 310 F.3d 243, 258 (2d Cir. 2002), and it is not "possible that [the plaintiff] could allege additional facts" sufficient to state a claim, *Panther Partners Inc. v. Ikanos*

*Commc'ns, Inc.*, 681 F.3d 114, 118 (2d Cir. 2012). Courts are not well positioned to "opine in the abstract" about futility. *Ali v. Al-Nahyan*, 808 F. Supp. 3d 88, 139 (D.D.C. 2025).

No futility likely exists, especially if the Court dismisses on the ground that Plaintiffs failed to allege enough facts on some point. Failing to include enough facts is not the sort of "substantive" bar that "better pleading will not cure." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). And as the parties' briefs reveal, Defendants' websites are replete with statements bolstering their liability. Plaintiffs and Defendants think this Court can consider those websites now. *See, e.g.*, MUSE-MTD 7 n.2; Wicked-MTD 1 n.1; *Geinosky*, 675 F.3d at 745 n.1. But if this Court disagrees, Plaintiffs could add them to a second amended complaint. *See Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 26 (2d Cir. 1988) (when "no answer had been filed," plaintiffs and courts can treat outside evidence "in response to the 12(b)(6) motion" as "an amendment to the complaint").

Nor have Plaintiffs engaged in any "repeated failure to cure." *Citigroup*, 659 F.3d at 213-14. Though this Court warned Plaintiffs that further amendments would be unlikely, Doc.50, that warning prompted Plaintiffs to get the EEOC to quickly issue right-to-sue letters, Lynch-Decl. ¶13—meaning Plaintiffs have pleaded their Title VII claims only once. And for all claims, this Court has not yet granted "leave to amend at least once," *100,000 Victim Fams.*, 108 F. Supp. 2d at 256, since Plaintiffs' first amendment to the complaint was as of right, *see* Doc.50 (citing Fed. R. Civ. P. 15(a)(1)(B)). Plaintiffs have also never been given leave to amend with the benefit of a reasoned dismissal from this Court. *See* Doc.55 (denying Defendants' first motions only as moot). "Without the benefit of a ruling, many

a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, 797 F.3d 160, 190 (2d Cir. 2015). So if the Court grants any part of Defendants' motion to dismiss, it should either grant leave to amend (or not preemptively deny leave to amend) so that Plaintiffs can make one attempt to cure any pleading deficiencies that the Court identifies.

## CONCLUSION

This Court should deny the motions to dismiss.

Respectfully submitted,

Dated: October 14, 2026

*/s/ Cameron T. Norris*

Thomas R. McCarthy*
Cameron T. Norris*
Daniel M. Vitagliano†
(SDNY Bar No. 5856703)
Tyler A. Dobbs*†
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
tom@consovoymccarthy.com
cam@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
tdobbs@consovoymccarthy.com

* *pro hac vice*
† supervised by principals of the firm admitted in Virginia

## CERTIFICATE OF COMPLIANCE

This brief complies with this Court's order allowing Plaintiffs to file a single brief of no more than 50 pages. Doc.65.

Dated: October 14, 2026 *_/s/ Cameron T. Norris_*